1

**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415)-777-5189
Email: scera@cerallp.com

**KLAFTER OLSEN & LESSER LLP**
Jeffrey A. Klafter (*pro hac vice to be requested*)
Seth R. Lesser (*pro hac vice to be requested*)
2 International Drive, Suite 350
Rye Brook, New York 10570
Telephone: (914) 934-9200
Facsimile: (914) 934-9200
Email: JAK@klafterolsen.com
Email: Seth@klafterolsen.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter (*pro hac vice to be requested*)
570 Lexington Avenue, 16th floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
Email: jfruchter@wohlfruchter.com

***Counsel for Plaintiff and the Proposed Class***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>            v.<br><br>FACEBOOK, INC.<br><br>                              Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF CAL. BUSINESS AND PROFESSIONS CODE §17200 ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff IntegrityMessageBoards.com, LLC, individually and on behalf of all others similarly situated, by and through its counsel, and upon personal knowledge as to facts known to Plaintiff, and as to all other facts upon information and belief following investigation of counsel, alleges as follows against Defendant Facebook, Inc. ("Facebook").

## INTRODUCTION

1.      Facebook is one of the world's largest social media services companies, and provides its users with an online platform ("Platform") to stay connected with family and friends through the sharing of photos, videos and other content.

2.      As of June 30, 2018, Facebook reported 2.23 billion monthly active users, and 1.47 billion daily active users on average for June 2018.[1]

3.      Facebook does not charge users to access the Platform. Instead, it generates substantially all of its revenue from selling advertising on the Platform to businesses seeking to market their products and services to Facebook users. During 2017, Facebook generated $40.65 billion in revenue, of which $39.94 billion was advertising revenue.[2]

4.      To fuel its massive advertising revenues, Facebook collects vast amounts of data concerning its users. For example, on April 11, 2018, Facebook's founder and CEO, Mark Zuckerberg ("Zuckerberg"), testified before the Energy and Commerce Committee of the United States House of Representatives ("House Testimony").[3] During an exchange with Zuckerberg, Congressman Ben Ray Luján cited reports that Facebook has as many as 29,000 data points for an average Facebook user.

---

[1] https://newsroom.fb.com/company-info/ (last accessed August 20, 2018). Facebook defines a daily active user (DAU) as a registered Facebook user who logged in and visited Facebook through its website or a mobile device, or used its Messenger application (and is also a registered Facebook user), on a given day. (Facebook, Form 10-K, for the fiscal year ended December 31, 2017 ("2017 10-K"), at 35). Facebook defines a monthly active user (MAU) as a registered Facebook user who logged in and visited Facebook through its website or a mobile device, or used its Messenger application (and is also a registered Facebook user), in the last 30 days as of the date of measurement. (*Id.* at 36). Facebook views DAU's, and DAUs as a percentage of MAUs, as measures of user engagement, and MAU's as a measure of the size of its global active user community. (*Id.* at 35-36).

[2] 2017 10-K, at 34.

[3] *See* https://energycommerce.house.gov/hearings/facebook-transparency-use-consumer-data/ (last accessed August 27, 2018); https://www.washingtonpost.com/news/the-

5.      Facebook collects user data such as age, gender, work, education and location when a user activates or updates their account. Facebook captures additional data concerning its users' interests and behaviors when individuals communicate with each other and share content on the Platform. Finally, until recently, Facebook acquired data concerning user demographics such as household income and home ownership from third party data providers ("Third Party Data").[4]

6.      In his testimony to Congress on April 10-11, 2018, Zuckerberg repeatedly stated that Facebook does not sell any user data to marketers. Instead, Facebook purports to use such data to display ads to Facebook users for products and services that such users are likely to buy based on criteria such as age, location, education, household income and homeownership. Advertisers provide Facebook with a profile of the people they want to target, and Facebook then purports to display ads to that target audience.

7.      As Zuckerberg explained in his testimony on April 10, 2018, to the Senate's Committees on the Judiciary, and Commerce, Science and Transportation ("Senate Testimony"):[5]

> What we allow is for advertisers to tell us who they want to reach, and **then we do the placement**. So, if an advertiser comes to us and says, "All right, I am a ski shop and I want to sell skis to women," then we might have some sense, because people shared skiing-related content, or said they were interested in that, they shared whether they're a woman, and **then we can show the ads to the right people** without that data ever changing hands and going to the advertiser. That's a very fundamental part of how our model works and something that is often misunderstood. So I'm -- I appreciate that you brought that up.

---

switch/wp/2018/04/11/transcript-of-zuckerbergs-appearance-before-house-committee/?utm_term=.3b8e0e116d7b (last accessed August 27, 2018).

[4] On March 28, 2018, Facebook announced the termination of its Partner Categories program. As a result, as of August 15, 2018, Third Party Data such as household income and home ownership was no longer available to advertisers as targeting criteria. Facebook further stated that as of October 1, 2018, no ads will be delivered based on Third Party Data. (*See* https://newsroom.fb.com/news/h/shutting-down-partner-categories/ and https://www.facebook.com/business/help/298717656925097) (last accessed August 20, 2018).

[5] *See* https://www.judiciary.senate.gov/meetings/facebook-social-media-privacy-and-the-use-and-abuse-of-data (last accessed on August 27, 2018); https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?utm_term=.08d8f25b84bf (last accessed August 27, 2018).

8.     Businesses advertising on Facebook use its self-serve ad interface, Ads Manager, to launch and manage their advertising campaigns.[6] Ads Manager provides interfaces that walk advertisers through all of the steps necessary to create and launch ads on the Platform. One of those interfaces asks advertisers to define a target audience they wish to reach based on criteria such as age, location, education, and prior to August 15, 2018, household income and home ownership.

9.     However, a 2016 survey of over 2,600 small business owners, and Plaintiff's analysis of its own Facebook ad campaign results (and surveys of Facebook users who responded to its ads), show that despite (i) providing advertisers with a tool in Ads Manager to define target audiences, and (ii) representing that it will display ads to the defined target audiences, Facebook deceived, and continues to deceive advertisers by programming its software to display a material percentage of ads to users who fall *outside* the target audiences defined by advertisers, and then charging advertisers for those mistargeted ads, in order to maximize its own revenue (beyond what it could have otherwise earned solely from legitimately targeted ads).

10.    Indeed, Plaintiff's analysis of its own Facebook campaign results showed that at various points approximately 40% or more of its ads were apparently displayed to users who fell outside of Plaintiff's defined target audiences, resulting in accuracy of 60% or less at a time when Facebook was representing that its ad targeting was 89% accurate.

11.    As a result of Facebook's programmatic disregard of advertisers' targeting instructions in order to maximize Facebook's ad revenue, Plaintiff and other advertisers paid for a material number of ads for which they would not have agreed to pay anything at all had they known the truth, and have been injured thereby.

12.    On account of Facebook's deceptive and misleading promotion of the audience targeting tool in its Ads Manager and deceptive and misleading practice of programmatically displaying a material percentage of ads to users outside of advertisers' defined target audiences to maximize its own revenue, this action seeks injunctive relief and damages on behalf of Plaintiff and the Class (as defined below).

---

[6] *See* https://www.facebook.com/business/learn/facebook-ads-reporting-ads-manager (last accessed August 20, 2018).

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because: (i) members of the Class are citizens of a State different from that of Defendant Facebook; and (ii) aggregating the claims of individual Class members, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs. Further, 28 U.S.C. § 1332(d)(5) does not apply because (i) the Defendant is not a State, State official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Class in the aggregate exceeds 100.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) since Defendant is headquartered in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

**PARTIES**

15.     Plaintiff IntegrityMessageBoards.com, LLC is a Louisiana limited liability company doing business as Investor Village. Non-party Ralph Kidd is the sole Managing Member of Plaintiff.

16.     Defendant Facebook is a Delaware corporation with its principal place of business located at 1 Hacker Way, Menlo Park, California 94025, which is located in this District. Facebook's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FB." Facebook's market capitalization as of August 20, 2018, was approximately $502 billion.

17.     Facebook disseminated the misrepresentations alleged herein from California; conceived, reviewed, approved, directed, and controlled the deceptive and misleading conduct alleged herein in California; and invoiced and collected the fees wrongfully earned from such deceptive and misleading conduct from California.

**SUBSTANTIVE ALLEGATIONS**

1.      **Facebook's Representations Regarding Ad Targeting**

18.     When users activate or edit an account on the Platform, Facebook collects data such as age, gender, education, work and location. After they begin using the Platform, Facebook collects additional data concerning interests and behaviors. Facebook represents that it uses this data (and until recently, Third Party Data) to serve ads to audiences defined by its advertisers. As Zuckerberg explained

in his April 11, 2018 House Testimony in the following exchange with Congresswoman Doris Okada Matsui:

> ZUCKERBERG: Congresswoman . . . one core tenet of our advertising system is that we don't sell data to advertisers. Advertisers don't get access to your data.
>
> There's a -- there's a core misunderstanding about how that system works, which is that -- *let's say if you're -- if you're a shop, and you're selling muffins, right, it's -- you might want to target people in a specific town who might be interested in baking, or -- or some demographic.*
>
> But we don't send that information to you. *We just show the message to the right people.* And that's a really important, I think, common misunderstanding...
>
> MATSUI: Yeah. I understand that.
>
> ZUCKERBERG: ... about how this system works.
>
> MATSUI: But Facebook sells ads based at least on part of data users provide to Facebook. That's right. And the more data that Facebook collects -- allows you to better target ads to users or classes of users.
>
> So, even if Facebook doesn't earn money from selling data, doesn't Facebook earn money from advertising based on that data?
>
> ZUCKERBERG: Yes, Congresswoman, we run ads. That's the -- *the business model is running ads. And we use the data that people put into the system in order to make the ads more relevant, which also makes them more valuable.* But it's -- what we hear from people is that, if they're going to see ads, they want them to be good and relevant.

19.     Zuckerberg's Congressional testimony matches the representations made on Facebook's website concerning the display of ads to audiences defined by its advertisers.  For example, Facebook's website explains, "[w]hether you want your ad to be shown to people based on age, location, hobby, or something else—we can help you connect to the ones *who are likely to be interested in what your business offers*."[7]

20.     Similarly, in the following screenshots from a slideshow on Facebook's website (available as of June 6, 2018 at https://www.facebook.com/ads/about), Facebook represented, among other things, that after an advertiser defines the targeting criteria for an ad, Facebook will show the ad "to *people that*

---

[7] https://www.facebook.com/business/learn/facebook-ads-choose-audience (last accessed August 20, 2018).

1   *match the advertiser's target audience*" (third slide below), based on information shared with Facebook

2   by its users, including information in their Facebook profiles (fourth slide below):



## How advertisers reach people through Facebook Ads

Let's take a look at how advertisers create and run ads on Facebook, Instagram and our partner sites.

 . . . .  . . . .  . . . . 

| Advertiser chooses a business goal | Advertiser identifies audience | Advertiser creates ads | Facebook shows ads to advertiser's audience |
|---|---|---|---|
| A business or organization chooses a goal, such as selling a product or increasing awareness of their brand name. | The advertiser decides who they want to reach with their ad. | The advertiser creates ads to show on Facebook, Instagram and other websites and mobile apps through our advertising products. | We show ads to people that match the advertiser's target audience, based on information we know through the sources described below. |

### How our system decides what ads to show

We use information from a few different sources, including those described below, to figure out which ads might be valuable to you.

**Activity on Facebook apps and services**

One of the top ways we know what ads you might want to see is your activity on the Facebook family of apps and services. This includes things like:

- Pages you and your friends like
- Information from your Facebook and Instagram profile
- Places you check in using Facebook

See your ad preferences 🔗

**Information shared with a business**

When you share information like your phone number or email address with a business, they may add it to a customer list that can be matched to your Facebook profile. Sources of this kind of information include:

- Loyalty programs (for example, a supermarket "club card")
- Information compiled by data providers
- Purchases at retail stores

Learn more about customer lists 🔗

**Other online activity**

Advertisers use Facebook technologies such as the Facebook pixel to help them show ads to people who have visited their website or used their mobile app. Business and organizations can try to reach people who have done things like:

- Viewed a web page that uses a Facebook pixel
- Downloaded their mobile app
- Made a purchase (or simply added a product to a shopping cart)

See your ad settings 🔗

**Location**

We use location data to do things such as show ads from advertisers trying to reach people in or near a specific place. We get this information from sources like:

- Where you connect to the internet (through IP address on computers, tablets and phones)
- Where you use your phone (through GPS and Location Services)
- Your location from your Facebook and Instagram profile

Learn more about location data 🔗

21.     When Plaintiff was advertising on the Platform, Facebook's website made similar representations concerning its ad targeting capabilities, explaining that (i) "[c]hoosing your audience with such reach, *accuracy* and affordability is what makes Facebook *an incredible place to advertise*," (ii) the

Facebook Platform "offers powerful and unique ways to show your ads *to the people most likely to care about your business*,"  and (iii) "[w]hen you create a Facebook ad, *you can choose the audience that should see it*."

22.    When Plaintiff was advertising on the Platform, Facebook further represented that its ad targeting capabilities were superior to those of competitors such as Google and Adobe precisely because of the data that Facebook users share:

> **Why is my third party analytics software showing that my ads were clicked outside of the location I targeted my ads to?**
>
> Some third party analytics software, such as Google Analytics and Omniture (Adobe) may show clicks on your ads from outside of the location you're targeting. This is because these platforms only use a person's IP address to find a location. If someone is using a VPN, proxy server or even clicking ads from their mobile device, it can hide their true IP address and location.
>
> Facebook can provide more accurate aggregated reporting because *we're able to target ads to people based on the data they've added on Facebook*, such as their current city, and the locations of their friends.

23.    In November 2017, Facebook published the results of a test in Latin American reportedly showing that Facebook advertising achieved accuracy rates of 91-94%.[8] In late November 2013, Facebook distributed a slide deck to its marketing partners to help them pitch Facebook's advertising services to their clients. The deck included a slide claiming that, for narrowly targeted campaigns, Facebook was 89% accurate at that time:

---

[8] *How Combining TV and Facebook Advertising Yields Higher Results* (https://www.facebook.com/iq/articles/how-combining-tv-and-facebook-advertising-yields-higher-results) (last accessed August 21, 2018).

CLASS ACTION COMPLAINT                                      8

24.     In connection with the slide above, Facebook advised its marketing partners that "in narrowly targeted campaigns, the average online reach is 38% accurate, but on Facebook, our average reach is 89% accurate. ***Because of this high accuracy on Facebook, businesses aren't seeing wasted impressions like they do in other mediums***."[9]

25.     No later than November 2015, Facebook published the 89% accuracy statistic to its website in connection with the promotion of its ad targeting tools:

> ***One of the biggest advantages to advertising on Facebook is your ability to target specific groups of highly engaged people***. In fact, compared to the average online reach of 38% for narrowly targeted campaigns, ***Facebook is 89% accurate*** (Source: Nielsen OCR, August 2013).

26.     To monitor its targeting accuracy, Facebook's software precisely tracks every ad that is displayed, and what data points caused the display of a particular ad to a particular user. Evidencing this level of tracking is a link labeled "Why Am I Seeing This Ad," that accompanies every ad displayed to a Facebook user. This link lets Facebook users see at least some of the data points that caused Facebook to display a particular ad to them. For example, in November 2015, an ad for SalesforceIQ (a relationship intelligence platform that aggregates and analyzes data from emails and other sources) was displayed to

---

[9] *Leaked Facebook Video Ad Pitch Deck Reveals Plans To Steal TV And YouTube Dollars* (https://techcrunch.com/2013/12/13/facebook-vs-tv-and-youtube/) (last accessed August 22, 2018).

Plaintiff's Managing Member, Mr. Kidd, because the advertiser (Salesforce) "wants to reach men aged 45 to 64 in the United States who have a Bachelor's degree. This is based on things like your Facebook profile information and your Internet connection":



27.     Similarly, an ad for Southwest Airlines was displayed in November 2015 to Mr. Kidd because the advertiser "wants to reach men aged 25 to 54 in the United States who have a Bachelor's degree. This is based on things like your Facebook profile information and your Internet connection":



2.    **Defining a Target Audience With Ads Manager**

28.    Facebook's Ads Manager is an interface that walks advertisers through the steps necessary to create and launch advertising campaigns on the Platform.[10]

---

[10] *See* https://www.facebook.com/business/learn/facebook-ads-basics (last accessed August 20, 2018). Until recently, Facebook's self-serve ad program consisted of two different interfaces — Ads Manager for beginning advertisers, and Power Editor for more experienced advertisers. Those two interfaces were recently combined into a single tool called Ads Manager that features two different workflows — Quick Creation for experienced advertisers familiar with Power Editor, and Guided Creation for less experienced advertisers. *See* https://www.facebook.com/business/m/one-sheeters/ads-manager-convergence, https://www.facebook.com/business/help/898399293584952 and https://www.facebook.com/business/help/161116027951840 (last accessed August 20, 2018). For purposes of this Complaint, the term "Ads Manager" shall be deemed to also refer to the Power Editor interface before it was merged into Ads Manager.

29.     As the first step, advertisers create a "Campaign." When creating a "Campaign," the interface asks advertisers to identify their objective for the Campaign (*e.g.*, building brand awareness, increasing website traffic, generating leads, etc.).

30.     For example, within the "Engagement" subcategory of objectives, an advertiser can seek to secure more "Likes" for its Facebook Page:



### Engagement

Get more people to see and engage with your post or Page. Engagement can include comments, shares, likes, event responses and offer claims.

| Post engagement | Page likes | Event responses |

Campaign Name ⓘ        Engagement

Create Split Test ⓘ        A/B test your creative, placement, audience, and delivery optimization strategies

Budget Optimization ⓘ        Optimize budget across ad sets

**Set Up Ad Account**

31.     When Plaintiff was advertising on the Platform, Facebook promoted the "Page Likes" objective as a mechanism "to ***connect with more of the people who matter to you***."[11]

---

[11] Having a "Page" on Facebook is a prerequisite for advertising on Facebook. A "Page" is a free public profile hosted by Facebook through which businesses and other organizations, brands, public figures, and causes, can interact with individual Facebook users. To publicly endorse a business, individuals can "Like" its Facebook Page. *See* https://www.facebook.com/business/products/pages (last accessed August 20, 2018).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

32.     After identifying an objective, an advertiser creates an "Ad Account" and then an "Ad Set" within the Account. The Ad Set interface contains a tool that offers advertisers the ability to manually define a target audience of Facebook users based on criteria such as location, demographics (such as age, gender, education, (and until recently), income and home ownership), interests and behaviors.[12]

33.     As an advertiser selects different targeting criteria, a meter embedded within the interface displays the Potential Reach of the ad based on the number of Facebook users within the target audience. For example, as per the screenshot on the next page, one of the target audiences defined by Plaintiff in Ads Manager consisted of users in the United States, ages 45-65+ with an interest in Investments AND who owned a home, AND were college graduates AND had household incomes over $250,000. The meter indicated a Potential Reach of 61,000 people for that target audience:

---

[12] Interests allow advertisers to reach individuals interested in a subject related to an advertiser's product or service (such as organic food or action movies). Behaviors allow advertisers to reach individuals based on purchasing behaviors, device usage and other activities. *See* https://www.facebook.com/business/learn/facebook-ads-choose-audience (last accessed August 20, 2018).



34.    Before October 2015, the audience definition interface ("Pre-October 2015 Interface") displayed multiple targeting categories, and an advertiser would select targeting criteria within those categories.   Adding multiple targeting criteria within a single category (such as multiple interests) increased the size of the audience, while adding new targeting criteria within a new category (like education level), decreased the size of the audience.

35.    For example, assume hypothetically that an advertiser started off with an audience consisting of individuals aged 18-65+ in the United States with an interest in the Beatles, and the audience size was 2,500,000. If the advertiser added an interest in Elvis Presley, the audience size would increase because the Pre-October 2015 Interface would interpret this additional criteria as creating an expanded audience of individuals aged 18-65+ in the United States with an interest in the Beatles OR Elvis Presley. But if the advertiser then added "Education Level: College grad" as a targeting criteria, the audience size would decrease because the Pre-October 2015 Interface would interpret this additional criteria as creating

an audience of individuals aged 18-65+ in the United States with an interest in the Beatles OR Elvis Presley, AND a College grad.

36.     When Plaintiff was advertising on the Platform, Facebook represented concerning the Pre-October 2015 Interface that, "[w]ith the ad creation tool, ***you can choose the type of people who should see your ad***. Just add traits and interests to make your audience broad or narrow—it all depends on who you want to reach . . . Select demographics like locations, age, gender, and languages. And choose other traits like level of education, if they have children, are recently married, or even if they own a home. ***When you run your ads, we'll serve it in the places you selected***."

37.     The following screenshot depicts the Pre-October 2015 Interface:



38.     In October 2015, Facebook launched its "Detailed Targeting" feature, which offers advertisers more granular control to build narrower or broader targeting tiers within a single category using "AND/OR" Boolean logic ("Post-October 2015 Interface").[13]

39.     For example, using Detailed Targeting, an advertiser can build a (i) narrow audience that will only include people who own a home AND who are interested in cooking AND who have children, or (ii) a broad audience that will include people who are homeowners OR who like cooking OR who are parents. The following screenshot illustrates how the "Detailed Targeting" interface would be used to narrow an audience:



40.     Facebook represents that Detailed targeting "*allows you to refine the group of people we show your ads to*."[14]

---

[13] *Facebook Flex Targeting: Now You Can Have Your Cake AND-OR Eat It Too* (https://www.digitalmarketer.com/facebook-flex-targeting/) (last accessed August 20, 2018).

[14] https://www.facebook.com/business/help/182371508761821 (last accessed August 20, 2018).

41.     Importantly, the target audience defined by the advertiser circumscribes the objective identified during the Campaign phase so that the objective is limited to the defined target audience. As Facebook represented when Plaintiff was advertising on the Platform:

**How does my objective impact who sees my ads?**

When you start advertising, you'll get to select an objective for your campaign.

Your ads will automatically be optimized to show to the people who are most likely to take actions that will help you achieve your objective. For example, if you are advertising an app *and your objective is to get more downloads*, your ads will be set up to show *to people within your target audience* who are most likely to install your app.

\* \* \*

**When I choose an objective, do I pay each time someone takes one of those actions?**

In general, you'll pay for impressions (CPM) on your ad. By default, your ad will be optimized to show to the people *who are most likely to take the actions that will help you meet your objective within your target audience*. Each impression your ad receives is likely to add value to your campaign.

42.     Similarly, when Plaintiff was advertising on the Platform, Facebook also represented:

When you choose Promote your page, your ad will be optimized to *reach people in your audience* who are likely to take the action of liking your Page.

43.     When Plaintiff was advertising on the Platform, Facebook further represented that when optimizing for Page likes:

By default, your ad is optimized *to reach people within your chosen audience* who are likely to click the Like button for your Page.

44.     After selecting targeting criteria and determining audience size, the next step within the Ad Set interface is placement, which allows an advertiser to determine where its ad will be displayed (which presently includes not just the Facebook website, but also other Facebook social media channels such as Instagram and Messenger, and third party apps and websites within Facebook's Audience Network).

CLASS ACTION COMPLAINT                    17

45.     Finally, the Ad Set interface asks the advertiser to set a campaign budget and schedule. In this context, Facebook explains how it will optimize delivery of the ad given the advertiser's Campaign objective, defined target audience, and budget. When Plaintiff advertised on Facebook, Facebook represented that, where the objective is "Page Likes," ads will be "optimized to reach people *within your chosen audience* who are likely to click the Like button for your page," and "optimized to reach people *in your audience* who are likely to take the action of liking your Page."

46.     As part of the budgeting step, an advanced option allows advertisers to modify their bid strategy. However, bid amounts are not the only factor relevant to getting an ad displayed to an individual within an advertiser's target audience. Instead, Facebook "auctions" off advertising space based on several factors. As Facebook explains:

> An auction takes place whenever someone is eligible to see an ad. The "participants" in an auction are *ads targeted to an audience the eligible person falls into*. *Billions of these auctions take place everyday* . . . The ad that wins an auction and gets shown is the one with the highest total value. Total value isn't how much an advertiser is willing to pay us to show their ad. It's combination of 3 major factors:
>
> * Bid
> * Estimated action rates
> * Ad quality and relevance.[15]

47.     Facebook defines the three major factors above controlling ad display as follows:

> **Bid**
>
> You tell us your cost goals with your bid strategy and we bid for you to help you meet that goal. This may include a bid cap (for the lowest cost bid strategy) or cost target (for the target cost bid strategy) to guide our bidding.
>
> **Estimated action rates**
>
> Each ad set is optimized for an action (an "optimization event"). Estimated action rates represent how likely we think a given person is to take that action. This helps differentiate between an ad being generally relevant to someone's interests and it being likely to cause them to take the action you're optimizing for. We base our estimates on the previous actions of the person you're trying to reach and your ad's historical performance data.

---

[15] https://www.facebook.com/business/help/430291176997542 (last accessed August 20, 2018).

**Ad quality and relevance**

We represent how interested we think a person will be in seeing your ad with measures of its overall quality and specific relevance. For example, if your ad has gotten lots of negative feedback, that can decrease its total value. Or, if the person has a history of being interested in what you're advertising, that can increase its total value.

48.     In other words, *billions of times per day*, Facebook's ad display software looks at all the ads targeting the audience into which a particular user falls, and then uses a highly automated and complex algorithm that *programmatically* and *instantly* determines what ad (among all the possible alternatives) to display to that user. The process of displaying ads to users is thus entirely *objective*, based on logical rules programmed into the algorithm by Facebook (that is, given the *billions* of ad auctions occurring per day, there are no humans making subjective decisions about what ads to display to which users).

49.     Moreover, as noted above, Facebook represents that its software tracks every ad that is displayed, and what data points caused the display of a particular ad to a particular user. Thus, it is possible for Facebook to determine on an automated Yes/No basis for every ad that Facebook has displayed whether the data points of a particular user to whom an ad was displayed matched — or did not match — the target audience defined for that ad by the advertiser using the targeting tool in Ads Manager (and if it did not match, what rule(s) caused the software to display the ad anyway).

**3.     Plaintiff's Business: Investor Village**

50.     Plaintiff operates Investor Village, which offers a platform to individual "Main Street" investors to connect and communicate with other like-minded investors concerning publicly-traded stocks. The free version of the platform features online discussion forums devoted to specific stocks, while premium members who pay a subscription fee enjoy access to advanced features such as enhanced navigation of discussions, private messaging capability, real-time stock quotes, and interactive charts. The goal of the platform is to provide investors with access to high quality investing insights and information to inform their investment decisions.

51.     While investors of all socioeconomic levels use Investor Village, Plaintiff focuses its marketing efforts on more highly educated investors with substantial incomes and assets. That focus is driven in part by the demographics of the Investor Village membership base — 84.4% have a college

degree or higher, 63.3% have incomes of $100,000 or greater, 59.4% have investment portfolios worth $250,000 or more, and 82.6% own their own home. In terms of age, 80.6% are 45 years or older.

52.     These more highly compensated and educated members constitute Plaintiff's most valuable members since they are the most likely to pay to subscribe to Investor Village's premium services. Additionally, Plaintiff has also found that, whether a given discussion on Investor Village revolves around a biotech, financial, industrial, metal, energy or other publicly-traded stock, highly compensated and educated members tend to contribute the most meaningful and valuable insights to the discussions because of their financial sophistication, industry experience, and substantial positions in the relevant stocks. In turn, their insightful contributions increase overall member engagement and generate greater word-of-mouth among other highly compensated and educated investors, which drives increased revenue from more subscriptions, and more advertising views as site traffic rises.

53.     Investor Village's website is located at: https://www.investorvillage.com/, and its Facebook Page can be accessed at: https://www.facebook.com/investorvillage/.

**4.      Plaintiff's June 2015 Promoting IV Advertising Campaign**

54.     In June 2015, Facebook displayed a "teaser" ad to Plaintiff depicting what Plaintiff's ad could look like were it to advertise on Facebook.

55.     On June 23, 2015, Plaintiff launched its first ad campaign on Facebook using Ads Manager. Named "Promoting IV," the ad set within the Campaign targeted individuals 44 years and older, who live in the United States and have an interest in at least one of a number of different approaches to investing. There was no targeting based on household income, home ownership or education. The campaign ran for two days, and Facebook charged Plaintiff $13.16 for the ads. Plaintiff does not allege that this campaign gave rise to liability on Facebook's part.

**5.      Plaintiff's August 2015 IV Likes Advertising Campaign**

56.     The June 2015 "Promoting IV" campaign did not deliver users falling within Investor Village's most valuable demographic — highly compensated and educated investors. Plaintiff concluded that this was because it had failed to select audience criteria in Ads Manager targeting that demographic. Accordingly, on August 29, 2015, with the goal of targeting highly compensated and educated investors, Plaintiff launched a new advertising Campaign called "Investor Village – Page Likes" ("IV Likes

Campaign") with the objective of increasing "Likes" *within this demographic* for Investor Village's "Page" on Facebook.

57.    To that end, after creating the IV Likes Campaign and identifying its objective, Plaintiff created an "Ad Set" called "US-45+" ("US 45 Ad Set") that used the Pre-October 2015 Interface to define the following target audience:

- Location: United States AND
- Interests: Investment AND
- Education Level: College grad AND
- Household Income: $250,000-$350,000; $350,000-$500,000; or Over $500,000 AND
- Home Ownership: Homeowners AND
- Age: 45-65+

58.    As per the screenshot in paragraph 33 above, the audience meter measured the potential reach of the defined audience as 61,000.

59.    Plaintiff elected to be charged for impressions, or CPM; i.e., every time its ad was displayed to a Facebook user within the defined target audience.[16]

60.    On August 29, 2015, Plaintiff launched the IV Likes Campaign. On the first day, it had generated three Likes for the Investor Village Page.

61.    On August 31, 2015, Facebook encouraged Plaintiff with a message that its "Ad Set Is Performing Well":

---

[16] Cost per thousand (CPM) is a marketing term that denotes the price of 1,000 advertisement impressions on one webpage. For example, if a website publisher charges $2.00 CPM, an advertiser must pay $2.00 for every 1,000 impressions of its ad.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



17   62.     By the afternoon of September 1, 2015, Facebook's reporting interface indicated that it

18   had generated twenty-one Likes. Plaintiff noticed, however, that at least four of those "Likes" — nearly

19   20% — were from Facebook users who were outside the target audience that Plaintiff had defined since,

20   according to their Facebook profiles, they did not graduate college.

21   63.     Additionally, another four of those Likes were from Facebook users who, based on their

22   Facebook profiles and other reliable third party data that Plaintiff accessed, clearly did not possess

23   household income over $250,000.

24   64.     In total, nearly 40% of the initial "Likes" from the IV Likes Campaign were outside the

25   target audience Plaintiff had defined using the targeting tools in Ads Manager (*i.e.*, users who are College

26   graduates AND have household income over $250,000 AND are homeowners), even though Facebook

27   claimed at the time that its ad targeting was 89% accurate.

28

CLASS ACTION COMPLAINT                                    22

65.     Concerned it may have set up its targeting incorrectly, on or about September 4, 2015, Plaintiff reviewed various representations by Facebook on its website regarding its ad targeting capabilities, including the representations in paragraphs 21 and 36 above.   In reliance on those representations, Plaintiff continued the IV Likes Campaign.

66.     As Plaintiff continued to monitor the results of the IV Likes Campaign, it noticed that a material percentage of the Likes continued to be from Facebook users who fell outside the defined target market ("Outside Likers") because they were not college graduates, and/or did not possess household income over $250,000, which resulted in an accuracy rate far lower than the 89% that Facebook was touting at the time.

67.     On or about October 30, 2015, Plaintiff reviewed various representations by Facebook on its website regarding its ad targeting capabilities, including the representations in paragraphs 31 and 41 above.  In reliance on those representations, Plaintiff continued the IV Likes Campaign.

68.     In November 2015, Plaintiff surveyed six of the users who liked its Page as a result of the IV Likes Campaign. *Every single one of those users* confirmed that they did *not* meet the household income criteria (including five out of six by a significant margin), and *only one* of those users graduated college.

69.     Plaintiff's further analysis of the Outside Likers indicated that many of them had a substantial number of seemingly unrelated Page "Likes" displayed on their Facebook profiles. Indeed, some of these additional, unrelated Page "Likes" appeared immediately after the relevant individual "Liked" the Investor Village Page. Additionally, Plaintiff noticed that many of the Outside Likers "Liked" many of the same unrelated Pages (i.e., the Page "Likes" of the Outside Likers overlapped).

70.     Based on Facebook's claimed accuracy rate of 89% at the time, it is highly improbable that the outcomes described above resulted from unintentional targeting errors or were designed to enhance the effectiveness of Plaintiff's campaign. Instead, Plaintiff's findings indicate that Facebook was programmatically displaying a material percentage of Plaintiff's ads — far greater than 11% — to users outside the defined target market who were serial "Likers;" *i.e.*, had a historical propensity to indiscriminately "Like" many unrelated Pages (a metric that Facebook concededly tracks using the Estimated Action Rate data described above in paragraph 47).

71.     Facebook engaged in this deceptive conduct to boost its own revenue beyond what it could have otherwise earned solely from legitimately targeted advertising. By displaying Plaintiff's ads to numerous serial Likers who fell outside of Plaintiff's defined target audience, Facebook generated more "Likes," which created the false impression that the IV Likes Campaign was more successful than it otherwise actually was. Plaintiff was thereby induced to continue the IV Likes Campaign and continue paying Facebook for ad impressions outside the defined target audience for which it would not have agreed to pay anything at all had it known the truth (given Plaintiff's use of Ads Manager to specifically target its core demographic of highly compensated and educated investors).

72.     Yet, even though Facebook was programmatically displaying a material percentage of Plaintiff's ads to users outside the audience defined by Plaintiff for the IV Likes Campaign, it still charged Plaintiff for all of the impressions generated by those displays. Plaintiff ultimately paid $1,409.69 to Facebook for impressions generated in connection with the IV Likes Campaign.

**6.     Plaintiff's January 2016 SCD Likes Advertising Campaign**

73.     On January 7, 2016, Plaintiff launched a new Facebook advertising campaign ("SCD Likes Campaign") for its Small Cap Directory ("SCD"). SCD is a database that provides investors with tools to search for and research over 18,700 small and micro-cap stocks.

74.     For its Campaign objective, Plaintiff selected increasing "Likes" for SCD's "Page" on Facebook. Plaintiff then used the Post-October 2015 Interface to define the following target audience for an "Ad Set" within that campaign called "US, CA-45+":

- Location: Canada OR United States AND
- Education Level: College grad AND
- Income: Over $500,000 AND
- Home Ownership: Homeowners AND
- Age: 45-65+

75.     The audience meter measured the potential reach of the defined audience as 250,000 people.

76.     For the SCD Likes Campaign, elected to be charged for Likes (rather than impressions).

CLASS ACTION COMPLAINT                    24

77.    However, after launching the SCD Likes Campaign, Plaintiff found that a material percentage of the Likes generated by the Campaign (for which Plaintiff paid) were from users outside of Plaintiff's defined target audience (because they were not college graduates and/or did not have household income over $500,000), which resulted in an accuracy rate materially lower than the 89% that Facebook was touting at the time.

78.    Even more significantly, when Plaintiff compared the list of Outside Likers from the SCD Likes Campaign to the Outside Likers for the IV Likes Campaign, there were overlaps.

79.    Based on Facebook's claimed accuracy rate of 89% at the time, it is highly improbable that the outcomes above resulted from unintentional targeting errors or were designed to enhance the effectiveness of Plaintiff's campaign. Instead, Plaintiff's findings indicate that Facebook was programmatically displaying a material percentage of Plaintiff's ads to users outside the defined target market who were serial "Likers."

80.    Facebook engaged in this deceptive conduct in order to boost its own revenue beyond what it could have otherwise earned solely from legitimately targeted advertising consistent with its representations. Yet, even though many of the Likes generated by the SCD Likes Campaign were from users outside of Plaintiff's defined target audience for that Campaign, Facebook still charged Plaintiff for all of the Likes generated by the Campaign. Plaintiff ultimately paid $242.17 to Facebook for Likes generated in connection with the SCD Likes Campaign.

81.    Plaintiff was not the only advertiser to experience anomalies with the targeting of its Facebook ads. In 2016, a leading Do-It-Yourself website design company called Weebly surveyed more than 2,600 self-described small business owners that sell online in some capacity. When asked about their Facebook advertising, *62 percent* said their paid ads on Facebook were missing the target.

82.    Weebly shared the findings of its survey with Small Business Trends, which published an article on January 3, 2017 entitled "62 Percent of Small Business Owners Say Facebook Ads Miss Their Targets, Weebly Reports." The article stated:

> Does your small business have presence on Facebook (NASDAQ:FB)?
>
> It makes sense. If everyone and their grandmother is there, your small business should be, too.

The trick is reaching all these people. And Facebook's targeted marketing tools seemingly allow you to do just that.

*It's just that not every small business owner believes these promoted messages are hitting their marks.*

According to a new survey of small business owners from Weebly, a DIY drag and drop web design company, *62 percent say their paid ads on Facebook are missing the target*.

83.    One reader named "Scott" shared the following comment to the article:

I have run 2, week long ad campaigns spread a year apart because the first one went so bad, I was hesitant to throw my money away again and the second campaign only brought (1) new page like while the first one brought 35 new page likes but here's the rub, *on both campaigns I targeted locally within 35 miles of my location, yet on the first campaign out of 35 new page likes, only one (1) was local and many of them were as far away as 150 miles!* What's up with that!?[17]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) and (b)(3) on behalf of itself and members of the Class, consisting of: All persons or entities within the United States who, from December 1, 2013, to the present ("Class Period"), paid Facebook for advertisements displayed to Facebook users who fell outside the target audiences defined by such persons or entities using Ads Manager.[18]

85.    Excluded from the Class are Defendant, and its subsidiaries and affiliates; its current and former officers, directors, and employees (and members of their immediate families); and the legal representatives, heirs, successors or assigns of any of the foregoing.

86.    Plaintiff reserves the right to amend the Class definition if further investigation and/or discovery reveal that the Class should be expanded, divided into subclasses, or modified in any way.

87.    As required by Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous that

---

[17] *62 Percent of Small Business Owners Say Facebook Ads Miss Their Targets, Weebly Reports* (https://smallbiztrends.com/2017/01/do-facebook-ads-work.html) (last accessed August 20, 2018).

[18] The Class Period starts on December 1, 2013, because as noted in paragraph 23 above, Facebook began disseminating the August 2013 Nielsen finding that its accuracy for narrowly targeted campaigns was 89%, in late November 2013.

joinder of all members is impracticable. On a January 27, 2016, conference call with analysts to discuss Facebook's 4Q and Full Year 2015 results, Zuckerberg represented that Facebook has "more than 2.5 million active advertisers." According to a 2017 Reuter's interview with Facebook COO Sheryl Sandberg, Facebook had more than 5 *million* businesses advertising on its Platform *each month* as of April 2017.[19]

88.    As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, and those common questions predominate over any questions affecting only individual members. Among the common questions of law and fact include:

- Whether Facebook misrepresented to prospective advertisers that it would display their ads to Facebook users who fell within the target audiences defined by those advertisers using Ads Manager;

- Whether Facebook deceived and misled its advertisers by programmatically displaying ads to a material percentage of Facebook users who fell outside the target audiences defined by those advertisers using Ads Manager;

- Whether Facebook charged advertisers for ads displayed to a material percentage of Facebook users who fell outside the target audiences defined by those advertisers using Ads Manager;

- Whether the misrepresentations and deceptive and misleading practices of Facebook alleged herein violated California's Unfair Competition Law; and

- Whether members of the Class have sustained damages and, if so, what is the proper measure of relief.

89.    As required by Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical of the claims of other members of the Class since Plaintiff and all members of the Class defined target audiences for ads using Facebook's Ads Manager, and then paid Facebook for ads that were displayed to Facebook users outside the defined target audiences.

90.    As required by Fed. R. Civ. P. 23(a)(4), Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has no interests adverse or antagonistic to those of the Class and has retained counsel experienced in complex class action litigation.

---

[19] *See Facebook's Sandberg says number of monthly advertisers tops 5 million* (https://www.reuters.com/article/us-facebook-advertising-idUSKBN17C1FC) (last accessed August 20, 2018).

91.     As further required by Fed. R. Civ. P. 23(b)(3), a class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the damages suffered by individual Class members may be relatively small, and the expense and burden of individual litigation would therefore make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

92.     Class certification of Plaintiff's claims is also appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Facebook has acted or refused to act on grounds generally applicable to Plaintiff and the Class, making appropriate both declaratory and injunctive relief with respect to Plaintiff and the Class.

93.     Because Facebook's records identify its advertisers and what sums they paid to Facebook in connection with their advertisements, and Facebook's software tracks the display of every ad, and what data points led to the display of a particular ad to particular users, Plaintiff seeks to represent an ascertainable Class, since determining inclusion in the Class can be easily accomplished through Facebook's own records.

## COUNT I

### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     During the Class Period, by reason of the conduct alleged herein, Facebook engaged in fraudulent, unlawful and unfair practices within the meaning of Section 17200 of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq* ("UCL").  The conduct alleged herein is a "business practice" within the meaning of the UCL.

**Fraudulent Practices**

96.     Facebook's misrepresentation that it would deliver ads to the audiences defined by advertisers using Ads Manager, and failure to disclose that it was programmatically displaying a material percentage of ads to Facebook users *outside* defined target audiences to maximize its own ad revenue, was likely to deceive advertisers. Such deceptive conduct constituted a fraudulent practice under the UCL, and caused advertisers to pay for mistargeted ads for which they would not have agreed to pay

anything at all had they known the truth about Facebook's misconduct.

97.     Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the fraudulent prong under the UCL. In deciding to start and continue advertising on Facebook, Plaintiff saw and reasonably relied upon representations by Facebook that it would display Plaintiff's ads to Facebook users within the target audiences defined by Plaintiff using Ads Manager.

98.     Facebook knew or had reason to know that Plaintiff regarded, or was likely to regard those representations as important to Plaintiff's decision to advertise on Facebook. Moreover, a reasonable advertiser would have attached importance to those representations in advertising on Facebook. Accordingly, Facebook's misrepresentation that it would display Plaintiff's ad to Facebook users within the target audiences defined by Plaintiff when, in fact, it was programmatically displaying a material percentage of ads to Facebook users outside those defined audiences to boost Facebook's own revenue, constituted a material misrepresentation.

99.     As a result of Facebook's material misrepresentations as alleged herein, Plaintiff paid for ads for which it would not have agreed to pay anything at all had it known the truth about Facebook's misconduct. Accordingly, Facebook's material misrepresentations were the immediate cause of Plaintiff's losses.

100.    As a result, Facebook's deceptive conduct, as alleged herein, violates the UCL's prohibition against "fraudulent" conduct.

**Unfair Practices**

101.    Facebook's deceptive and misleading conduct, as alleged herein, is oppressive, immoral, unethical, and unscrupulous, caused Plaintiff and the Class substantial injury (given the millions of businesses advertising on Facebook), and violates established public policy against deceptive conduct by businesses.  Further, it allowed Facebook to have an unfair advantage over competitors who accurately and truthfully represent their ad targeting practices.

102.    Facebook engaged in unfair and deceptive acts and business practices by misrepresenting that it would deliver ads to the audiences defined by advertisers using Ads Manager, and then programmatically displaying a material percentage of ads to Facebook users *outside* defined target audiences in order to maximize its own ad revenue, and lure advertisers to advertise on Facebook rather

through Facebook competitors, such as Google and Yahoo.

103.    Additionally, the justifications or reasons for, or the utility or benefit (if any) of Facebook's unfair and deceptive acts and business practices are substantially outweighed by the substantial economic injury and harm that such conduct caused to Plaintiff and other members of the Class.

104.    Finally, the harm caused by Facebook's deceptive conduct is not one that Plaintiff and members of the Class could have reasonably avoided, given Facebook's representations that it is highly accurate in its placement of ads in accordance with the specific criteria identified by advertisers and because Facebook conceals that it is programmatically displaying a material percentage of ads to Facebook users outside the audiences defined by advertisers.

105.    Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the unfairness prong under the UCL as detailed in paragraphs 97-99 above.

106.    As a result, Facebook's unfair and deceptive acts and business practices, as alleged herein, violate the UCL's prohibition against "unfair" conduct."

**Unlawful Practices**

107.    Facebook's deceptive conduct, as alleged herein, violates California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*. ("FAL"), because Facebook misrepresented that it would deliver ads to the audiences defined by advertisers using Ads Manager, and then programmatically displayed a material percentage of ads to Facebook users *outside* defined target audiences in order to maximize its own ad revenue. As a result, Facebook's representations to advertisers were untrue and misleading, and Facebook knew (or by the exercise of reasonable care should have known) that they were and are untrue and misleading.

108.    Plaintiff suffered injury in fact and has lost money or property as a result of Facebook's violation of the unlawful prong under the UCL as detailed in paragraphs 97-99 above.

109.    As a result, Facebook's deceptive conduct, as alleged herein, violates the UCL's prohibition against "unlawful" conduct."

CLASS ACTION COMPLAINT                              30

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, demands judgment against Defendant as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff as the Class representative, and Plaintiff's counsel as class counsel;

B.    Finding and declaring that Defendant's misconduct, as alleged herein, violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*., and other applicable California law as set forth herein;

C.    Awarding damages, or restitution of monies Defendant unlawfully obtained from Plaintiff and the Class as a result of Defendant's misconduct alleged herein;

D.    Awarding injunctive and other equitable relief available under applicable law, including without limitation, an order enjoining Defendant from continuing to programmatically display ads to Facebook users outside the audiences defined by advertisers in Ads Manager;

E.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, attorneys' fees, expenses and other costs; and

F.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:   August 28, 2018          Respectfully submitted,

By: /s/ Solomon B. Cera

**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
595 Market Street, Suite 2300
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415)-777-5189
Email: scera@cerallp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KLAFTER OLSEN & LESSER LLP**
Jeffrey A. Klafter (*pro hac vice to be requested*)
Seth R. Lesser (*pro hac vice to be requested*)
2 International Drive, Suite 350
Rye Brook, New York 10570
Telephone: (914) 934-9200
Facsimile: (914) 934-9200
Email: JAK@klafterolsen.com
Email: Seth@klafterolsen.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter (*pro hac vice to be requested*)
570 Lexington Avenue, 16th floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile:  (212) 758-4004
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiff and the Proposed Class*