**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
Pamela A. Markert (State Bar No. 203780)
595 Market Street, Suite 1350
San Francisco, California 94105
Telephone: (415) 777-2230
Facsimile: (415)-777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

**KLAFTER OLSEN & LESSER LLP**
Jeffrey A. Klafter (*pro hac vice* to be requested)
Seth R. Lesser (*pro hac vice* to be requested)
2 International Drive, Suite 350
Rye Brook, New York 10570
Telephone: (914) 934-9200
Facsimile: (914) 934-9200
Email: JAK@klafterolsen.com
Email: Seth@klafterolsen.com

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter (*pro hac vice* to be requested)
570 Lexington Avenue, 16th floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC. <br><br> Defendant. | ) Case No.: 4:18-cv-05286 PJH <br> ) <br> ) <br> ) **PLAINTIFF'S MEMORANDUM IN** <br> ) **OPPOSITION TO DEFENDANT** <br> ) **FACEBOOK, INC.'S MOTION TO** <br> ) **DISMISS THE CLASS ACTION** <br> ) **COMPLAINT** <br> ) <br> ) Date:  February 13, 2019 <br> ) Time: 9:30 a.m. <br> ) Court: Courtroom 3, 3rd Floor <br> ) Hon. Phyllis J. Hamilton |

# TABLE OF CONTENTS

Page(s)

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

LEGAL STANDARDS .................................................................................................... 7

ARGUMENT ................................................................................................................... 7

    A.    Facebook's Attacks on Plaintiff's Specificity of Pleading As To Level of Accuracy and Its Programmatic Mis-Displaying of Advertisements Misconstrue The Claims and Are Misplaced ........................................................................ 7

    B.    Facebook's Challenge to the Specificity of the Claim That Plaintiff was Misled In Connection With the Two Campaigns are Insufficient to Warrant Dismissal .......... 12

    C.    Plaintiff Has Alleged Statutory Standing Under the UCL ............................................. 14

           1.    Plaintiff Has Properly Pled Economic Injury to Assert Standing ...................... 14

           2.    Plaintiff's Claims Are Not Limited to the Misrepresentations On Which It Relied ............................................................................................................... 16

    D.    Plaintiff Has Stated a UCL Claim on the Merits ......................................................... 17

           1.    Plaintiff States a Claim Under the UCL Fraud Prong ........................................ 17

           2.    Plaintiff States a Claim Under the "Unfair" UCL Prong .................................... 19

           3.    Plaintiff States a Claim Under the Unlawful Prong of the UCL ......................... 20

           4.    Plaintiff States a Claim for Injunctive Relief ................................................... 20

CONCLUSION ............................................................................................................... 21

1

**Cases**

*Anderson v. SeaWorld Parks & Entm't, Inc.*
    No. 15-CV-02172-JSW, 2016 WL 8929295 (N.D. Cal. Nov. 7, 2016) ................................. 16

*Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*
    648 F.3d 986 (9th Cir. 2011) .............................................................................................. 7

*Concha v. London*
    62 F.3d 1493 (9th Cir. 1995) ............................................................................................ 13

*Davidson v. Kimberly-Clark Corp.*
    889 F.3d 956 (9th Cir. 2018) ............................................................................................ 20

*Davis v. HSBC Bank Nevada, N.A.*
    691 F.3d 1152 (9th Cir. 2012) .......................................................................................... 18

*Durell v. Sharp Healthcare*
    183 Cal. App. 4th 1350 (2010) ......................................................................................... 16

*Figy v. Amy's Kitchen, Inc.*
    No. CV 13-03816 SI, 2013 WL 6169503 (N.D. Cal. Nov. 25, 2013) ................................ 16

*In re Facebook PPC Advert. Litig.*
    No. 5:09-CV-03043-JF, 2010 WL 5174021 (N.D. Cal. Dec. 15, 2010)............................. 19

*In re Tobacco II Cases*
    46 Cal. 4th 298 (2009) ............................................................................................ 16, 17, 19

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*
    No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017)........................ 8, 16

*In re Yahoo! Litig.*
    251 F.R.D. 459 (C.D. Cal. 2008) ................................................................................. 3, 8, 9

*Johnson v. Gen. Mills, Inc.*
    275 F.R.D. 282 (C.D. Cal. 2011) ...................................................................................... 10

*Letizia v. Facebook Inc.*
    267 F. Supp. 3d 1235 (N.D. Cal. 2017) ....................................................................... 16, 19

*Moore v. Kayport Package Exp., Inc.*
    885 F.2d 531 (9th Cir. 1989) ........................................................................................ 12, 13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*
    135 S. Ct. 1318 (2015)....................................................................................................... 10

*Opperman v. Path, Inc.*
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ................................................................................ 13

*Pulaski & Middleman, LLC v. Google, Inc.*
    802 F.3d 979 (9th Cir. 2015) ..................................................................17

*Rubenstein v. Neiman Marcus Grp. LLC*
    687 F. App'x 564 (9th Cir. 2017) .............................................................13

*Singh v. Google LLC*
    No. 16-CV-03734-BLF, 2018 WL 984854 (N.D. Cal. Feb. 20, 2018)...........15, 16, 17

*Tyler Barnett PR, LLC v. Facebook Inc.*
    No. 16-CV-06232-JSW, 2018 WL 2974695 (N.D. Cal. June 1, 2018) ......................20

*Williams v. Gerber Prod. Co.*
    552 F.3d 934 (9th Cir. 2008) ..................................................................17

*Woods v. Google, Inc.*
    889 F. Supp. 2d 1182 (N.D. Cal. 2012) .................................................3, 9, 17

*Woods v. Google, Inc.*
    No. 5:11-CV-01263-EJD, 2017 WL 4310765 (N.D. Cal. Sept. 28, 2017).....................9

*Yastrab v. Apple Inc.*
    173 F. Supp. 3d 972 (N.D. Cal. 2016) .......................................................16

**Statutes**

California Business & Profession Code

    § 17200.............................................................................................2

**Rules**

Federal Rules of Civil Procedure

    Rule 9(b) ...................................................................................2, 8, 12

Plaintiff IntegrityMessageBoards.com, LLC, individually and on behalf of all others similarly situated, by and through its counsel, respectfully submits this memorandum of law in opposition to the motion to dismiss of Defendant Facebook, Inc. ("Facebook").[1]

## **INTRODUCTION**

The claim in this case is straightforward: for years, Facebook has deceptively marketed its advertising platform by promising advertisers that it could serve ads to granular target audiences using its extraordinary cache of demographic data. Specifically, on its website, Facebook misrepresented (and continues to misrepresent) that Plaintiff and other advertisers can use Facebook's Ads Manager software to display ads based on highly specific demographic criteria such as level of education, geography, household income, home ownership, hobbies, interests, and the like. These assertions were (and are) untrue. The Complaint details the nature and scope of Facebook's misrepresentations by specifying the demographic inputs advertisers could select, and therefore were led to believe would determine the target audiences to whom their ads were displayed (based on Facebook's representations). Complaint ("Cmplt.") ¶¶ 28-43. Plaintiff then alleges how Facebook deliberately mistargeted ads to boost its revenue, and the damages that Plaintiff and thousands of other advertisers suffered:

- "Facebook deceived, and continues to deceive advertisers by programming its software to display a material percentage of ads to users who fall outside the target audiences defined by advertisers…." *Id.* ¶ 9.

- "Plaintiff's analysis of its own Facebook campaign results showed that at various points approximately 40% or more of its ads were apparently displayed to users who fell outside of Plaintiff's defined target audiences, resulting in accuracy of 60% or less at a time when Facebook was representing that its ad targeting was 89% accurate." *Id.* ¶ 10.

- As a result of Facebook's programmatic disregard of advertisers' targeting instructions in order to maximize Facebook's ad revenue, Plaintiff and other advertisers paid for a material number of ads for which they would not have agreed to pay anything at all had they known the truth, and have been injured thereby." *Id.* ¶ 11.

---

[1]   All emphasis herein is added, unless otherwise noted.

Much of Facebook's brief in support of its motion to dismiss ("Def. Mem.") is devoted to contending that the Complaint fails to satisfy Fed. R. Civ. P. 9(b). Yet the complaint specifically alleges the "who, what, when, where and how" of Facebook's misrepresentations, the dates of those misrepresentations and why those misrepresentations were false or misleading. *Id.* ¶¶ 18-25, 28-43, 56-83. These allegations are more than sufficient to allow Facebook to defend itself, even as it repeatedly mischaracterizes those allegations, and ignores governing law.

Facebook's standing arguments fare no better. The Complaint specifies the timeframe of Plaintiff's advertising campaigns; what targeting representations Plaintiff saw and relied upon; how Plaintiff's ads were displayed to a material percentage of Facebook users outside its target audience (contrary to those representations); how Plaintiff paid for mistargeted ads for which it would not have paid anything at all (but for Facebook's misrepresentations); and how thousands of other advertisers experienced equally dismal results. *Id.* ¶¶ 56-83.

Facebook's "merits" based challenge to Plaintiff's claims has no place on this motion to dismiss. Nevertheless, Plaintiff's allegations sufficiently state a claim under all three sections of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"). Facebook's challenge to these claims is premised on formulaic arguments.

While Facebook's contentions are addressed one-by-one below, one initial point is worth noting. The claims in this case are not predicated **solely** on Facebook's misrepresentation of 89% accuracy (as Facebook mistakenly contends). To the contrary, the Complaint alleges a long-running campaign by Facebook to convince advertisers that it will serve their ads to Facebook users who satisfy their targeting criteria (Cmplt. ¶¶ 18-25, 32-43) — a scheme that remains ongoing (as per the statements of Facebook's CEO, Mark Zuckerberg, to Congress, and representations currently appearing on Facebook's website; *id.* ¶¶ 18-20). That campaign included not just the 89% accuracy claim, but several other misrepresentations concerning Facebook's purportedly laser-like targeting capabilities that Plaintiff saw and relied upon (*id.* ¶¶ 65, 67), as well as numerous others. *Id.* ¶¶ 19-20, 22-25, 40, 42-43. Indeed, beyond these misrepresentations, the very steps through which Facebook's software walks advertisers to select their desired target audience conveys to advertisers that the ads will be

shown to viewers who meet those criteria.  *Id.* ¶¶ 32-39.  Thus, the 89% claim (which ran for nearly two years from November 2015 through October 2017[2] — as well as a 91-94% accuracy rate Facebook publicized in 2017 (*id.* ¶ 23)) — was simply a part of the deceptive scheme, and only one of the multiple representations Facebook used to convince advertisers to utilize its Ads Manager software.  In short, the claim here is predicated on Facebook promising highly targeted advertising placement and then deliberately and materially failing to deliver such placement — a claim which two other California-based District Courts have recognized as valid under the UCL.  *See Woods v. Google, Inc.*, 889 F. Supp. 2d 1182, 1197 (N.D. Cal. 2012) (representations that Google could "target [plaintiff's] ads to almost any set of locations" were actionable misrepresentations under the UCL); *In re Yahoo! Litig.*, 251 F.R.D. 459, 472–73, 476 (C.D. Cal. 2008) (representations that plaintiffs' ads would be "highly targeted" were actionable misrepresentations under the UCL).  While Facebook argues it disclaimed 100% accuracy, Plaintiff's claims are not grounded in Facebook's failure to obtain perfect accuracy, but on Facebook's *deliberate* display of a material number of ads to users outside of Plaintiff's and other advertisers' target audience to boost Facebook's own revenue after representing that it had a unique ability to display ads to the requested target audiences.  Cmplt. ¶¶ 9-10.

## STATEMENT OF FACTS

Plaintiff alleges that, at least since December 1, 2013 and continuing today, Facebook has deceptively marketed its website as a highly targeted advertising platform, and then "deceived advertisers by programming its software to display a material percentage of ads to users who fall outside the target audiences defined by advertisers, and then charging advertisers for those mistargeted ads, in order to maximize its own revenue (beyond what it could have otherwise earned solely from legitimately targeted ads)."  Cmplt. ¶ 9.  Facebook represents that its vast trove of demographic data

---

[2]    *See* Internet Archive's Wayback Machine at https://web.archive.org/web/20151118174631/ https://www.facebook.com/business/a/online-sales/ad-targeting-details (captured November 18, 2015) and https://web.archive.org/web/20171016091716/https://www.facebook.com/business/a/online-sales/ad-targeting-details (captured October 16, 2017) (last visited December 27, 2018).  Facebook concedes in its motion for judicial notice that previous versions of websites archived on the Wayback Machine are subject to judicial notice.  ECF No. 26 at 4.

enables it to display ads to exceedingly precise and granular target audiences. Plaintiff contends that, notwithstanding these representations, Facebook deliberately mistargets ads to boost its own revenue.

The Complaint specifies Facebook's misrepresentations concerning its targeting, including the following four that the Complaint alleges Plaintiff read and relied upon:

(i)     Facebook "offers powerful and unique ways to show your ads *to the people most likely to care about your business*," and "[w]hen you create a Facebook ad, *you can choose the audience that should see it*;" Cmplt. ¶¶ 21, 65;

(ii)    Facebook promoted the "Page Likes" objective as a mechanism "to *connect with more of the people who matter to you*;" *id.* ¶¶ 31, 67;

(iii)   "[w]ith the ad creation tool, *you can choose the type of people who should see your ad* . . . *When you run your ads, we'll serve it in the places you selected*;" *id.* ¶¶ 36, 65; and

(iv)    your ad will be optimized to show to the people *who are most likely to take the actions that will help you meet your objective within your target audience*." *id.* ¶¶ 41, 67.

These, and the other misrepresentations alleged in the Complaint (*id.* ¶¶ 20, 22-25, 40, 42-43), were all made by Facebook to convince potential advertisers that advertising on Facebook would permit them to target specific demographics on a granular level. As Facebook continues to tout on its website:



Cmplt. ¶ 20; *see also*, *e.g.*, ¶ 22, 28-48 (setting forth detail of how Facebook informs advertisers of how their advertisements can be set up and targeted). Plaintiff was further led to believe that Facebook would deliver targeted ads by the way in which Facebook's advertising interface, Ads Manager, allowed selection of a target audience with extraordinary specificity:



*Id.* ¶ 34; *see also* ¶¶ 32-39 (describing the relevant targeting interfaces). Plaintiff used this interface to target an audience of Facebook users for its IV Likes Campaign limited to: Location: United States AND Interests: Investment AND Education Level: College grad AND Household Income: $250,000-$350,000; $350,000-$500,000; or Over $500,000 AND Home Ownership: Homeowners AND Age: 45-65+ *Id.* ¶ 57; *see also id.* ¶ 74 (target audience for SCD Likes Campaign).

At various times, Facebook has quantified its targeting accuracy. For more than two years (November 2015 through October 2017), it published the following representation:

> One of the biggest advantages to advertising on Facebook is your ability to target specific groups of highly engaged people. In fact, compared to the average online reach of 38% for narrowly targeted campaigns, Facebook is 89% accurate (Source: Nielsen OCR, August 2013).

*Id.* ¶ 25. More recently, in November 2017 it represented the results of a test in Latin America reportedly showing that Facebook advertising achieved accuracy rates of 91-94%. *Id.* ¶ 23.

Plaintiff is a typical purchaser of Facebook advertising. It operates a small business, Investor Village, which offers an internet platform to individual "Main Street" investors to connect and communicate with other like-minded investors concerning publicly-traded stocks. *Id.* ¶ 50. Plaintiff's marketing targets highly educated investors with substantial incomes and assets, which is the demographics of its membership base. *Id.* ¶ 51. After being solicited by Facebook to use its advertising, Plaintiff launched one advertising campaign in August 2015, and then a second campaign in January 2016, both using Ads Manager. The first, the "IV Likes Campaign," targeted highly compensated and educated investors with the goal of having such investors "Like" Plaintiff's page on Facebook, while the second, the "SCD Likes Campaign," targeted even more highly compensated investors with the goal of having such investors "Like" the Small Cap Directory page on Facebook. *See Id.* ¶¶ 56-59; 73-76. As noted, Plaintiff relied on Facebook's representations that its ads would be displayed to investors matching the criteria it selected. *See* ¶61 (detailing the IV Likes Campaign and the manner in which Facebook led Plaintiff to believe that it would be reaching its detailed demographic target); ¶¶ 59; 73-76 (detailing same regarding Plaintiff's SCD Likes Campaign).

After launching its IV Likes Campaign, however, Plaintiff noticed that "nearly 40% of the initial 'Likes'" were "from outside the target audience it had defined using Ads Manager (*i.e.*, College graduates AND have household income over $250,000 AND are homeowners)." *Id.* ¶¶ 62-64. Further analysis (including a survey) found that Facebook was programmatically displaying Plaintiff's ads to a pool of serial "Likers" (*i.e.*, Facebook users with a propensity to indiscriminately "Like" ads) falling outside its target market, resulting in a materially deficient targeting accuracy. *Id.* ¶¶ 66, 68-70. These findings were confirmed by the SCD Likes Campaign during which Plaintiff found overlaps between the serial Likers of its two campaigns. *Id.* ¶¶ 77-79.[3]

---

[3] Facebook suggests that Plaintiff "could not have had a 'false' sense of the [IV Likes] campaign's success" if it "knew that non-targeted-audience users were Liking its Page as a result of the IV Likes Campaign." Def. Mem. at 11. First, irrespective of what Plaintiff discovered through its own analysis, there is no question that Facebook's deliberate display of Plaintiff's ads to serial Likers was designed to create a false impression of success by maximizing the number of Likes. Further, Plaintiff was unsure as to whether the initial mistargeting was an aberration or a pattern, and only after reviewing Facebook's representations, determined to continue to run the IV Likes Campaign.

But even though Facebook had deliberately displayed ads to a material percentage of Facebook users outside Plaintiff's target market during the two campaigns — resulting in a material number of ads being displayed outside of Plaintiff's target specification — Facebook charged Plaintiff for *all* of the impressions and Likes generated by the two campaigns. *Id.* at ¶ 72 (Facebook charged Plaintiff $1,409.69 for *all* impressions generated by IV Likes Campaign), ¶ 80 (Facebook charged Plaintiff $242.17 for *all* Likes generated by SCD Likes Campaign). As a result, Plaintiff paid for advertising that it would not have otherwise agreed to pay anything at all, but for Facebook's misrepresentations.

## LEGAL STANDARDS

When ruling on a motion to dismiss, a district court must accept all factual allegations in the complaint as true, construe the pleadings in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Ass'n for Los Angeles Deputy Sheriffs v. Cty. of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

## ARGUMENT

Facebook's presentation of its arguments is somewhat scattershot, with the apparent intent of creating confusion. Irrespective, Plaintiff will address Facebook's arguments, as set forth in the Argument section of its brief, one-by-one as they are presented.[4]

### A.    Facebook's Attacks on Plaintiff's Specificity of Pleading As To Level of Accuracy and Its Programmatic Mis-Displaying of Advertisements Misconstrue The Claims and Are Misplaced

Cmplt. ¶¶ 65, 67. But *nothing changed* — as late as November 2015 (*three* months after the IV Likes Campaign launched), Plaintiff confirmed through a survey and ongoing analysis that a material number of its ads during the overall campaign were still being displayed to users outside its target market who were serial Likers. *Id.* ¶¶ 68-70.

[4]    Facebook includes in its introduction a fine point of distinction that it does not appear to develop in the brief thereafter, namely that the 89% accuracy representation refers not to targeting accuracy, but to "reach," which Facebook defines to "refer to the number (or relative percentage) of people in a target audience to whom an ad is displayed." Def. Mem. 2. But the context in which Facebook's 89% accuracy claim appeared makes it clear that "targeting" and "reach" effectively mean the same thing. *See* Cmplt. ¶ 25 (stating that Facebook advertising gives you the "ability to ***target*** specific groups of highly engaged people," and then noting that "compared to the average online ***reach*** of 38% for narrowly ***targeted*** campaigns, Facebook is 89% accurate," thus indicating that the accuracy claim relates to targeting.)

Facebook first argues that "[n]one of the statements on which Plaintiff alleges it actually relied include any representation regarding the specific level of accuracy with which Facebook delivers an ad to a target audience, let alone a guarantee of perfect accuracy." Def. Mem., Section A.1, at 9. But Plaintiff does not have to allege that Facebook promised a specific level of accuracy, let alone perfect accuracy, to state a claim, and, of course, Facebook cannot cite a single case suggesting that this is required.[5]

Rather, Plaintiff alleges that Facebook provided advertisers with a detailed interface to allow them to define target audiences, represented that it displays ads to the defined target audiences, but then instead deliberately displayed ads to users *outside* Plaintiff's target audience at a materially deficient rate. *See* Cmplt ¶¶ 9-12. That is a paradigmatic fraud claim, as per an earlier *Yahoo!* decision (out of the Central District) in which Judge Snyder upheld a "targeting accuracy" claim like the one alleged here in the face of a similar Rule 9(b) challenge. There, the plaintiffs alleged Yahoo! had misrepresented that plaintiff's ads would be "highly targeted" (notably, *without* specifying a percentage). *In re Yahoo! Litig.*, 251 F.R.D. at 472. Like Facebook here, the defendants argued, among other things, that plaintiffs had not complied with Rule 9(b). *Id.* The Court disagreed:

> [The] plaintiffs have adequately pled their claim for misrepresentation. The SAC alleges that advertisers—a group that includes plaintiffs—"buy ad placements from [defendants] precisely because of [defendants'] promise, and contractual obligation, *to deliver targeted advertising through its Sponsored Search and Content Match products*" . . . The SAC further alleges that despite defendants' representations that they would provide plaintiffs with "*highly targeted*" advertising services, they failed to do so, and instead, charged for advertising that was of little or no value to plaintiffs. Thus, plaintiffs have pled that they relied on defendants' alleged misrepresentations. *Furthermore, because*

---

[5]  At Def. Mem. 17, lines 9-10, Facebook misleadingly paraphrases a snippet from the Yahoo decision (swapping in "percentage" for "characteristics") to suggest the decision held "percentages" are required, but that is a mischaracterization since the decision addressed representations concerning privacy. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *26 (N.D. Cal. Aug. 30, 2017). Moreover, the *Yahoo* court found that the following statement — defendants have "physical, electronic, and procedural safeguards that comply with federal regulations to protect personal information about you" — made a "specific, non-subjective guarantee." *Id.* Here, Facebook made similarly specific, non-subjective statements. *See, e.g.*, Cmplt. ¶ 36 ("When you run your ads, we'll serve it in the places you selected.") and ¶41 ("your ads will be set up to show to people within your target audience").

> *the SAC identifies the alleged misrepresentations made by defendants . . . they have complied with Rule 9(b)'s heightened pleading standards for fraud.*

*Id.* at 473.[6]  Likewise, a targeting accuracy claim (not based on a specific percentage) was upheld in *Woods*, 889 F. Supp. 2d 1182, where the court held that the plaintiff adequately pled a UCL claim against Google where the plaintiff alleged that (i) Google's interface led him to believe that Google would "target [plaintiff's] ads to almost any set of locations he selected, (ii) Google distributed plaintiff's ads to users outside those geographic locations, and (iii) Google charged him for clicks on ads distributed to users outside the designated geographic locations.  *Id.* at 1197; *see also Woods v. Google, Inc.*, No. 5:11-CV-01263-EJD, 2017 WL 4310765, at *4 (N.D. Cal. Sept. 28, 2017) (denying Google's motion for summary judgment on Woods's UCL claim based on location targeting). Compared to those cases, the explication here of the "who, what, where, when, and "why" of the alleged misrepresentations and the nature of the deceptive scheme is, in actuality, more fulsome and complete, down to specific dates and screenshots of the representations and the Ads Manager platform.

Facebook next resorts to challenging Plaintiff's claims – as it does multiple times throughout its brief – by pointing to an exculpatory disclaimer in its advertising terms of service that it "will do its best to deliver the ads to the audience [specified]" and it "cannot guarantee in ***every instance*** that [the] ad will reach [its] intended target."  Def. Mem. 9 (citing Ex. A ¶ 1). The disclaimer, however, raises a factual issue; namely, whether Facebook actually did "its best" for advertisers.  As Plaintiff alleges, Facebook deliberately mistargeted ads to boost its own revenue (Cmplt. ¶¶ 12, 71, 80), and thus "did its best" for itself, not advertisers.[7]

---

[6]    While the Court's quoted analysis concerned plaintiff's assertion of a stand-alone mis-representation claim, the decision later held that claim served as a predicate for the plaintiff's UCL claim and declined to dismiss that claim as well.  251 F.R.D. at 476.

[7]    Facebook also claims Plaintiff should not have expected accuracy for the first 50 Likes because of the so-called Learning Phase.  (Def. Mem. at 4 n.4).  But Exhibit C (describing the "Learning Phase") is not a screenshot from the Wayback Machine, but from November 2018, and thus does not prove that the "Learning Phase" concept actually appeared on Facebook's website in 2015-2016 when Plaintiff was advertising.  *See* Plaintiff's Response to Defendant Facebook, Inc.'s Request for Judicial Notice filed concurrently herewith.  Even if some other version of it existed during the 2015-2016 period (which Facebook does not demonstrate), its conspicuousness and significance should not be assessed on a motion to dismiss.

Further, Facebook concedes (Def. Mem. at 1), that the phrase "*every* instance" in the disclaimer means all the time, or 100%, and argues that "[p]articularly in light of Facebook's express disclosure that it does not guarantee 100 percent accuracy in terms of which users will see ads, see Ex. A ¶ 1, no reasonable consumer could have read [the representations cited by Plaintiff in the complaint] as such." Def. Mem. at 17.  But, as noted, Plaintiff is *not* claiming that it expected 100% accuracy. Rather, Plaintiff claims that Facebook represented that it would display ads to users matching Plaintiff's targeting criteria, but then deliberately failed to do so, in a material way, in order to boost its own revenue, Cmplt. ¶¶ 9-10.  In Plaintiff's case, targeting accuracy of "60% or less" is *material* non-performance, and Facebook's disclaimer of 100% accuracy does not and should not immunize it from liability.  For example, had Facebook only delivered 5% accurate ads (*i.e.*, 95% went to untargeted individuals), under its view of its disclaimers, it could walk away scot-free.  Obviously, that (or even 60% accuracy) is not excused by language disclaiming 100% accuracy.  At any rate, whether Facebook's inaccuracy was material presents a question of fact for a jury.  *See Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 287 (C.D. Cal. 2011) (materiality is a question of fact for the jury).[8]

In its Introduction (but not in its argument), Facebook also quotes a second disclaimer in paragraph 2 of its Ad Terms (Ex. A ¶ 2) which stated, "In instances where we believe doing so will enhance the effectiveness of your advertising campaign, *we may broaden the targeting criteria you specify*."  Def. Mem. 2 (emphasis in brief).  But Facebook fails to explain how it could possibly "believe" that broadening Plaintiff's targeting criteria to include users *outside* Plaintiff's target market would "enhance the effectiveness" of Plaintiff's campaigns when Plaintiff used Facebook's Ads Manager to expressly **limit** display of its ads to highly compensated and educated users (Plaintiff's core demographic).  Cmplt. ¶¶ 51-52, 57, 74.  In fact, it is not credible for Facebook to claim it had any basis for this "belief" when it never consulted with Plaintiff, but instead offered Plaintiff an automated interface to select a target audience without any human intervention (*id.* ¶¶ 28-39), and Facebook tracks

---

[8]  Facebook states that its 89% accuracy claim is not a guarantee, but the Supreme has held that the word "is" — as in "Facebook is 89% accurate" — indicates a statement of fact that expresses certainty.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1325 (2015) (statement that coffee "is" hot is a statement of fact expressing certainty).

*billions* of ads per day. *Id.* ¶ 48. At any rate, the question of whether Facebook could have had any reasonable belief in this regard is obviously a question of fact not susceptible to resolution on a motion to dismiss.

Finally, hoping to distract attention from the misrepresentations that Plaintiff alleges, Facebook faults Plaintiff for failing to allege specifics about the Nielsen study that Facebook itself cited to support its claim of 89% accuracy. Def. Mem. 9, 15-16. This misdirection fails. Aside from the fact that there is no basis to charge Plaintiff with knowledge of the data that Nielsen used or its methodology, Facebook represented 89% targeting accuracy as well as made other claims about targeting accuracy (91-94% in another instance, *see id.* ¶ 23), as part of a broader scheme to convince potential advertisers that "businesses [will not be] seeing wasted costly impressions like they do in other mediums" and "One of the biggest advantages to advertising on Facebook is your ability to target specific groups of highly engaged people" – a claim it backed up specifically with the 89% number. *Id.* ¶ 25. That Facebook might have used the 89% number sloppily or failed to note the circumstances and limitations regarding the study from which it pulled the number is irrelevant to the role it played in Facebook's scheme. It is Facebook's false representations and its scheme to mislead advertisers that it would deliver focused advertisements that are at issue. The point is that Facebook promoted the 89% number (and also the 91-94% number) to potential advertisers simply as an indicia of its ability to accurately display ads to users who met advertisers' targeting criteria, which is in substance the same claim made by the other misrepresentations that Plaintiff alleges — *i.e.*, Facebook will accurately display your ads to users who meet your targeting criteria. *See id.* ¶¶ 18-22, 31, 36, 40-43. Whether Facebook's 89% claim was in fact accurate, or whether the Nielsen study suffered from certain flaws or limitations is irrelevant since the 89% claim was just one misrepresentation in a broader scheme to mislead advertisers into believing that Facebook would accurately display ads to the target audiences defined by advertisers, when in fact, it was deliberately mistargeting ads.[9]

---

[9]  Facebook also contends that the words "narrowly targeted" defeat Plaintiff's claims (Def. Mem. at 9), but a fair reading of the phrase "narrowly targeted" describes what Ads Manager is designed to do; namely, help advertisers create a campaign limited to specific targeting criteria. Cmplt. ¶¶ 32-39.

**B.** **Facebook's Challenge to the Specificity of the Claim That Plaintiff was Misled In Connection With the Two Campaigns are Insufficient to Warrant Dismissal**

As noted, Plaintiff pleads the "who, what, when, where, and how" of Facebook's misrepresentations, and why those misrepresentations were misleading. Yet, in two subsections (Section A.2.a & b, Def. Mem. 10-11), Facebook attacks the specificity with which Plaintiff alleges it was misled in entering into the two advertising "campaigns." First, Plaintiff clearly alleges that it was misled by Facebook's displaying of a material percentage of ads to users outside Plaintiff's target criteria. Ignoring the fundamental nature of being misled in such circumstances, Facebook turns to challenging the sufficiency of Plaintiff's pleading of the results of the two ad campaigns. Facebook essentially contends (without citing relevant caselaw) that Plaintiff had to allege with specificity the exact results of these two campaigns – *e.g.*, Facebook writes, "Plaintiff says nothing about the total number of Likes or the overall accuracy rate"; "the Complaint does not specify any information about the actual results of the campaign in terms of the number or demographics of people to whom the ad was displayed or who Liked the Page 'as a result of' the campaign, or how many of those Likes were purportedly from users outside the target audience"; and "as with the IV Likes Campaign, the Complaint contains no allegations about the actual results of the campaign in terms of the number or demographics of people to whom the ad was displayed or who Liked the Page, or how many of those Likes were from users outside the target audience." Def. Mem. 10-11.

These arguments fail because *without access to Facebook's database* (which stores information concerning to whom each ad was displayed) (Cmplt. ¶¶ 26-27, 49), Plaintiff cannot possibly know the details that Facebook is demanding, much less know them with precision. Although conveniently ignored by Facebook, Ninth Circuit precedent is clear that in averments of fraud, Rule 9(b)'s heightened particularity is "relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). That is why Rule 9(b) only "requires that plaintiffs specifically plead those facts surrounding alleged acts of fraud to which they can

---

Certainly, Facebook itself never defined "narrowly targeted" to have any other meaning when it used the term.

reasonably be expected to have access." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995); *accord Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 975 (N.D. Cal. 2015) ("facts that are within the defendants' sole knowledge may be pleaded generally") (citing *Moore*, 885 F.2d 531).

Because Plaintiff cannot "reasonably be expected to have access" to Facebook's database (and, of course, does not have such access), Plaintiff pleads what the Ninth Circuit requires: "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of the facts on which the belief is founded." *Moore*, 885 F.2d at 540. That is precisely what Plaintiff did at Complaint paragraphs 62-70 and 77-79, which specify the analyses Plaintiff undertook to ascertain who was seeing its advertisements. Those paragraphs adequately state the claims with the particularity required given Plaintiff's lack of access to Facebook's data. *See, e.g., Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 568 (9th Cir. 2017) (district court's granting of Rule 9(b) motion to dismiss in case alleging that Nieman Marcus had misleadingly advertised comparison prices where the comparisons used by Nieman Marcus were not information as to which the consumer could have reasonable access and finding it sufficient that plaintiff's "allegations regarding the fictitious nature of the Compared To prices may properly be based on personal information and belief at this stage of the litigation.").

Moreover, while Facebook attempts to burrow deeply into the weeds and demand far beyond what is needed to allege a viable claim, Facebook also ignores the plain allegations of the Complaint. For instance, it contends that Plaintiff failed to adequately allege the basis that the Likes fell outside the target market. To the contrary, the Complaint provides specific detail as to how and why Plaintiff reached that conclusion, *see* Cmplt. ¶ 62 ("*according to their Facebook profiles*, they did not graduate college"); ¶ 63 – two sources of confirmation ("*based on their Facebook profiles* and other *reliable* third party data that Plaintiff accessed, clearly did not possess household income over $250,000"); ¶ 68 ("In November 2015, Plaintiff surveyed six of the users who liked its Page as a result of the IV Likes Campaign."); ¶¶ 69, 78 (Plaintiff noticed many of the users who liked its Page were serial Likers outside its target).

## C.    Plaintiff Has Alleged Statutory Standing Under the UCL

Facebook asserts two challenges to Plaintiff's UCL standing.  Both fail.

### 1.    Plaintiff Has Properly Pled Economic Injury to Assert Standing

Facebook's first contention (Def. Mem. 12-13) is that Plaintiff has not pled that it paid for any mistargeted ads, supposedly because Plaintiff fails to "support" its allegation that it was charged for "*even a* single ad to a non-target audience user" or that the percentage exceeded 11%.  Def. Mem. 13 (emphasis by Facebook).

Aside from the point that Plaintiff's claims are not predicated exclusively on the 89% target number, the Complaint alleges for the "IV Likes Campaign" that as of September 1, 2015, at least eight out of 21 individuals (*i.e.*, 40%) who Plaintiff surveyed were outside the target demographics (Cmplt. ¶¶ 62, 63, 64), and that in November 2015 when Plaintiff surveyed another six users who had "Liked" its page, "[e]very single one of those users confirmed that they did not meet the household income criteria (including five out of six by a significant margin) and only one of those users graduated college." *Id.* ¶ 68 (emphasis deleted).  An allegation of even one person – since Plaintiff does not have to prove his case but simply allege it – would suffice.  Here, Plaintiff alleges, with specificity, at least fourteen.  That suffices to create standing for his claims here since Plaintiff alleges that it paid $1,409.69 for *all* impressions generated by the IV Likes Campaign (*id.* ¶ 72), even though some of those impressions were attributable to users outside Plaintiff's target market, and thus Plaintiff would have not paid for those impressions, but for Facebook's misrepresentations.

And although the IV Likes Campaign allegations confer standing as to the SCD Likes Campaign, where Plaintiff elected to be charged for "Likes" (*Id.* ¶ 76), the Complaint alleges concerning the SCD Likes Campaign that "Plaintiff found that a material percentage of the Likes generated by the Campaign (for which Plaintiff paid) were from users outside of Plaintiff's defined target audience." (*Id.* ¶ 77). The Complaint further alleges an overlap of serial Likers with the IV Likes Campaign (*id.* at ¶ 78), and that "a material percentage of Plaintiff's ads [were] to users outside the defined target market who were serial 'Likers." *Id.* ¶ 79.  Finally, Plaintiff alleges that "even though many of the Likes generated by the SCD Likes Campaign were from users outside of Plaintiff's defined

target audience for that Campaign, Facebook still charged Plaintiff for **all** of the Likes generated by the Campaign. Plaintiff ultimately paid $242.17 to Facebook for Likes generated in connection with the SCD Likes Campaign" (*id.* ¶ 80), and thus Plaintiff paid for "Likes" in connection with the SCD Likes Campaign for which it would not have paid, but for Facebook's misrepresentations.

That Plaintiff has adequately alleged injury traceable to payments for the display of ads to users outside the target market sufficient to confer standing is underscored by the single case Facebook relies upon, *Singh v. Google LLC*, No. 16-CV-03734-BLF, 2018 WL 984854 (N.D. Cal. Feb. 20, 2018). The claim in that case was that Google made false and misleading statements to potential advertisers when it represented that "invalid clicks account for less than 10% of all clicks on AdWords ads." *Id.* at *1. The court dismissed the plaintiff's claim because he could not allege that he "actually paid for invalid or fraudulent clicks *at a rate above what was advertised*." *Id.* at *4; *see also id.* at *5 ("the injury must necessarily be that Singh was charged for invalid clicks *at a rate exceeding those representations*."). Here, in contrast, Plaintiff alleges that he paid for mistargeted ads at a rate of "40% or more" Cmplt. ¶¶ 10, 70-72, 77-80), which exceeds the inaccuracy rate of 11% that Facebook represented.[10]

Moreover, unlike this case, where Plaintiff relies on its personal experience using Ads Manager to launch ad campaigns, the plaintiff in *Singh* failed to plead any "factual allegations applicable to [his] personal experience with Google advertisements," *Singh*, 2018 WL 984854, at *2. Thus, unlike this case, the plaintiff in *Singh* did not know and could not allege that he, in fact, had paid for *any* invalid clicks (much less more than 10%), and Judge Freeman's holding was that the Court "f[ound] that the TAC does not contain any factual allegations regarding Singh's own *experience* paying for invalid clicks, and thus the TAC does not allege that Singh suffered an economic injury as a result of Google's

---

[10]    Facebook argues that "Plaintiff simply assumes . . . that the percentage of non-targeted audience users who Liked its Page must be equal to percentage of non-target-audience users to whom Facebook allegedly delivered its ad." Def. Mem. at 10. Effectively, Facebook is asking the Court to draw an inference in its favor that just because the percentage of non-targeted Likes was 40% or more, does not mean that ads were mistargeted at a rate of 40% or more. But as noted above, on a motion to dismiss, all reasonable inferences must be drawn in favor of the plaintiff, and here (absent discovery) it is reasonable to infer proportionality; namely, that if 40% or more of the Likes were outside the target market, then 40% or more of the ads were mistargeted and displayed to users outside the target market.

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS
Case No. 4:18-cv-05286-PJH

conduct sufficient to confer standing under the UCL and FAL." *Id.* at *10-11. As shown, the Complaint here alleges that Plaintiff actually paid for mistargeted ads. Thus, this Complaint survives the *Singh* analysis because it alleges precisely what Judge Freeman required the plaintiff there to allege, but could not.

### 2. Plaintiff's Claims Are Not Limited to the Misrepresentations On Which It Relied

Facebook next contends that "Plaintiff's Claims Are Limited To The Misrepresentations On Which It Alleges It Relied." (Def. Mem. 13-15). This is wrong. When a plaintiff alleges a concerted misleading advertising scheme – what is commonly referred to as a "*Tobacco II*" claim, after *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009) – then a plaintiff need not allege that it relied upon each and every representation that was part of the scheme. *See Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972, 980 (N.D. Cal. 2016) (for purposes of Rule 9(b), once the details of the deceptive campaign are particularly pled, individual reliance on specific statements need not be pled); *Anderson v. SeaWorld Parks & Entm't, Inc.*, No. 15-CV-02172-JSW, 2016 WL 8929295, at *5 (N.D. Cal. Nov. 7, 2016) ("a plaintiff's allegations about an alleged 'long-term advertising campaign' are sufficiently particular" if the plaintiff alleges "facts about the campaign to show, in terms of 'breadth and content,' it would not be 'unreasonable to presume that all [putative] class members were exposed to' to the allegedly misleading representations and to show that it would be unrealistic for a plaintiff to prove reliance on a particular advertisement.").[11]

---

[11] All the cases Facebook cites (Def. Mem. 14) are inapposite because they involved plaintiffs who could not allege having seen and relied upon *any* of the representations at issue. *See Letizia v. Facebook Inc.*, 267 F. Supp. 3d 1235, 1243 (N.D. Cal. 2017) ("Plaintiffs have not alleged they actually saw *either* of the erroneous metrics at issue"); *In re Yahoo! Inc. Customer Data Security Breach Litigation*, 2017 WL 3727318, at *28 ("Plaintiffs do not allege that they 'actually read' Defendants' Terms of Service, let alone that Plaintiffs "actually read" the separate Privacy Policy containing the alleged misrepresentation at issue."); *Figy v. Amy's Kitchen, Inc.*, No. CV 13-03816 SI, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013) (plaintiff did not allege seeing the representation at issue prior to purchasing the products); *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1363 (2010) (plaintiff failed to allege that he ever saw or read defendant hospital's representations).

Here, Plaintiff plainly asserts an ongoing and multipronged fraudulent advertising campaign over several years that is continuing (Cmplt. ¶¶ 18-27), as well as the interface itself into which advertisers enter their target demographic information. *Id.* ¶¶ 28-41. Since the claim in this case is not predicated *entirely* on the 89% representation, but on a long-running campaign, Facebook's argument that Plaintiff must allege reliance upon each and every single misrepresentation fails under *Tobacco II*.

The Complaint alleges the misrepresentations that are part of the alleged deceptive campaign that Plaintiff saw and relied upon in continuing to advertise with Ads Manager, Cmplt. ¶¶ 65, 67, citing *id.* ¶¶ 21, 31, 36, 41. Facebook concedes there were four specific such misrepresentations identified in the Complaint (even though one would suffice) and Facebook's contentions about timing are meaningless since there is no possible contention that Plaintiff has not identified representations upon which it relied to its detriment after seeing representations that were part of the ongoing scheme.

### D. Plaintiff Has Stated a UCL Claim on the Merits

Somewhat half-heartedly, Facebook also contends that, somehow, the Complaint fails to set forth a cognizable claim on the merits under any of the UCL's three predicate sections. Facebook's "hope to make something stick by throwing a lot at the wall" contentions all fail.

### 1. Plaintiff States a Claim Under the UCL Fraud Prong

To state a claim under the fraud prong of the UCL, "it is necessary *only* to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal. 4th 298; *accord Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015). The vantage point is that of a "reasonable consumer." *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Whether reasonable advertisers are likely to be deceived by a representation of targeting accuracy is usually a question of fact inappropriate for resolution on a motion to dismiss. *Woods*, 889 F. Supp. 2d at 1197; *see also Singh*, 2018 WL 984854, at *6 ("Reasonableness of reliance is ordinarily a question of fact.").

The Complaint here asserts, in essence, that Facebook promised advertisers focused, granular targeted advertisements and materially failed to deliver because it deliberately mistargeted ads to boost its own revenue. In a word, it alleges fraud. Ignoring the vast majority of the Complaint, Facebook nonetheless argues (1) that Plaintiff did not allege enough information about the details of the Nielsen

study that Facebook touted (Def. Mem. 16) and (2) that some of the representations it quotes could not have misled consumers.  Def. Mem. 17-18.

The first of these two points has already been addressed at page 11 above. As to the second, statements such as (among others) "with the ad creation tool, you can choose the type of people who should see your ad" and "when you run your ads, we'll serve it in the places you selected" (Cmplt. ¶ 36), or "your ad will be optimized to show to the people who are most likely to take the actions that will help you meet your objective within your target audience" and "your ads will be set up to show to people within your target audience" (*id.* ¶ 41), or "when you create a Facebook ad, you can choose the audience that should see it" (*id.* ¶ 21), are statements of fact which were allegedly false or misleading given Facebook's programmatic displaying of ads to serial likers and others *outside* an advertiser's target area, particularly when taken in conjunction with the manner in which advertisers are led to believe that when they enter precise demographic information into Ads Manager they are defining the audience that will see the advertiser's ads.  Cmplt. ¶¶ 28-47.

None of these representations are "generalized promotional statements."  Def. Mem. 17.  They are specific misleading representations that a reasonable advertiser could, most certainly, have relied upon and hence state a UCL fraud claim.  In fact, Facebook's argument actually reduces to its contention that "in light of Facebook's express disclosure that it does not guarantee 100 percent accuracy in terms of which users will see ads, *see* Ex. A ¶ 1, no reasonable consumer could have read them as such."  Def. Mem. 17.  But of course, as noted, a representation of 100% accuracy is not the claim in the case, and the fact that Facebook has to distort the nature of Plaintiff's claim betrays the weakness of Facebook's position.[12]

---

[12]  The two cases that Facebook cites at Def. Mem. at 17-18, are distinguishable.  The first, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012), involved claims that defied "common sense" in that a consumer might have believed that there were no costs associated with a credit card and there had been no representations to even suggest that.  By contrast, here, as set forth in detail, it is alleged that Facebook affirmatively represented that it would display ads to users matching targeting criteria and then deliberately mistargeted. Facebook's other case actually supports Plaintiff because while Facebook quotes (actually, misquotes by leaving out a few words) a general statement from the case, the Court found that, despite an unambiguous disclaimer, "the allegations in the SAC may be sufficient at the pleading stage to support a claim that Facebook's filtering system

## 2. Plaintiff States a Claim Under the "Unfair" UCL Prong

Facebook concedes that Plaintiff's "unfair" UCL claim is based on the same misrepresentations as its "fraudulent" UCL claim. (Def. Mem. at 18). Since, as shown above, Plaintiff has adequately alleged those misrepresentations, the "unfair" UCL claim also survives. Moreover, Plaintiff's allegations (Cmplt. ¶¶ 101-106) adequately state an "unfair" UCL claim under at least one of, if not all three of, the three tests. *See Letizia*, 267 F. Supp. 3d at 1247 (since court found that plaintiff's "unfair" UCL claim did not merit dismissal under the "balancing" test, it need not analyze plaintiff's claim under the "tethering" test).

Under the balancing test, a plaintiff states a claim if it alleges that the harm from an unethical business practice is greater than the utility of the practice (as Plaintiff has done here; Cmplt. at ¶ 103). *Letizia*, 267 F. Supp. 3d at 1245–46. Because this determination is one of fact which requires a review of evidence from both parties, courts are reluctant to dismiss unfair prong claims under the balancing test. *Id.* at 1246. Here, there is insufficient evidence to conduct a proper balancing test. If anything, Facebook has failed to justify (through its disclaimers or otherwise) its unethical practice of mistargeting ads for its own benefit at the expense of advertisers. The ultimate scope and how much its deceptive practices have cost advertisers cannot now be determined. *See Letizia*, 267 F. Supp. 3d at 1247 (declining to dismiss claim under UCL's unfair prong).

Under the "tethering" test, the UCL reflects California's policy of deterring deceptive business practices, *see In re Tobacco II Cases*, 46 Cal. 4th 298, and Facebook's deliberate mistargeting of ads

---

suffers from serious defects" (*i.e.*, claims akin to those here). The Court only ruled in Facebook's favor because Plaintiff could not plead "a reasonable inference that Facebook knew of the problems at the time that it made its representations in the Help Center with respect to the filtering system." *In re Facebook PPC Advert. Litig.*, No. 5:09-CV-03043-JF, 2010 WL 5174021, at *10 (N.D. Cal. Dec. 15, 2010). Here, as noted above, the relevant disclaimers are ambiguous and inadequate, and Facebook has not raised the issue of its knowledge. In any event, Plaintiff alleges that Facebook knowingly mistargeted ads to boost its revenue, as evidenced, for example, by the apparently deliberate pattern of ads being displayed to serial Likers outside Plaintiff's target market. Cmplt. ¶¶ 9, 70, 78-79. Moreover, Plaintiff alleges that Facebook has knowledge of how each and every one of its ads performs as evidenced by displaying this information to users. *Id.* ¶¶ 26-27, 49.

while still charging for those ads plausibly qualifies as the kind of deceptive business practice covered by the UCL.  Again, the scope and extent cannot now be determined.

Finally, under the "FTC" test, the injury to the Class (which undoubtedly numbers in the many thousands) is plausibly substantial (even if small for individual advertisers like Plaintiff), not outweighed by any countervailing benefits, and one that could have reasonably been avoided.  Again, the scope and proof of this cannot possibly be adjudicated from the face of the Complaint.

### 3. Plaintiff States a Claim Under the Unlawful Prong of the UCL

Facebook challenges Plaintiff's claim that the misrepresentations at issue violate California's False Advertising Law (and therefore form a predicate for the "unlawful" prong of the UCL) on the supposed grounds that (1) it lacks standing (Def. Mem. 20-21) and (2) that it failed to plead the misrepresentations upon which it relied with "requisite particularity and does not explain how the reported results it achieved through its advertising campaigns demonstrate that any of Facebook's representations were misleading."  Def. Mem. 21.  The first contention was disposed of at pages 14-16, above, and the second at 12-13 above.  Accordingly, Facebook's contentions fail.

### 4. Plaintiff States a Claim for Injunctive Relief

Plaintiff adequately pleads a claim for injunctive relief under *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018), *cert. denied,* No. 18-304, 2018 WL 4350853 (U.S. Dec. 10, 2018). *Davidson* ruled that a previously deceived plaintiff who brings a false advertising claim has standing to seek injunctive relief based on its inability to rely on defendant's advertising claims in the future. *Davidson*, 889 F.3d at 969–70.  Applying *Davidson*, this Court in fact recently held that advertisers had standing to pursue injunctive relief against Facebook because they alleged that Facebook continued to employ deficient auditing and verification practices, and therefore they could not trust the accuracy of Facebook's representations concerning its advertising metrics in the future.  *Tyler Barnett PR, LLC v. Facebook Inc.*, No. 16-CV-06232-JSW, 2018 WL 2974695, at *2–3 (N.D. Cal. June 1, 2018).  This case is materially no different.

Here, the Complaint alleges that Facebook continues to misrepresent that it offers granular accuracy in targeting ads.  As Facebook's CEO recently testified before Congress, "We just show the

message to the right people." Cmplt ¶ 18. Moreover, Facebook's website continues to represent that it will show ads "to people that match the advertiser's target audience." *Id.* ¶ 20. And Facebook's targeting claims have, if anything only become bolder in recent years. As recently as November 2017 (*id.* at ¶ 23), it published the results of a test in Latin America claiming accuracy rates as high as 91-94% (*i.e.*, even higher than the 89% claim that was removed from its site).

While Facebook continues to tout its targeting accuracy, there is no indication that Facebook has stopped mistargeting ads. Therefore, under *Davidson*, Plaintiff, and thousands of other advertisers, face a risk of future harm since they cannot trust Facebook's representations regarding its targeting accuracy should they wish to advertise on Facebook again in the future. In particular, since Plaintiff continues to operate its popular investment forum, Investor Village, and continues to target highly compensated and educated investors (Cmplt. ¶ 51), it is reasonable for the Court to infer on a motion to dismiss that Plaintiff would advertise on Facebook again if Plaintiff could trust Facebook to display its ads only to users matching its targeting criteria (and, Plaintiff represents that it would and Plaintiff would so allege if given the opportunity to amend).

## **CONCLUSION**

For all of the above reasons, the Court should deny Facebook's motion to dismiss, and grant such other relief as is just and proper. In the alternative, if the Court grants Facebook's motion to dismiss or any part thereof, it should do so without prejudice, and grant Plaintiff leave to amend its Complaint to address any claims the Court found insufficiently pled.

Dated: December 31, 2018      Respectfully submitted,

By: /s/ Pamela A. Markert

**CERA LLP**
Solomon B. Cera (State Bar No. 099467)
Pamela A. Markert (State Bar No. 203780)
595 Market Street Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189
Email: scera@cerallp.com
Email: pmarkert@cerallp.com

**KLAFTER OLSEN & LESSER LLP**
Jeffrey A. Klafter (*pro hac vice to be requested*)
Seth R. Lesser (*pro hac vice to be requested*)
2 International Drive, Suite 350
Rye Brook, NY 10570
Telephone: (914) 934-9200
Facsimile: (914) 934-9200
Email: JAK@klafterolsen.com
Email: Seth@klafterolsen.com

**WOHL & FRUCHTER LLP**

J. Elazar Fruchter (*pro hac vice to be requested*)
570 Lexington Avenue, 16th floor
New York, New York 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiff and the Proposed Class*