UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Phyllis J. Hamilton, Judge

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM,   ) | |
|          ) | |
|      Plaintiff,   ) | |
|          ) | |
|   VS.      ) | **NO. CV 18-05286-PJH** |
|          ) | |
| FACEBOOK, INC.,   ) | |
|          ) | |
|      Defendant.   ) | |
| _____) | |

Oakland, California
Wednesday, February 13, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

          KLAFTER, OLSEN & LESSER LLP
          Two International Place - Suite 350
          Rye Brook, NY  10573
    **BY:  SETH R. LESSER, ESQUIRE**

          CERA LLP
          595 Market Street - Suite 1350
          San Francisco, CA  94105
    **BY:  SOLOMON B. CERA, ESQUIRE**
         **PAMELA A. MARKERT, ESQUIRE**

(Appearances continued on the following page)

Reported By:       Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
             Official Reporter

APPEARANCES CONTINUED:

For Defendant:

               LATHAM & WATKINS LLP
               555 Eleventh Street, N.W. - Suite 1000
               Washington, D.C.  20004
      **BY:  SUSAN E. ENGEL, ESQUIRE**

               LATHAM & WATKINS LLP
               505 Montgomery Street - Suite 2000
               San Francisco, CA  94111
      **BY:  ELIZABETH L. DEELEY, ESQUIRE**

<u>**Wednesday - February 13, 2019**</u>                    <u>**11:36 a.m.**</u>

P R O C E E D I N G S

---oOo---

**THE CLERK:**  Calling CV 18-5286-PJH,

IntegrityMessageBoards.com vs. Facebook, Inc.

Counsel, please step forward and state your appearances.

**THE COURT:**  All right.  Counsel, appearances.

**MR. LESSER:**  Good morning, Your Honor.  Seth Lesser of

Klafter Olsen Lesser for the plaintiff.  I'm accompanied by two

of my co-counsel.

**MR. CERA:**  Good morning, Your Honor.  Solomon Cera for

the plaintiff.

**THE COURT:**  Good morning.

**MS. MARKERT:**  Good morning, Your Honor.  Pamela

Markert for the plaintiff.

**THE COURT:**  All right.  Good morning.

**MS. ENGEL:**  I am Susan Engel from Latham & Watkins.  I

represent Facebook.  Here with me is Elizabeth Deeley, also of

Latham & Watkins.

**MS. DEELEY:**  Good morning, Your Honor.

**MS. ENGEL:**  Also from Facebook are Kate Patton and

Holly Tambling.

**THE COURT:**  Good morning.

This matter is on for a hearing on yet another motion to

dismiss.  And I have reviewed the papers.  Did you wish to be

heard further?

      **MS. ENGEL:** Please.

    Plaintiff's claim in this case is that Facebook misrepresented how accurately Facebook would deliver its ad campaigns. There is nothing in the Complaint, there are no specific factual allegations that in any way suggest Facebook does a bad job delivering ads. There is certainly nothing that would satisfy the Rule 9(b) pleading standard applicable here.

    The case should be dismissed for three straightforward reasons.

    One, plaintiff has not identified any specific representation about ad accuracy that it actually saw and relied upon. It points to promotional statements that are too general to be actionable.

    Two, plaintiff has not pleaded that any statements Facebook did make are false or misleading.

    And, three, plaintiff has not pleaded any economic injury that resulted from the promotional statements it says it did see.

    Before I get into those, I'd like to just step back for a minute and explain a little bit about what the parties are talking about with this target audience.

    People who use Facebook share information about themselves: Demographic information, where they live, their interests. This sharing of information allows Facebook to show

1    ads to people who are most likely to be interested in those

2    ads, and Facebook allows advertisers to create a customized

3    audience with targeting criteria.  Here the plaintiff says it

4    used targeting criteria, including a higher education and

5    higher income.

6        This ability to target a particular audience is what makes

7    advertising on Facebook so valuable as compared to advertising

8    on a medium like television where an advertiser does not have

9    the same ability to target a specific customized audience.

10    Facebook does a good job delivering ads accurately.

11    Plaintiff points to this 89-percent accuracy rating in a

12    Nielsen survey that gives Facebook for certain campaigns an

13    89-percent rating and an average online rating for not Facebook

14    of 38 percent.

15    We think this is a Complaint in search of a theory.

16    Plaintiff does not settle on what it says Facebook actually

17    promised.  We do know what the case is not about.  The

18    plaintiff admits that Facebook did not promise it would deliver

19    ads only to its target audience.  The plaintiff has to admit

20    this because it agreed to a contract with Facebook that has as

21    one of its terms the following provision:  "We do our best to

22    deliver the ads to the audience you specify, although we cannot

23    guarantee in every instance your ad will reach its intended

24    target."

25    Facebook does do a great job, but it does not promise

advertisers 100-percent accuracy.

Plaintiff also admits that Facebook did not make any promise to it about an 89 percent accuracy which comes from the Nielsen rating I was talking about.

Plaintiff admits it does not -- it never saw or relied on that statement.  It does try to fit itself within the *Tobacco II* exception for long-term ad campaigns, but that exception is not pleaded at all in this case.

So what plaintiff is left with is four statements that it pulls from Facebook's promotional web pages about advertising.  So I think it's worth at looking what those four statements say.

Plaintiff says in paragraphs 65 and 67 that these are the four statements it relies on, and it points to paragraphs 21, 31, 36, and 41.

All four of them tout the accuracy of Facebook advertising.  And I'm only reading snippets, but they are in those four paragraphs.  They say Facebook is an incredible place to advertise; Facebook advertising helps advertisers connect with more of the people who matter to you; and it says Facebook will serve the ad in the places you selected.  There is nothing false or misleading about this.

Plaintiff admits that Facebook did serve ads in the places it selected.  Its only complaint is that Facebook did not serve its ads well enough.  Facebook did not do a good enough job.

1      **THE COURT:**  That's not how I read the Complaint.  It
2  seems to me that the issue is whether or not Facebook did
3  indeed place the ads and send them to people who were not in
4  the target group.
5      **MS. ENGEL:**  Well, I think that's consistent --
6      **THE COURT:**  There doesn't appear to be any complaint
7  that --
8      **MR. LESSER:**  That's --
9      **THE COURT:**  -- you did service the target area, but
10  you also appear to have serviced a nontarget area.
11      **MS. ENGEL:**  I think that's consistent.  I don't mean
12  to misspeak.  Plaintiff recognizes that Facebook did deliver
13  some ads within the target audience.
14      **THE COURT:**  Right.
15      **MS. ENGEL:**  It complains that Facebook did not
16  deliver --
17      **THE COURT:**  All the ads to the target area.
18      **MS. ENGEL:**  It complains that Facebook did not deliver
19  more ads to the target audience.
20      **THE COURT:**  No.  I read the Complaint as complaining
21  that Facebook sent intentionally-targeted ads to non-targeted
22  users, to users who did not fit within the criteria that
23  Facebook said that the plaintiff could select as its target
24  audience.
25      **MS. ENGEL:**  Plaintiff is alleging that Facebook sent

1  some ads to the target audience and some ads not to the target

2  audience.

3      THE COURT:  Right.

4      MS. ENGEL:  Right.  So plaintiff also takes the

5  position that Facebook did not promise to send all ads to the

6  target audience.  The plaintiff says in its brief it did not

7  expect one hundred percent accuracy.

8      THE COURT:  Okay.  Okay.

9      MS. ENGEL:  Right?  So what it says is Facebook

10  promised to deliver ads to the people within the target

11  audience, but it failed to do so in a material way.  It doesn't

12  tell us how poorly it thinks Facebook did, but it believes the

13  promise is you said you would do a good enough job, a better

14  job.  It's not taking the position you said you would only

15  place them.

16      And this is important because plaintiff relies on two

17  cases, the *Yahoo!* and the *Google* case, and in those cases,

18  there were specific promises to place the ads on certain

19  premium websites or in a particular location.  And the

20  plaintiff in those cases said what this plaintiff is not saying

21  here.  It said Google and Yahoo! promised to only place the ads

22  on these premium sites.  That's a specific promise.

23      It then came forward with allegations that the specific

24  promise was misleading because Yahoo! and Google had not placed

25  the ads only on these websites.

1    Here plaintiff isn't saying Facebook promised only to

2    deliver the ads within the target audience, but -- they're not

3    saying that.  They're saying, *We know they didn't promise a*

4    *hundred percent.  We know they didn't promise only to put the*

5    *ads within the target audience.  But they still somehow*

6    *promised to do better than they did.*  That's pretty vague.

7    The materiality language that they use is the language of

8    a contract claim.  It's not the language of a 9(b) claim.  They

9    say repeatedly -- and it's in their causes of action --

10   Facebook failed to deliver ads to the target audience in a

11   material way.

12   If this were a contract claim under Rule 8, they could

13   say -- and they've not brought a contract claim because we

14   think Facebook's disclaimer precludes them from doing that.

15   But if it were, they could point to a specific contractual

16   obligation and then they would allege that Facebook breached

17   that obligation in a material way.

18   That's not enough under 9(b).  They need to tell us what

19   is the specific promise.  If it's not a hundred percent, it's

20   not 89 percent, they need to say somehow that these promotional

21   statements amount to a specific promise, but there is no

22   specific accuracy promised in any of those statements.

23   And then they also need to tell us how did Facebook not do

24   that.

25        **THE COURT:**  Let me just give you a hypothetical.  So

1    if an advertiser says, "I only want my ads going to people who

2    make $100,000 a year or more," and they subsequently determine,

3    because of "Likes" or whatever, that half of the people who

4    responded, either by "Likes" or in some other way, fell below

5    that income threshold.  Are you taking the position that

6    because half of the recipients did fall within the targeted

7    range, that it's okay that -- that it's in compliance with the

8    contractual responsibility of Facebook to have sent the other

9    half or directed it to users who fall below the income

10   threshold?

11        **MS. ENGEL:**  Well, so I think two points.  One, if an

12   advertiser says, *I only want my ads to be delivered within the*

13   *target audience* -- we're not quibbling with the fact that they

14   defined a target audience with these criteria.  The question

15   here, and I think where the Complaint is lacking, is where did

16   Facebook promise to deliver ads only to that targeted audience.

17   What statement does the plaintiff point to that says you -- *we*

18   *will deliver the ads only to the target audience you have*

19   *specified.*

20        **THE COURT:**  How about "You can choose the type of

21   people who should see the ad.  We will serve it in places you

22   select"?

23        **MS. ENGEL:**  Plaintiff doesn't take the position that

24   that means we will only deliver the ads to the people you

25   selected.  Plaintiff doesn't take the position because that

promotional statement, which is not in the contract, it's in various business web pages that are not part of -- that were not on the Ads Manager interface -- they're not quoted as part of -- I think the chart that you'll see.  Sorry.

They can't take that position and it can't be read to mean *we will only deliver the ads in the places you select* because of the disclaimer.

**THE COURT:**  What is the purpose of selecting a target if you're not going to send it to just those targeted people?

**MS. ENGEL:**  Let me move to my second point.

I guess the question is whether Facebook -- there are facts in the Complaint that Facebook did not deliver them to the target audience.  We don't think there are any -- we don't think the statements --

**THE COURT:**  I'm sorry.  The Complaint does give examples of number of "Likes," for instance, that they received back from people who weren't in the targeted area, the targeted audience.

**MS. ENGEL:**  So plaintiff will point to three paragraphs that do have this handful of "Likes," but I think it's important to understand a couple of things about the statements they're complaining about, how their ad campaigns were charged.

The first campaign, they were charged for impressions.  An impression is just when you see an ad.  The fact that they

1   point to a handful of people who liked their page --

2           **THE COURT:**  Well, they had to have received the

3   impression --

4           **MS. ENGEL:**  They say they didn't, and plaintiff

5   doesn't allege that in the Complaint.

6       Let me just step back and explain a little bit about

7   Facebook pages.

8       A Facebook page is just a public profile on Facebook

9   like --

10          **THE COURT:**  And I confess, I don't know anything about

11  Facebook.

12          **MS. ENGEL:**  So I think this is important to understand

13  because I think the few facts that they have as "Likes," they

14  really don't tell us anything about even the few days of the

15  campaign let alone the whole campaign.

16      So the U.S. Federal Courts, for example, has a Facebook

17  page where you can find info about the courts and the courts

18  might post an update.  Businesses can have these pages on

19  Facebook, and to advertise on Facebook, a business has to have

20  a Facebook pages.

21      Plaintiff alleges that it has a couple of Facebook pages.

22  Okay?  So people can go to the businesses page and they will

23  see a thumbs-up icon on the page and they can click it.  That's

24  a "Like."  You don't need to see an ad in order to click that

25  "Like."  And that "Like" will register for the plaintiff's page

as a Like.  It has nothing to do with the seeing an ad.

Any person can "Like" an ad.

**THE COURT:**  So you're taking the position then that the "Likes" that the plaintiff has reported that they received did not necessarily follow impressions that were shown.  It could have been a result of the persons having wandered onto their Facebook page on their own.

**MS. ENGEL:**  Well, a couple things.

There is nothing in the Complaint that ties them to seeing an ad.  And we also know that people can "Like" --

**THE COURT:**  Is that what you're arguing?

**MS. ENGEL:**  There are no facts that suggest these "Likes" came as a result from seeing an ad or that Facebook -- I mean, plaintiff did not elect to be charged for "Likes" for the first campaign.  Plaintiff was only charged for people who saw the ad for impressions.

So it was never -- there are no facts saying that the "Likes" either suggest Facebook delivered the ad wrong or that -- we know that plaintiff was not charged for those "Likes" because that's not how it opted to be charged for that campaign.  It was only charged based on who saw the ad.

The other thing plaintiff tells us -- both sides talk about the two campaigns.  There is actually an earlier first campaign, and the Complaint is not based on it.  But the plaintiff says that in that campaign, it did not select the

targeting criteria of a college graduation or higher income. Anyone who "Liked" that first ad campaign, those "Likes" appear on plaintiff's page.

So just the fact that there are "Likes" on a page doesn't tell you anything about how well Facebook delivered the ad campaigns that plaintiff is now complaining about. And plaintiff doesn't -- it never ties it to seeing the ad.

Plaintiff does say it picked up the phone and called six people, it surveyed six of the "Likers." It doesn't tell you what questions it asked, other than college degree. The people said no. And what your income is, "What's your income?"

The plaintiff doesn't say it asked them *Did you see my ad?* That would have been a relevant question, to the extent we can rely on a survey at all, in deciding whether plaintiff had pled facts showing that Facebook delivered the ad to the wrong people and charged plaintiff.

The plaintiff is going to come up and tell you this is a factual dispute, but we think all of those facts are necessary to -- before you bring a fraud claim that says *Facebook delivered my ads wrong.* Like the circumstances of the fraud, why a promotional statement that says *we'll deliver the ads to the people you choose* -- we know Facebook delivered some of them. The only facts that plaintiff has to suggest that Facebook didn't deliver all of them even are these handful of "Likers." The remaining allegations are really this

materiality language.

And I would point the Court -- there is a *Netflix vs. Cullen* case.  We cite it on the reply brief of page 12.  Page 12 of our reply brief.  And in that case -- it's actually the only case that I found where there -- the plaintiff put a gloss on the statements.

So in that case, just to explain a little bit, Netflix had made statements about how quickly it would add closed captioning to its videos.  The plaintiff said *I'm interpreting Netflix's representations as telling me that it will close caption in a,* quote, "meaningful," unquote, *manner or rate.* It's going to do this in -- at a meaningful pace.

"Meaningful" did not appear in any of the statements.  There were statements *we're going close caption,* you know, *we've already done this many*, but there was no, kind of, you know -- *how quickly we'll do it* was not in there.

And the Court said *I'm going to look at plaintiff's interpretation,* like the inference it draws from the statement, and I'm going to look at whether that is actionable.  And the Court said, "Interpreting these statements as Netflix saying 'we're going to closed caption at a meaningful pace' is too general.  'Meaningful' is vague.  It's subjective.  It you can't verify it.  It's not actionable."

Then it looked at the specific statements and it said, "These are not false or misleading because Netflix is closed

captioning."  Nothing in the specific statements, once you take
off the gloss, says what pace Netflix will do it at.

So we think that case is applicable here because we do
read -- as we can understand it, we do read plaintiff as
saying, *The way I interpret Facebook's promises to me are 'we
will deliver ads'* -- and maybe "good enough" is not giving them
enough credit.  *We will deliver ads well, meaningfully.  We
will do a good job*.  And that's not the specific language of
the statements.

And once you put that gloss on it, we think it's not
actionable.  And without that gloss, I think you do have a more
specific statement on its face in paragraph 36 where -- I just
want to make sure I read the language correctly.  It says
Facebook will, quote, "serve it in the places you selected,"
unquote.  But if that does not mean Facebook will serve it only
in the places you selected -- and, again, plaintiff is not
interpreting it in that way and it can't -- then what does it
mean?  It has to mean something like the *Netflix* case.  *We'll
serve it in the places you selected and we'll do it really
well.  We'll do it meaningfully*.  That's promotional -- vague,
like there is no way to verify that.  Right?

And this is what leads plaintiff, we think, into trouble
on the false or misleading as well.  They never tell us even if
you had identified a specific promise, how did Facebook break
that promise?  Like what was it supposed to do?  What was the

1    threshold that we can, like, objectively measure?

2        All they tell us about how Facebook broke the promise is

3    in the materiality language and then this cherry-picked what we

4    think is one percent of the whole first campaign and it's

5    "Likes," it's not impressions.  They don't tie the "Likes" to

6    the campaign.  They have no facts at all, like, even helping us

7    understand are the "Likes" even from people outside the

8    targeted audience?  How do you know?  How do you know that

9    these people who didn't have a college education saw the ad?

10    Right?  Did you ask them that when you called them?

11        We think those facts don't tell us anything about the

12    first few days, and certainly they don't even plead -- they say

13    there is a 40-percent rate from the first few days.  They say

14    at various times there was a 40-percent accuracy rate.  There

15    is not actually an allegation in the Complaint that that

16    percentage of accuracy carried forward for the whole campaign.

17    So we still don't know how accurately plaintiff thinks Facebook

18    delivered its campaign.

19        So plaintiff will also tell you it doesn't have access to

20    these facts.  That's what it said in its brief.  But we know it

21    had access to the information about the first few "Likes," and

22    we also know that they've pleaded that Facebook failed to

23    deliver its ads -- you know, forgetting "Likes", but Facebook

24    didn't show its ads to people at a material percentage or in a

25    material way.

If there is a factual basis for that, plaintiff has to plead it. If there is not, then it's another -- we think it's too conclusory to begin with, but if they are telling you they don't have facts to support it, then it's yet another reason to disregard it.

If I can talk about economic, injury just quickly?

**THE COURT:** All right.

**MS. ENGEL:** We think the same vagueness plagues their economic injury argument, and we relied on Judge Freeman's decision in our brief in the *Singh vs. Google* case, and we think that's applicable here as well.

In that case, the plaintiff was an advertiser on Google's Ad program. And in that case, the advertiser also was challenging statements and also made whether it's a good enough or a meaningful -- meaningful enough type of challenge. It said Google -- *Google promised me I would only be charged for ten percent of clicks that were wrong but not more*, and so Judge Freeman said if that is the promise, if that is the misrepresentation, then to plead economic injury that resulted from that misstatement, the advertiser had to plead that it was charged for more than the 10 percent in valid clicks it thought it would be charged for.

And so we think the same is true here. If plaintiff is saying *I didn't understand Facebook to be promising it would only deliver to my target audience,* then it should be telling

us *Well, how well do you think Facebook would deliver it?  What is the promise*?  But then it also has to plead that it paid for too many inaccurately-delivered ads.

And there is no allegations that break down anything about what Facebook -- about what plaintiff paid.  He gives us the total amount that he paid for the campaign, but he doesn't give us any specifics.  And this causal nexus is also subject to Rule 9(b).  He can't say *my relying on these statements caused my economic injury* without giving us the specifics.

And then lastly, we do think there is a fundamental problem with the timing of when plaintiff says it saw the statements.

It does not say that it saw the statements before it placed its ad order.  It only says that during the first campaign, it went and looked at some of these promotional business web pages, saw the statements, and what does it say that those statements caused the plaintiff to do?  It was just continuing the campaign.

There is no facts in the Complaint that say if it hadn't seen those statements, the plaintiff would have canceled the campaign.  There are no facts tying plaintiff seeing these promotional statements in those four paragraphs to the resulting economic injury.

**THE COURT:**  Okay.  All right.  That's fine.

**MR. LESSER:**  Thank you, Your Honor.

1    I think from your questions --

2    **THE COURT:**  Let's start first with counsel's argument

3  that the Complaint omits the word "only" when you're

4  describing --

5    **MR. LESSER:**  What the Complaint alleges is that

6  Facebook promised people like my client *we will show the ads to*

7  *the people you choose.*  Highly granular level.  You go on the

8  website, you choose --

9    **THE COURT:**  But does that mean that your client

10  understood that to mean that Facebook would show the ads

11  only --

12    **MR. LESSER:**  No, it does not, Your honor, but if I say

13  to you, Your Honor, *I'm going to paint your house white.*  *I*

14  *have this great new paint.*  *It's fabulous paint.*  *It's white*

15  *paint.*  *It's wonderful.*  *I might not quite have enough to do*

16  *the entire house,* and then you show up at your house and 40

17  percent of it is green, you'd say *you misled me.*

18    Because Facebook says *we can't promise you in every*

19  *instance we'll get it right,* by that logic, by Facebook's logic

20  here today, if they got it right only three percent of the

21  time, they'd still be off the hook.  No.

22    This company sets out to convince consumers, like in this

23  instance, *we will show it to people with all these various*

24  *demographics,* that -- that's a -- that's actually a promise

25  under the law.  It's not just promotional, quote, "material."

1    That's an actionable statement in advertising that causes

2    people to act, and that's how Facebook makes money.  And

3    clients have reasonable expectation -- you go through and you

4    check all these boxes, that, in fact, yes, they will get it

5    pretty close in some measure to what you want.

6        Now, it is not required under the law -- I've never seen

7    deceptive advertising placed -- and it's certainly true in the

8    one example that counsel tried to put before you where you have

9    to say the percentage exactly of success.  I would think it

10   would probably be 90 percent.  If they had 90 percent success,

11   we wouldn't be here.  85 percent, maybe.  But by the time

12   you're getting down to 40 percent not to the right people, by

13   the time you're getting to the point when my client reaches out

14   to people who "Liked" its page and every single one of those

15   people in the middle of the first campaign did not meet the

16   criteria, and further, which we allege, ignored entirely in

17   their papers, ignored by counsel in argument, that what was

18   happening was apparently -- and this is what we allege -- that

19   Facebook set up these systems to programmatically show the ads

20   to people who were, quote -- we created the expression "serial

21   'Likers'," in other words, they just "Like" pages.

22       Now, counsel went into -- by the way, let me address two

23   cases --

24           THE COURT:  Hold on.  Hold on.

25           MR. LESSER:  I'm sorry.

1          **THE COURT:**  Counsel argues, however, that just because

2     there were users that "Liked" the ads doesn't necessarily mean

3     that they were shown impressions of the ad.

4          **MR. LESSER:**  Correct.  And that's where I was about to

5     go.

6          Let's look at paragraph 61 of the Complaint because

7     when -- this is -- paragraph 61 -- I can hand up a copy.

8          **THE COURT:**  I have the Complaint.

9          **MR. LESSER:**  Okay.  Yes.  61 of the Complaint.

10          First of all, the most reasonable inference is in fact

11    when people "Liked" my client's page, they learned about it

12    through the advertisement, not through the happenstance of

13    trolling the entirety of Facebook to land on a page that is

14    addressed to investors, high net-worth investors.  That's what

15    my client has his community for.  The likelihood of these

16    people landing on that page otherwise is not a reasonable

17    inference.

18          But the reason I'm drawing your attention to paragraph 61,

19    more particularly to what's on the second half of it on 62,

20    this is how Facebook tells its investors whether the campaign

21    is being successful.  How?  It's this screenshot.  It talks

22    about your ad sets cost per page "Like."  It's charging per

23    page "Like" for my client.  And this is how it tells my client

24    his ads were being successful.  We didn't think there was any

25    question.  Even Facebook here is saying *lifetime result,*

*investor builds page "Likes," 14 page "Likes" for $18.81.*

Facebook itself is telling people *we're running your ads for impressions*. This is the impression ad. How it's reporting it to my client is page "Likes" because Facebook well knows that people found my client's page to "Like" it because of the ads they were shown. This is how Facebook itself ties the two together.

And the reasonable inference is of course that's what's occurred. These people didn't just happen out of the blue to wander to this website, and of course, as I said, that's how Facebook presents it.

I'd like to address -- we have two cases, at least from California, that are fundamentally this case, the *Google* case and the *Yahoo!* case. And respectfully, counsel has misrepresented what they actually addressed because the argument was in those cases, there was no promise to only show, there was no disclaimer, in other words, as we have here. That's just wrong. We know it's wrong because -- or there was no promise -- there was no promise of a contrapositive positive, not to not to show it to other people, because that's essentially Facebook's defense. *We didn't promise you we wouldn't show it to people outside your target audience*, although of course it's charging for those such people, which is where the economic injury does exist.

Let's deal with the *Woods* case, *Woods vs. Google*. The

decision itself on its face discusses how Google directed the
court to web pages stating that location targeting -- that's
what was at issue there.  It's really the same thing.  *We'll
show it to people from a geographic area*, just as Facebook does
when it says -- this is from -- from page 6 of our Complaint:
"We'll show it to people from 20 miles of my store, Menlo Park,
California."  Instead, you know, the ad was shown to, say,
Judge Burns down in San Diego.  He's not within 20 miles -- at
least I don't think he lives within 20 miles of Menlo Park, I'd
suspect.

   This is a specific kind of thing Facebook promises, and it
did not do.  That's exactly what the *Google* case was about; in
fact, only geographic, not income level, not this depth of
granularity that Facebook promises, and these people believe
they will show because you go to their website, you fill in all
the fields, you think that's who's going to see it because that
is what Facebook is telling you who's going to see it.

   But in *Google*, the defendant, Google, directed the court
to web pages stating that, "Location targeting is not limited
to users' physical location and may be based upon some other
things.  We might not quite get it right."  So, in other words,
it says if someone searches for New York plumbers, we may show
golden ads targets New York, regardless of the user's physical
location.  So it's done through queries rather than as Facebook
does it from its demographic database.

1    "The court conceded that Google disclosed the possibility

2    of ads being displayed to users outside the specified

3    location."  That is their defense on disclaimer here, that the

4    company said *we might not get it exactly right*.  The Complaint

5    was sustained because it promised advertising and materially

6    did not provide that.

7        And respectfully also the representation -- omission or

8    misrepresentation of a material fact is a fraud in California.

9    And that's why we used the word "material," to a degree beyond

10   what any reasonable person would have assumed the ads were not

11   shown.

12       Now, let's turn to this other case because what Facebook

13   has been relying upon in -- let me find the case -- in the

14   *Yahoo!* case, supposedly there was a promise there not to show

15   it to people outside of the targeted audience.

16       So as I said, it's rare in this world you ever see a

17   contrapositive promise.  A company says, *I will do X*.  You

18   rarely ever see, I believe it's fair to say, we all know from

19   experience, the company will say *and we promise not to not do

20   X*.  But that's the defense on the promise.

21       We went and pulled, Your Honor, because -- we went and

22   pulled the actual Complaint that was being addressed in the

23   decision.  I can hand up a copy, if you want.  My point being

24   is that the piece where there was a promise -- if I may.  And I

25   don't recommend that you read this whole Complaint.  I will

point out one or two things about it in a moment.

There was, in fact, in this case several claims.  The claim about the targeted advertising -- by the way, the representations in *Yahoo!* were "highly targeted."  Not "perfectly targeted."  "Highly targeted."  They were sustained because, in fact, the -- because the Complaint alleged they weren't highly targeted properly at all.  They were materially off, in other words.

But there was a separate claim in the case where there was a promise separate and apart that had to do with spyware locations and whether Yahoo! would allow people who were -- had spyware, and Yahoo! Terms of Service did say *we will not show* -- because it would have been illegal -- *we will not show things* -- *we will not have people use our site who have spyware*.  So that was a specific representation.

The target advertising allegation is nowhere near as detailed in terms of representations or the like, but it's actually basically paragraph 26 of what I just handed to you, Your Honor.

"Defendants represented that advertisement displays would be," quote, "highly targeted," and they cite the web page.

"Defendants represented that ads would be shown to users searching for what you sell."  It sounds pretty much like our case so far, does it not?  They cite it.

"Defendants represented that," quote, "a listing for your

business will appear when internet users enter searches related to your keywords."  Pretty close again.  Not without -- not the page after page we have of the detail, but it's one paragraph.

"Defendants further represented that relevant listings are displayed to interested users."  This is all the same case.

"Defendants thereby promise only to show class members' ads to -- when they're actually revelvant to users as revealed to."

It is our case.  Indeed page 6 of defendant's reply brief on the *Google* case is our case again.  Page -- excuse me.  Page 4, the case is described as follows.  I'm reading now from counsel's brief.

"And in *Woods*," the Google case, "the plaintiff alleged that Google represented it would deliver ads to users in geographic locations selected by advertisers.  The plaintiff believed this statement to mean that Google would only show ads to users who were physically located in the geographic area he selected, but Google actually delivered ads to other users." As I pointed out, the decision made clear that Google also said *we might not get it right all the time*.

And ultimately, what we have in this case is that Facebook, we allege, deliberately set up its system to show the ads to people who, in fact, were outside the target audience. This is what we learned -- my client learned from the serial "Likes" and showed them in both campaigns.  That's when my

client said *oh, my gosh, I'm being basically had here*.

And, you know, on a motion to dismiss, reasonable inferences get drawn in support of the plaintiff's claim, not finding minute holes to possibly hypothesize counterfactual alternatives.

We allege the ads in detail. We give the time. We give place. We give several years worth of ads. We say specific ads my client saw. We say that my client saw these ads and continued to use -- to do the campaign. He acted in reliance upon that ad to do things that he ended up paying for. The campaign continued. He paid for that.

And these aren't generalized things such as the -- the other case, "meaningful." It literally says we will show it to people with this income, who live here, who -- who are female, who live in Menlo -- 20 miles from Menlo Park, are interested in X, Y and Z. This is all very specific. This is why it makes money. This is why Facebook makes money. It's hard not to be that granular and say this is all fluff and we don't understand what's going on. Of course one does understand what's going on.

I hope I have addressed all your concerns. If -- oh, one last thing.

I think on *Tobacco II*, we allege a multi-year campaign. We have several years within the four corners of the Complaint. The argument made in the briefing has to be decades long.

1    Now, I admit there is a decision from Judge Patel that
2    used a series of reasons that he found the Complaint
3    insufficient.  He said the advertising campaign wasn't decades
4    long as in *Tobacco II* itself.

5    However, the California Supreme Court has applied that
6    *Tobacco II* to a four-year time period, which we actually now, I
7    think -- we start in 2013, we are now in 2019.  We are now in
8    the sixth year.

9    In the *Google* case, it was a year and a half.  In another
10   case in the California appellate courts, which I can pull up
11   the name if anybody really wishes to know -- *Morgan vs. AT&T*
12   *Wireless*.  It was a nine-month campaign.  And there are other
13   cases from this court alone.  The *Trump University* case was
14   four years.  *Opperman* case before Judge Tigar was five years.

15   We fully fit within the argument of how long does it need
16   to be a concerted advertising campaign to make it so that you
17   don't have to see every advertisement.  Moreover, all the cases
18   where that normally applies, I hasten to point out, were when
19   the person saw none of the advertisements in the campaign and
20   that's why the court said *You don't have standing to be here.*
21   *You didn't see any of the advertisements.*

22   We certainly saw at least four we identify, and there are
23   actually others.  We don't have to identify others, but it
24   would be true when we get to our client's deposition they will
25   learn more.

1    If there is anything I missed, I would love to address it.

2        **THE COURT:** My only remaining question is with regard

3    to the prayer for relief, you are seeking injunctive relief on

4    this, but there does not appear to be any allegation in the

5    Complaint that your client would use the service again if it

6    knew it could rely upon the representations.

7        **MR. LESSER:** That's a fair point and fair question,

8    and, in fact, I would -- I would -- I can tell you and

9    represent that my client would use it again. We did not put

10   those words in the Complaint. If it is indeed necessary to do

11   so, if Your Honor were to strike that, I assume without

12   prejudice, at the time of my client's deposition when he would

13   say *yes, of course I would like to be able to advertise on*

14   *Facebook again,* we would put it back in.

15       But, you know, the case should now proceed otherwise

16   without that obviously tripping it up because we could amend to

17   include it, but to come back here and re-argue this I don't

18   think would be very efficient.

19       **THE COURT:** All right.

20   Last word. Was there something else?

21       **MR. LESSER:** There is one other piece that

22   Ms. Markert -- if you wish to hear the request for judicial

23   notice.

24       **THE COURT:** No. No. I don't want argument on that.

25   Okay. I still have another big case, so --

          **MS. ENGEL:**  Just a few points.

     I'm not going to say that anyone is misrepresenting the
*Google* and *Yahoo!* cases, but I think if you look at both of
those cases, it's very clear that the plaintiff was not
alleging that it -- sorry.  Let me flip that.

     The plaintiffs in both cases were alleging that Google and
Yahoo! would place the ads only on the premium sites.  In the
*Yahoo!* case, it was to place the ad on this kind of sponsored
search premium place instead of on what the plaintiff alleged
happened, spyware programs that would send a pop-up ad, which
is annoying, on your computer.

     And the plaintiff in the *Yahoo!* case said it was charged
premium pricing that was supposed to be for placement on the
sponsored search products.  The plaintiff said it was charged
those premium prices for what amounted to the equivalent of
pop-up ads.

     They were clearly only cases.  They were cases where the
plaintiff said *I understand that you are only going to charge
me premium rates for placement in these premium locations*.

     The same thing in the *Google* case.  The Google motion to
dismiss says Google didn't put forward these documents about
the disclaimer so I can't consider them.  So the way the
court -- the way the court considered the case was the
plaintiff said *I understand Google to have promised to put my
ads only -- to deliver them only to users who are physically in*

*this part of Arkansas.*  There was a dispute about whether

Google was allowed to deliver ads to people who not only were

physically present in Arkansas based on, like, their IP

address, but also to people who had a geographic connection.

Google had said *look at my -- look at these other Help*

*pages that tell advertisers when you target a geographic*

*location, I will also deliver the ad to people who like that*

*area in Arkansas, who -- phone data says that they are*

*connected to that place in Arkansas.*  It was a dispute about

the meaning of delivering ads to the geographic location.

That's just not what we have here.  What we have here in

this case is the plaintiff is saying *I don't understand*

*Facebook to have promised me it will only deliver ads to my*

*targeted audience.*  I -- I admit that plaintiff did deliver a

whole lot of ads to my targeted audience.  What I'm -- what

plaintiff is complaining about is this handful of "Likes."  And

it points to the email it got, and it actually said -- I think

counsel said that in the first campaign, he was charged for

"Likes."

That's not correct.  In paragraph 59, plaintiff elected to

be charged for impressions in the first campaign.  This

screenshot that is on page 22 saying 14 page "Likes" for $18,

that means that when Facebook delivered ads to people, 14 of

them "Liked" the page.

Why is Facebook telling the advertiser this information?

Because plaintiff also alleges in paragraph 56 for the first ad campaign, it said *What's my goal?  What do I want to get out of the ad campaign*?  And it says *the objective of increasing "Likes."*  That's the goal.

So Facebook told him *You've gotten 14.  That's how well your ad campaign has done.  And you got 14 by paying $18 for me to show people your ad.*  That doesn't tell you the number of people who saw the ad.  It also doesn't tell you in paragraph 62 and 63 when he says, "I called 'Likers'," he doesn't tell you who he called.  Like, we know there are dozens of "Likes" on his Facebook page before he even started the first ad campaign.

If I can also just quickly make one point about the *Tobacco II* cases.  The *Tobacco II* cases hold when you have specifically pleaded -- I don't -- I'm not taking the position that it has to be decades long, but when a plaintiff specifically pleads a long-term ad campaign and that the plaintiff has relied on that long-term ad campaign, the plaintiff doesn't need to go to a specific portion of statements and say *These are the ones I saw on this day.  I saw this cigarette package on Tuesday, March 31.*  But we don't think the allegations in the Complaint, like, at all match any case that has applied *Tobacco II*.

**THE COURT:**  All right.  Thank you.  Matter is submitted.

1        **MR. LESSER:**  And, Your Honor, thank you for not going

2   into what -- Ms. Markert was prepared to do so -- the judicial

3   notice.  I have to say for a lawyer who doesn't -- not a

4   California lawyer, the number of notices and motions to strike

5   and such are to me just so foreign.  You just don't see them

6   elsewhere.

7        **THE COURT:**  Have a good day.

8        **MR. LESSER:**  Every day.  I know.

9        (Proceedings adjourned at 12:24 p.m.)

1

2

3                     <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, February 15, 2019

8

9    *Pamela Batalo Hebel*

     _____
10   Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
     U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25