**POMERANTZ LLP**
Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Fax:    (310) 861-8591
Email: jlurie@pomlaw.com
Email: abasser@pomlaw.com

**MOLOLAMKEN LLP**
Steven F. Molo (*admitted pro hac vice*)
Caleb Hayes-Deats (*admitted pro hac vice*)
Lauren F. Dayton (*admitted pro hac vice*)
430 Park Avenue
New York, NY  10022
Phone: (212) 607-8160
Fax:    (212) 607-8161
Email: smolo@mololamken.com
Email: chayes-deats@mololamken.com
Email: ldayton@mololamken.com

**WOHL & FRUCHTER LLP**
Joshua Elazar Fruchter (*admitted pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY  10952
Phone: (845) 290-6818
Fax:    (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC, RETOUR, INC., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FACEBOOK, INC.<br><br>Defendant. | Case No. 4:18-cv-05286 PJH-JCS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs IntegrityMessageBoards.com, LLC ("IMB") and Retour, Inc. ("Retour," and together with IMB, "Plaintiffs"), individually and on behalf of all others similarly situated, allege as follows against Defendant Facebook, Inc. ("Facebook"):[1]

---

[1] All emphasis in text and images is added unless otherwise noted.

FIRST AMENDED CLASS ACTION COMPLAINT            1

**INTRODUCTION**

1.      This action seeks damages for Plaintiffs and other advertisers who were victims of Facebook's years-long fraud.

2.      Facebook falsely claimed that it could "show ads to people that *match the advertiser's target audience*," purporting to offer advertisers an array of criteria for selecting such an audience. Facebook even claimed that, "for narrowly targeted campaigns, Facebook is 89% accurate" in its ad placement.

3.      Those representations were false.  Facebook could not and did not accurately target the audiences advertisers selected.

4.      Despite that knowledge, Facebook continued to falsely assure advertisers, *for years*, that that they could choose their audience with a high degree of precision.

5.      Plaintiffs were two of the millions of advertisers Facebook deceived.  In August 2015, IMB relied on Facebook's claims and paid Facebook to show its advertisement to users who lived in the United States, were older than 45, had graduated college, had an interest in investments, owned homes, and had incomes of over $250,000 per year.  But when IMB attempted to identify the Facebook users who viewed and responded to its ad, it began to suspect that a majority of them fell outside of the target audience it had selected.

6.      In January 2018, Retour paid Facebook to display ads to users who had certain interests, behaviors, and job titles.  But Retour, like IMB, experienced poor results.

7.

1

2

3    8.    But recent discovery has also revealed a second, simpler reason for Facebook's

4    inaccurate targeting:

5

6

7

8

9

10    9.

11

12

13

14

15

16

17    10.    Facebook lied to its advertisers for one simple reason: money. Facebook generates

18    "substantially all" of its revenue from advertising, including $26.9 billion in 2016 alone.

19

20

21    After

22    all, that is what Facebook had publicly promised them. Had advertisers known the truth, Facebook

23    stood to lose billions. So Facebook chose to lie.

24    11.    Facebook's fraud .

25    Throughout that period, Facebook had a choice. It could have disclosed its poor accuracy to

26    advertisers. Or it could have ceased claiming the ability to display ads to targeted users with a high

27    degree of accuracy. Rather than do so, however, Facebook put its profits over its integrity and

28    continued to charge for targeting it did not and could not provide.

3

12.     Plaintiffs come before this Court seeking redress for Facebook's fraud, including reimbursement for amounts advertisers would not have paid if they had known the truth, punitive damages, and injunctive relief to prevent the recurrence of such sustained and brazen fraud.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(d)(2)(A) because: (i) members of the Class (defined below) are citizens of a State different than Facebook; and (ii) aggregating the claims of individual members of the Class, the total matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs.  Further, 28 U.S.C. § 1332(d)(5) does not apply because (i) the Defendant is not a State, State official, or other governmental entity against whom the Court may be foreclosed from ordering relief, and (ii) the number of members of the Class exceeds 100 in the aggregate.

14.     Venue is proper under 28 U.S.C. § 1391(b) because Defendant is headquartered in this District, and a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

## PARTIES

15.     Plaintiff IMB is a Louisiana limited liability company doing business as Investor Village, with its principal place of business in Marrero, Louisiana.  Ralph Vincent Kidd IV is IMB's sole managing member.

16.     Plaintiff Retour is a New York corporation with its principal place of business in Elmsford, New York.  David Pollack owns and manages Retour.

17.     Facebook is a Delaware corporation with its principal place of business located within this District at 1 Hacker Way, Menlo Park, California 94025.  Facebook's common stock trades on the New York Stock Exchange under the ticker symbol "FB."  Facebook's market capitalization as of June 10, 2020, was approximately $680 billion.

18.     Facebook disseminated the misrepresentations alleged herein from California; conceived, reviewed, approved, directed, and controlled the deceptive and misleading conduct alleged herein in California; and invoiced and collected the fees wrongfully earned from such deceptive and misleading conduct from California.

## FACEBOOK'S TARGETING PROMISE

19.     Facebook is the world's largest social media company, and it provides users with an online platform to stay connected with family and friends through the sharing of photos, videos, and other content.

20.     In its 2019 SEC Form 10-K, Facebook reported 2.5 billion monthly active users, and 1.66 billion daily active users on average for December 2019.

21.     Facebook does not charge users for access to its platform.  Instead, it generates almost all of its revenue from selling advertising to businesses seeking to market their products and services to Facebook users.  During 2019, Facebook generated $70.7 billion in revenue, of which $69.7 billion was advertising revenue.

22.     Beginning no later than November 2007, Facebook began to pitch itself to advertisers as a platform for delivering ads to a narrowly targeted audience.  On November 6, 2007, Facebook issued a press release announcing that CEO Mark Zuckerberg had introduced Facebook Ads, "an ad system for businesses to connect with users and ***target advertising to the exact audiences they want***."

23.     A widely circulated photo shows Zuckerberg making that pitch to advertisers in 2007:



Facebook CEO and founder Mark Zuckerberg speaks to press and advertising partners in 2007.

24.     Specifically, Zuckerberg claimed, "Let's talk about targeting.  ***With Facebook you will be able to select exactly the audience you want to reach, and we will only show your ads to them***.  We know exactly what gender someone is, what activities they are interested in, their location, country, city or town."

25.     Zuckerberg has repeated that claim for more than a decade.  In April 2018, he testified before the Senate's Commerce and Judiciary Committees that: "What we allow is for advertisers to tell us who they want to reach, and then we do the placement.  So, if an advertiser comes to us and says, 'All right, I am a ski shop and I want to sell skis to women,' then we might have some sense, because people shared skiing-related content, or said they were interested in that, they shared whether they're a woman, and then *we can show the ads to the right people*."

**Website Representations**

26.     Facebook's website repeated and amplified Zuckerberg's public claim that Facebook would display ads to users who matched the target audiences defined by advertisers.

27.     For example, ███████████████████████, Facebook's website represented that an advertiser's ads would be shown "to people *within your target audience*" who are "most likely to take actions that will help you achieve your objective."  While IMB was advertising on Facebook, the website also represented for a period of time that "[b]y default, your ad will be optimized to show to the people who are most likely to take the actions that will help you meet your objective *within your target audience*."

28.     ███████████████████████, Facebook's website promised advertisers:

> With the ad creation tool, *you can choose the type of people who should see your ad*.  Just add traits and interests to make your audience broad or narrow—it all depends on who you want to reach . . . .  Select demographics like locations, age, gender, and languages.  And choose other traits like level of education, if they have children, are recently married, or even if they own a home.  *When you run your ads, we'll serve it in the places you selected*.

29.     ████████████████ Facebook also represented on its website that:

- "Choosing your audience with such reach, *accuracy* and affordability is what makes Facebook an incredible place to advertise";

- "[W]hen you create a Facebook ad, *you can choose the audience that should see it*"; and

- Facebook "offers powerful and unique ways to show your ads *to the people most likely to care about your business*."

6

30.     Facebook further represented ▮▮▮▮▮▮▮▮ that "your ad is optimized to reach people *within your chosen audience* who are likely to click the Like button for your Page."

31.     ▮▮▮▮▮▮▮▮▮▮▮, Facebook's website provided a detailed slideshow on its "About Ads" page.   As shown below, that slideshow represented that, after an advertiser identifies the audience "who they want to reach with their ad," Facebook shows the ad "*to people that match the advertiser's target audience*" based on sources that included the user's interests and data provided by Facebook's third-party partners:

## How advertisers reach people through Facebook Ads

Let's take a look at how advertisers create and run ads on Facebook, Instagram and our partner sites.

  ....   ....  .... 

**Advertiser chooses a business goal**

A business or organization chooses a goal, such as selling a product or increasing awareness of their brand name.

**Advertiser identifies audience**

The advertiser decides who they want to reach with their ad.

**Advertiser creates ads**

The advertiser creates ads to show on Facebook, Instagram and other websites and mobile apps through our advertising products.

**Facebook shows ads to advertiser's audience**

We show ads to people that match the advertiser's target audience, based on information we know through the sources described below.

## How our system decides what ads to show

We use information from a few different sources, including those described below, to figure out which ads might be valuable to you.

### Activity on Facebook apps and services

One of the top ways we know what ads you might want to see is your activity on the Facebook family of apps and services. This includes things like:

- Pages you and your friends like
- Information from your Facebook and Instagram profile
- Places you check in using Facebook

See your ad preferences ☑

### Information shared with a business

When you share information like your phone number or email address with a business, they may add it to a customer list that can be matched to your Facebook profile. Sources of this kind of information include:

- Loyalty programs (for example, a supermarket "club card")
- Information compiled by data providers
- Purchases at retail stores

Learn more about customer lists ☑

### Other online activity

Advertisers use Facebook technologies such as the Facebook pixel to help them show ads to people who have visited their website or used their mobile app. Business and organizations can try to reach people who have done things like:

- Viewed a web page that uses a Facebook pixel
- Downloaded their mobile app
- Made a purchase (or simply added a product to a shopping cart)

See your ad settings ☑

### Location

We use location data to do things such as show ads from advertisers trying to reach people in or near a specific place. We get this information from sources like:

- Where you connect to the internet (through IP address on computers, tablets and phones)
- Where you use your phone (through GPS and Location Services )
- Your location from your Facebook and Instagram profile

Learn more about location data ☑

32.   Finally, ████████████████████████ Facebook's website quantified the accuracy that advertisers could expect from the targeting for which they were paying.  As shown below, it stated, "One of the biggest advantages to advertising on Facebook is your ability to target specific groups of highly engaged people.  In fact, compared to the average online reach of 38% *for narrowly targeted campaigns, Facebook is 89% accurate*."



33.   Facebook identified the "source" of that representation as, "Nielsen OCR, August 2013."

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████  Facebook's juxtaposition of the claim of 89% accuracy, on the one hand, with the broad representation that advertisers could "target specific groups of *highly engaged*

people," on the other, led advertisers to believe that the promise of 89% accuracy applied to whatever audience they hoped would be "highly engaged" with the ads they were paying for.

34.     Moreover, ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Instead, until October 2017, it continued to broadly (and falsely) claim that its targeting was 89% accurate██████████████████████████ ████████████████████████████████████

## Facebook's Targeting Interface

35.     The targeting interface Facebook provided to Plaintiffs and millions of other self-serve advertisers reinforced the false impression that Facebook would display ads only to users who matched advertisers' targeting criteria.

36.     Facebook's self-serve ad program initially consisted of two different tools, one called Ads Manager and another called Power Editor, both of which shared substantially the same targeting interface.  In September 2017, Facebook combined Ads Manager and Power Editor into a single self-serve tool that retained the name Ads Manager and featured two different workflows called Quick Creation and Guided Creation, both of which again shared substantially the same targeting interface. For purposes of this First Amended Class Action Complaint (and as in the original complaint), the term "Ads Manager" shall be deemed to include Power Editor during the period before it was merged into Ads Manager.

37.     Self-serve advertising campaigns on Facebook consisted of the following three structural components: Campaigns, Ad Sets, and Ads.

38.     When creating a "Campaign," self-serve advertisers identified an objective for their ads, such as building brand awareness, increasing traffic to their website, or securing Facebook page "likes."

39.     Advertisers next created an "Ad Set."  The process of creating an "Ad Set" included the targeting interface that purported to offer advertisers the ability to define the target audience to which

Facebook should show their ads.[2]

40.     As shown below, the targeting interface invited advertisers to answer the question, "Who do you want your ads to reach?"  It then allowed advertisers to select from a broad array of categories, including location, age, gender, language, interests, behaviors, and others. █████



---

[2] The Ad Set interface also allowed advertisers to determine their bid amounts and budget, set a schedule for running their ads, and determine placement on Facebook, Instagram, and/or other platforms.

41.     As advertisers selected different targeting criteria, Facebook displayed a meter in the upper right corner that measured "Audience Definition," alerting the advertiser to whether Facebook viewed its audience as too "specific" or too "broad."

42.     In October 2015, Facebook implemented a new "Detailed Targeting" interface.   As shown below, the interface continued to ask, "Who do you want your ads to reach?," and retained the Audience Definition meter, but added a feature to enable advertisers to construct even more granular target audiences using "AND/OR" Boolean logic, as well as exclusionary criteria:



43.

███████████████████████████████████

██████████████████████████████[3]

### PLAINTIFFS' FACEBOOK ADVERTISEMENTS

44.     Plaintiff IMB, like millions of other advertisers, was attracted by Facebook's representations about the accuracy of its ad targeting.  IMB operates Investor Village, an online platform allowing individual investors to connect and discuss publicly traded stocks.  Investor Village seeks to provide investors with access to high-quality investing insights and information to inform their investment decisions.  It offers free access to online discussion forums devoted to specific stocks. Users who pay a subscription fee can also obtain premium access to other features, such as interactive charts, private messaging, and real-time stock quotes.

45.     While investors of all socioeconomic levels use Investor Village, its members tend to be older and well educated, and generally earn above-average incomes.  In 2015, IMB conducted a survey that found that 84% of Investor Village members have a college degree, 63% have annual incomes of over $100,000, 59% have investment portfolios worth more than $250,000, 83% own their own home, and 81% are 45 years or older.

46.     Investor Village, like many other entities, has a Facebook page.  In June 2015, IMB's managing member, Ralph Kidd IV, was browsing Facebook and saw a promotional "teaser" ad depicting what an Investor Village ad could look like.  Mr. Kidd clicked the teaser and was redirected to Ads Manager.  Mr. Kidd browsed Facebook's targeting interface and saw various representations regarding the display of ads to users matching an advertiser's targeting criteria.  Based on those



representations, he concluded that Facebook's targeting interface presented a unique opportunity to target ads to IMB's demographic of highly compensated and educated investors.

47.     Because IMB had limited resources to spend on advertising, it did not invest in generic advertising.  But it found the promise of using Facebook's targeting interface to narrowly define a specific audience to be very attractive.

48.     On June 23, 2015, IMB launched its first ad campaign on Facebook.  IMB's initial ad campaign targeted individuals based on criteria that did not include household income, home ownership, or education.  The initial campaign did not succeed in attracting the educated, professional, and wealthy investors that IMB sought, but IMB later concluded that was because it had made mistakes in how it selected the targeting criteria.  IMB does not allege that this campaign gives rise to liability on Facebook's part.

**IMB's August 2015 IV Likes Advertising Campaign**

49.     On August 29, 2015, IMB launched a new advertising campaign called "Investor Village—Page Likes" (the "IV Likes Campaign"), with the goal of targeting highly compensated and educated investors.  IMB elected to be charged based on the number of "impressions" its campaign generated, *i.e.*, the number of Facebook users who saw its ad.

50.     IMB's objective for the IV Likes Campaign was for investors within its target demographic to "like" Investor Village's Facebook page.  To that end, IMB used Facebook's targeting interface to define the following target audience:

- Location: United States AND
- Interests: Investment AND
- Education Level: College grad AND
- Household Income: $250,000-$350,000; $350,000-$500,000; or Over $500,000 AND
- Home Ownership: Homeowners AND
- Age: 45-65+

51.     Facebook projected the potential reach of the defined audience to be 61,000 people.

14

52.     Relying on Facebook's promise of narrow targeting to a specific audience—including as conveyed by the visuals in the targeting interface—IMB expected that Facebook would display its ad to users within the target audience that it had defined.

53.     On August 31, 2015, Facebook encouraged IMB with a message that its "Ad Set Is Performing Well":



54.     By September 1, 2015, Facebook reported that IMB's ad had generated twenty-one likes.  IMB noticed, however, that at least four of those "likes"—nearly 20%—were from Facebook users who were outside the target audience that IMB had defined because, according to their Facebook profiles, they did not graduate college.

55.     At least another four "likes" came from Facebook users who appeared, based on their Facebook profiles and other publicly available data, not to have annual household incomes of over $250,000.

56.     IMB was concerned that nearly 40% of the users it reached through the IV Likes Campaign fell outside its target audience, either because they lacked a college degree or had annual household incomes below $250,000.  Based on that concern, on or before September 4, 2015, IMB reviewed various representations by Facebook on its website regarding its ad targeting capabilities, including the representations described in paragraphs 28-29 above.

15

57.     IMB continued to monitor the results of the IV Likes Campaign and noticed that a material percentage of the Facebook users who "liked" its page continued to fall outside its target audience because they were not college graduates, and/or did not possess household income over $250,000.   On or before October 30, 2015, IMB reviewed additional representations on Facebook's website regarding its ad targeting capabilities, including the representations in paragraph 27 above.

58.     In November 2015, IMB surveyed six of the users who "liked" its Facebook page as a result of the IV Likes Campaign.   ***None*** out of the six satisfied the household income criteria (including five out of six who missed the $250,000 cutoff by a wide margin).   Only one out of the six (16.7%) satisfied the homeownership targeting criteria.   And only one out of six satisfied the college graduate targeting criteria.   Thus, not one of the Facebook users IMB surveyed fell fully within the target audience.   The vast majority did not meet multiple targeting criteria that IMB had set.

59.     Further analysis by IMB revealed that many users who "liked" the Investor Village page as a result of the IV Likes Campaign had also "liked" seemingly unrelated Facebook pages, such as pages advertising chiropractors or Florida vacation properties.   Indeed, some of these additional, unrelated "likes" appeared immediately after the relevant individual "liked" the Investor Village Page.   Additionally, IMB noticed that many of the users "liked" many of the same unrelated pages (i.e., their page "likes" overlapped).

60.     IMB also noticed that Facebook consistently exhausted IMB's daily budget for the IV Likes Campaign (which started off at $10/day).

61.     Facebook regularly invoiced IMB for each of the impressions generated by the display of IMB's ad in connection with the IV Likes Campaign, regardless of whether the user viewing IMB's ad fell within the defined target audience.

62.     IMB ultimately paid Facebook $1,409.69 for the IV Likes Campaign.

**IMB's January 2016 SCD Likes Advertising Campaign**

63.     On January 7, 2016, IMB launched a new Facebook advertising campaign ("SCD Likes Campaign") for its Small Cap Directory ("SCD").   SCD is a database that provides investors with tools to search for and research over 18,700 small and micro-cap stocks.   IMB launched the SCD Likes Campaign with the objective of increasing the number of "likes" for SCD's Facebook page.

64.     To that end, IMB used the targeting interface to define the following target audience:

- Location: Canada OR United States AND

- Education Level: College grad AND

- Household Income: Over $500,000 AND

- Home Ownership: Homeowners AND

- Age: 45-65+

65.     Facebook projected the potential reach of the defined audience to be 250,000 people.

66.     For the SCD Likes Campaign, IMB elected to be charged for "likes" (rather than impressions).

67.     IMB again found that a material percentage of the "likes" generated by the SCD Likes Campaign (for which IMB paid) were from users outside of IMB's defined target audience (because they were not college graduates and/or did not have household income over $500,000).  IMB also compared the "likes" generated by the IV Likes and SCD Likes Campaigns and found that many users from outside the target audiences had "liked" both and also "liked" many of the same pages.

68.     Facebook regularly invoiced IMB for each of the "likes" generated by the display of IMB's ad in connection with the SCD Likes Campaign, regardless of whether the user viewing IMB's ad fell within the defined target audience.

69.     IMB ultimately paid Facebook $242.17 for the SCD Likes Campaign.

**Retour's January 2018 While You Were Out Advertising Campaign**

70.     Plaintiff Retour also advertised on Facebook.

71.     Retour develops smart TV products for office and healthcare environments, as well low-cost software applications that extend the functionality and productivity of other popular software, such as Outlook.

72.     In 2017, Retour developed an application for Outlook called "While You Were Out" (the "WYWO App"), that allowed users to create and email short memoranda documenting phone messages.  After developing the WYWO App, Retour began to sell it through the Microsoft Office online store.

73.     In January 2018, Retour decided to promote the WYWO App through a Facebook ad campaign (the "WYWO Campaign").  Retour's Facebook ad featured a screenshot of the WYWO App interface.

74.     Retour used the targeting interface to define an audience of Facebook users that it believed would be interested in downloading the WYWO App.  Specifically Retour targeted based on the following criteria:

- Location: Living In: Canada, United States, Europe
- Age: 25-55
- Interests: Office management, 7 Habits of Highly Effective People, Secretary, Company secretary, Business opportunity, Wired (magazine), Small Business Owners, Microsoft Outlook, Self-employment, Application software, Microsoft, How to make money on internet, Getting Things Done, Tech News, Organization, Entrepreneurship, Receptionist, Business, Efficiency, Operations management, Business Insider, Business owner, Wired (website), Small office/home office, Personal Growth and Development, Website, Microsoft Office, Personal development, Windows Store or Productivity software.
- Behaviors: Small business owners
- Employers: Financial Times
- Job title: Office management, Co-Owner, Receptionist Secretary, Front Desk Receptionist, Self-Employed, Business Office Manager, Human Resources Manager (HR Manager) or Medical Receptionist

75.     Facebook estimated that Retour's ad would reach between 496 and 1,400 users each day.

76.     Relying on the visual and textual representations in the targeting interface, Retour expected that Facebook would display its ad with a high degree of accuracy to users who matched the targeting criteria Retour had selected.

77.     Retour launched the WYWO campaign on January 18, 2018, and ran it until January 25, 2018.  The WYWO Campaign was a failure.  It did not generate a single inquiry.  Nor did it lead to any meaningful increase in sales of the WYWO App in the Microsoft Office online store.  Because of the poor response, Retour terminated the WYWO Campaign after one week, paying Facebook a total of $20.

**FACEBOOK'S FRAUD**

78.    Plaintiffs' failed experiences advertising on Facebook were caused by Facebook's false claims about its ad targeting accuracy.  Facebook lied when it assured advertisers that it would only "show ads to people that *match the advertiser's target audience*," that ads will be shown "*to people in your target audience*," and that ads will "*reach people within your target audience*."

███████████████████████████████████████████████████████████

████████████████   Facebook's representations about its targeting accuracy were false for at least two different reasons.

79.    First, Facebook used a programming technique to expand certain targeting criteria and show ads to Facebook users who fell outside of those criteria.  It did so to determine whether target expansion could successfully be used to exhaust advertiser budgets (which was a high priority for Facebook).

80.    Second, ████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████   But Facebook continued to publicly make the same false representations about targeting accuracy for years, and never disclosed its poor accuracy rates to advertisers.

**Target Expansion**

81.    As noted above, Facebook consistently exhausted IMB's daily budget for the IV Likes Campaign, and IMB paid for many impressions or views from users who fell outside its defined target audience.

82.     Before IMB began advertising on Facebook, Facebook had designed a method for expanding advertisers' targeting criteria to ensure that advertisers consistently exhausted their budgets. On July 18, 2014, Facebook applied to the U.S. Patent and Trade Office (the "USPTO") to patent a system for expanding advertisers' targeting criteria.   The USPTO did not disclose Facebook's application until January 21, 2016.   The title of Facebook's patent application was "Expansion of Targeting Criteria Using an Advertisement Performance Metric *to Maintain Revenue*."   According to the application, the method described "increases the users eligible to be presented with the advertisements to include users that do not meet targeting criteria included in the advertisement."   The method did so by identifying users that it deemed likely to have an "affinity" for the ad despite not meeting the advertiser's targeting requirements.[4]   The application further explains that one purpose of target expansion is to "facilitate spending on the advertisement request to satisfy the advertisement request budget."

83.     █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████ Facebook ███████████ always benefited from target expansion because it increased revenue, and Facebook continues to benefit to this day.

84.     █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████  Both the IV Likes and the SCD Likes Campaigns targeted Facebook users who had graduated from college. ███████████████████████████████████████████████████████

---

[4] Facebook used the word "affinity" as a euphemism.  The method described in the application could "expand[ ] the targeting criteria by reducing a threshold number or percentage of user characteristics satisfying the targeting criteria."  In other words, the method could expand an advertiser's target audience by simply dropping criteria the advertiser had chosen.

1 █████████████████████████████████████████████████████████

2 ███████████████5

3    85.  ███████████████████████████████████████████

4 █████████████████████████████████████████████████████████

5 ████████████████████████████████████

6    86.  ███████████████████████████████████████████

7 █████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████

9    87.  ███████████████████████████████████████████

10 ████████████████  If Facebook had adhered to IMB's targeting criteria, it would have showed IMB's

11 ads only to users its data showed to be college graduates. ████████████████████

12 █████████████████████████████████████████████████████████

13 ██████████████

14 **<u>Data Inaccuracy</u>**

15    88.  ███████████████████████████████████████████

16 █████████████████████████████████████████████████████████

17 █████████████████████████████████████████████████████████

18 █████████████████████████████████████████████████████████

19 █████████████████████████████████████████

20    89.  ███████████████████████████████████████████

21 █████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████

23 █████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25    90.  ███████████████████████████████████████████

26 █████████████████████████████████████████████████████████

27 5 _____

28 ██████████████████████████████████████████

91.   Facebook used two types of data when targeting ads: native data and partner data. ███

**A.   <u>Native Data</u>**

92.   Facebook has long collected vast amounts of "native" data directly from its users. The types of native data Facebook collects and stores fall into three broad categories: (1) demographics (including attributes such as age, gender, education, and job title), (2) interests, and (3) behaviors.

93.   Facebook receives some of this information directly from users who input it into the platform themselves. But it also attempts to infer information from users' actions on the internet. The actions Facebook monitors are not limited to its platform. Facebook uses cookies and tracking tools like Facebook Pixel to compile information about the other websites and online retailers that users visit. Facebook's mobile app also monitors the Wi-Fi networks a user connects to, the type of phone the user has, the other apps the user has installed, and other information. As a result of its tracking, Facebook reportedly has as many as 29,000 data points for an average Facebook user.

94.

95.                                                                                   Bosworth was a senior figure in Facebook's management. He joined Facebook as a Vice President in January 2006 (less than two years after Facebook's founding), and has remained a member of Zuckerberg's inner circle since that time. In early 2013, he assumed an ads leadership role alongside Facebook's Chief

1  Operating Officer and Board Member Sheryl Sandberg. 

6  96.

### B. **Partner Data**

97. For several years, Facebook offered targeting advertising based only on "native" data. However, on April 10, 2013, Facebook formally announced its new Partner Categories program, under which it would partner with third-party data providers to allow advertisers to target ads based on additional categories for which Facebook did not have native data. In a press release, Facebook stated:

> *Today we're launching Partner Categories*, *a new way to target ads to more categories of people* . . . . Partner categories uses data from select third parties including Acxiom, Datalogix, and Epsilon . . . . At launch, Partner Categories includes more than 500 unique groups. In addition, Partner Categories works with other Facebook targeting options, *so advertisers can further refine their campaigns <u>to reach only the right people</u>*. *Ads that are well targeted benefit the advertisers who run them by driving higher return on investment* and are a better experience for people who see more relevant ads.

98. Facebook touted the accuracy and value of its new partners. Facebook's Director of Global Marketing Solutions, Yvette Lui, stated that "[p]artnering with Acxiom gives marketers *a more accurate and effective way to reach the right groups of real people* . . . ." Lui further claimed that

"Datalogix has proven to be a true innovator and critical partner to Facebook as *we seek to provide greater value to marketers* and more relevant ads to people."

99.    In January 2014, Sandberg touted the Partner Categories program during an earnings call with investors:

> The third driver for both the quarter and the full year has been our investment in product development. *We're especially pleased with the improvements we've made to our targeting capabilities and measurement tools* . . . .  Custom audiences is our most important product in this effort.  When we launched it over a year ago, it allowed marketers to reach their current customers on Facebook. *Since then, we've built more targeting capabilities* while maintaining user privacy. These include lookalike targeting that lets marketers reach people who are similar to their best customers *and Partner Categories which use third-party data to improve our targeting.  Now marketers can <u>reach exactly the people they're looking for</u>,* such as people who buy fashion apparel or are in the market for a new car. *We've more than doubled the number of Partner Categories in the U.S., and now offer more than 1,000.  And we believe there's still significant opportunity ahead, as we continue to improve our targeting capabilities.*

100.    On its website, Facebook assured advertisers that "Partner Categories include data from *trusted* data partners. *The data from these partners allows you to target people based on certain attributes like their income and whether or not they're a homeowner.*"

101.    ███████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

████    IMB's IV Likes Campaign was still using household income to target its ads, and experiencing dismal results.

102. ████████████████████████████████████████
████████████████████

C. ████████████████

103. ████████████████████████████████████
████████████████████

104. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

105. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████

106.    Importantly, the accuracy rate of Facebook's targeting for a "narrowly targeted" ad campaign that combined multiple criteria would have been worse than the accuracy rate for any individual criterion in that campaign.  For example, the IV Likes Campaign used both interests and household income as targeting criteria. ████████████████████

████████████████████████████████████████

████████████████████████████████████████



1 ███████████████████████████████████████████████

2 ███████████████████████████████████████████.   And

3 IMB's informal survey in fact found no instance in which Facebook's targeting of the IV Likes

4 Campaign was accurate.

5     107.   The targeting expansion ████████████████ explain the poor

6 targeting results IMB experienced, and corroborate IMB's conclusion that a material percentage of the

7 ads that IMB paid for were displayed to users who did match the targeting criteria that IMB had

8 specified using Facebook's targeting interface.   Target expansion resulted in IMB's ads being displayed

9 to users who had not graduated college. █████████████████

10 ████████████████ led Facebook to show IMB's ads to users who did not meet IMB's

11 criteria for household income, did not own a home, and did not have had an interest in investments.

12     108.   ██████████████ the failure of Retour's WYWO Campaign. ████████

13 ███████████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ███████████████████████████████████████████████

17 ████████, the WYWO Campaign was displayed to a high percentage of Facebook users who did

18 not match the targeting categories that Retour had selected.

19           **THE PROFITS OF FACEBOOK'S FRAUD**

20     109.   Facebook had a simple motivation for defrauding its advertisers: money.

21     110.   From the moment Facebook introduced advertising, it identified a high degree of

22 targeting accuracy as its key selling point.   As noted above, on November 6, 2007, Zuckerberg

23 announced that, "[w]ith Facebook you will be able to select exactly the audience you want to reach, and

24 we will only show your ads to them.   We know exactly what gender someone is, what activities they

25 are interested in, their location, country, city or town."

26     111.   Facebook has repeated this sales pitch for more than a decade, and it has produced

27 astronomical revenues.   Facebook generates "substantially all" of its revenue from advertising, and it

28

has experienced exponential growth as it has purported to offer advertisers additional targeting criteria. The chart below shows the growth in Facebook's advertising revenue over time:

| Calendar Year | Facebook Ad Revenue |
| --- | --- |
| 2013 | $6.986 billion |
| 2014 | $11.492 billion |
| 2015 | $17.079 billion |
| 2016 | $26.885 billion |
| 2017 | $39.942 billion |
| 2018 | $55.013 billion |
| 2019 | $69.655 billion |

112.

113.

114.    Subsequently, a day before Facebook went public on May 18, 2012—at a planned $104 billion valuation and 100 times trailing earnings—an article in TechCrunch opined, "That's a big multiple to live up to, and [Facebook] will likely need to add bold new revenue streams to justify the mammoth valuation."

115.    Less than a year later, on March 25, 2013, the *New York Times* reported that Facebook would no longer target ads based solely on native data.  Instead, Facebook announced that it would use data third parties had gathered about Facebook users in an effort to refine its ad targeting.  As Facebook's product director for ads, Gokul Rajaram, told the *New York Times* in an interview, "Our goal is to improve the relevance of ads people see on Facebook and *the efficacy of marketing campaigns*."  The *New York Times* opined that the new third party data initiative was motivated by

Facebook's need to increase revenue to boost its flagging stock price (which had dropped approximately 33% since its May 2012 IPO).

116.

 :

| Calendar Year | Revenue Attributable to Partner Categories |
|---------------|--------------------------------------------|
| 2013 | |
| 2014 | |
| 2015 | |
| 2016 | |

117.

118.

119.

120.

121.   IMB's experience is illustrative.   IMB did not invest in generic advertising.   But Facebook's interface and other representations led IMB to expect that Facebook would display IMB's ads to users who matched IMB's target audience (corresponding to the highly educated and compensated demographic that comprised the vast majority of IMB's membership). ████████

122.   Retour similarly would not have advertised on Facebook if it had known that ████████

123.   ████████

████████[6]

## ALLEGATIONS RELATING TO PUNITIVE DAMAGES

124.   The Class is entitled to an award of punitive damages against Facebook under California Civil Code § 3294.   For years, Facebook adopted a brazen policy of fraudulently concealing the material inaccuracy of its targeting data, respectively, from advertisers in order to boost its revenue by tens of billions of dollars.

125.   Facebook's policy of fraudulently concealing the material inaccuracy of its targeting data constituted intentional concealment of material facts known to Facebook with the intent of

---

[6] ████████

inducing advertisers to pay for ads that sought to target users based on targeting data that Facebook knew was materially inaccurate.

126.    As set forth above, Facebook's policy of fraudulently concealing the material inaccuracy of its targeting data from advertisers was motivated by its desire to generate tens of billions of dollars in highly profitable revenue.  Even though Facebook knew that its reliance on wildly inaccurate targeting data harmed Plaintiffs and other advertisers—who wrongly expected that their ads would be displayed to targeted users with a high degree of accuracy—Facebook was unwilling to jeopardize that highly profitable revenue stream.  So it chose to lie.

127.    Facebook's policy of fraud was authorized and ratified, or at the very least consciously disregarded, by Facebook's officers, directors, and managers. ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ Yet, Facebook continued to assure advertisers that it would show ads "*to people that match the advertiser's target audience*," that ads will be shown "*to people in your target audience*," and that ads will "*reach people within your target audience*."

128.    Facebook's Chief Operating Officer and Board Member, Sheryl Sandberg, also knew of (or consciously disregarded) ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████ She publicly touted the precision of the targeting opportunities Partner Categories purportedly made available.

129. ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████



131.   Based on the foregoing, Zuckerberg, Sandberg, Bosworth, and other Facebook officers, directors, and managers authorized and ratified—or at the very least consciously disregarded—Facebook's policy of fraudulently concealing ██████████████████████████████████ ████████████, thereby entitling members of the Class to punitive damages under California Civil Code § 3294.

## CLASS ACTION ALLEGATIONS

132.   Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of themselves and members of the Class consisting of: all individuals or entities ("Persons") within the United States who, from August 28, 2014, to the present (the "Class Period"), paid Facebook for advertisements displayed to Facebook users who fell outside the target audiences defined by such Persons using Ads Manager (the "Class").

133.   Excluded from the Class are Defendant, and its subsidiaries and affiliates; its current and former officers, directors, and employees (and members of their immediate families); and the legal representatives, heirs, successors or assigns of any of the foregoing, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.  Also excluded from the Class are any advertisers who are bound by an enforceable arbitration agreement with Facebook.

134.     This action has been brought and may be properly maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(b)(3).  Determining inclusion in the class can be done through Facebook's own records.

135.     Certification of the Class is also appropriate under Rule 23(b)(2) because Facebook has acted or refused to act on grounds generally applicable to Plaintiffs and the Class, making both declaratory and injunctive relief appropriate.

136.     Plaintiffs reserve the right to amend the definition of the Class if further investigation and/or discovery reveal that the Class should be expanded, divided into subclasses, or modified in any way.

137.     The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Facebook had millions of active advertisers during the Class Period.

138.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including, *inter alia*:

- Whether Facebook defrauded members of the Class by misrepresenting during the Class Period—through public statements by its officers, on its website, and in its targeting interface—that it would accurately display ads to Facebook users who matched the targeting criteria defined by advertisers;

- Whether Facebook defrauded members of the Class by concealing from advertisers during the Class Period the material inaccuracy of its native and third-party data;

- Whether Facebook improperly charged members of the Class for ads displayed with a high degree of targeting accuracy, when Facebook could not and did not provide anything close to that degree of accuracy due to target expansion and/or data inaccuracy;

- Whether Facebook's fraudulent misrepresentations and omissions violated California's Unfair Competition Law;

- Whether Facebook's fraudulent misrepresentations and omissions violated California Civil Code § 1709;

- Whether members of the Class have sustained damages and, if so, what is the proper measure of those damages;

- Whether Facebook's fraud warrants an award of punitive damages; and

- Whether members of the Class are entitled to injunctive relief.

139.   Plaintiffs are members of the putative Class.  Plaintiffs' claims are typical of the claims of other members of the Class because Plaintiffs and all Class members defined target audiences for their ads, and then paid Facebook for ads that were displayed to Facebook users outside those defined target audiences because of targeting expansion, Facebook's reliance on inaccurate native data, Facebook's reliance on inaccurate Partner Categories, and/or any other reasons that may be revealed through further discovery.

140.   Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class.

141.   Plaintiffs have retained counsel experienced in complex federal class-action litigation, including consumer class actions.

142.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because the damages suffered by individual members of the Class may be relatively small, and the expense and burden of individual litigation would therefore make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
### Violations of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200 *et seq.*

143.   Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

144.   During the Class Period, Facebook violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, by engaging in fraudulent, unlawful, and unfair business practices.

145.   Facebook engaged in a fraudulent practice under the UCL when it misrepresented—both by affirmative statements and material omissions of information it had a duty to disclose—its intention and ability to accurately display ads to users who matched the targeting criteria advertisers selected through Facebook's targeting interface.  Facebook's statements and omissions were likely to deceive Plaintiffs and other members of the Class into believing that Facebook accurately displayed ads to users who matched their targeting criteria when, in reality, Facebook displayed a material percentage of ads

to users who did not match those targeting criteria as a result of targeting expansion, and/or Facebook's reliance on materially inaccurate targeting data.

146.    Facebook's deceptive and misleading conduct, as alleged herein, also constituted an unfair practice under the UCL.  That conduct was oppressive, immoral, unethical, and unscrupulous.  It also violated established public policies against deceptive conduct by businesses, as reflected in the California Consumers Legal Remedies Act (the "CLRA"), Cal. Civ. Code § 1750 *et seq.*, and the California False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code § 17500.  Finally, it allowed Facebook to have an unfair advantage over competitors who accurately represented their ad targeting practices.  The harm Facebook's practices caused to Plaintiffs and the Class outweighed the utility of those practices, if any.

147.    Facebook's deceptive and misleading conduct, as alleged herein, also constituted an unlawful practice under the UCL.  The conduct alleged violated the FAL because, as described above, Facebook disseminated statements that it knew to be untrue and misleading, or at least would have known to be untrue and misleading through the exercise of reasonable care.

148.    Facebook's fraudulent, unfair, and unlawful conduct caused Plaintiffs and the Class to suffer injury, including but not limited to loss of the money Plaintiffs and the Class paid Facebook to advertise on its platform.  Plaintiffs and the Class suffered injury at the time they paid Facebook for the display of their ads.  But for Facebook's fraudulent, unfair, and unlawful conduct, Plaintiffs and the Class would have paid less for the advertisements they placed, or refused to advertise on Facebook altogether.

149.    Plaintiffs were exposed to Facebook's long-term campaign to promote its targeting accuracy.  Plaintiffs also saw and reasonably relied upon specific representations by Facebook (in its targeting interface and elsewhere on its website) that it would display Plaintiffs' ads to Facebook users who matched the targeting criteria that Plaintiffs defined.  Facebook also concealed from Plaintiffs the material inaccuracy of its targeting data (which it had a duty to disclose; *see* paragraphs 157-158 below).

150.    Facebook knew that Plaintiffs regarded (or were likely to regard) those representations and omissions as important to Plaintiffs' decision to advertise on Facebook.  Moreover, a reasonable

advertiser would have attached importance to those representations and omissions in deciding whether to advertise on Facebook.  Accordingly, Facebook made material misrepresentations and omissions when it claimed to accurately display ads to users who matched Plaintiffs' targeting criteria despite knowing that it showed a material percentage of ads to users who did not match those targeting criteria.

151.    Facebook could have disclosed the truth about targeting expansion and the material inaccuracy of its data to Plaintiffs.  If Facebook had disclosed the truth, and not made misrepresentations, Plaintiffs would have behaved differently, and paid less (or nothing) for their advertisements, or refused to advertise on Facebook altogether.  Accordingly, Facebook's material misrepresentations and omissions were an immediate cause of Plaintiffs' losses.

152.    As a result of the foregoing, Plaintiffs and other members of the Class are entitled to relief against Facebook under the UCL, including restitution.

153.    Injunctive relief is also appropriate on behalf of members of the Class because Facebook continues to violate the UCL by knowingly misrepresenting the accuracy of its ad targeting and failing to disclose the true accuracy rates of its targeting categories.  But for Facebook's ongoing violations of the UCL, Plaintiffs would advertise on its platform.  Plaintiffs thus face an actual threat of future harm that is concrete and particularized; that is, while they would like to resume advertising on Facebook, Plaintiffs cannot do so because they remain unable to rely on Facebook's representations about the accuracy of its ad targeting.

## SECOND CAUSE OF ACTION
### Deceit Under Cal. Civ. Code §§ 1709-1711

154.    Plaintiffs reallege and incorporates by reference all of the allegations set forth above.

155.    Facebook engaged in deceit within the meaning of California Civil Code § 1709 when, during the Class Period, it misrepresented (both through affirmative statements and material omissions of information it had a duty to disclose) its intention and ability to accurately display ads to users who matched the targeting criteria advertisers selected through Facebook's targeting interface.  Facebook's actions constitute deceit for three reasons.

156.    *First*, under California Civil Code § 1710, Facebook made false statements about its intention and ability to accurately display ads to targeted users that it did not believe to be true, and had

no reasonable ground for believing to be true, given its knowledge concerning target expansion and the material inaccuracy of its targeting data.

157.    *Second*, under California Civil Code §1710, Facebook had a duty to disclose the material inaccuracy of its targeting data because such inaccuracy was a material fact. Facebook knew that Plaintiffs and other members of the Class expected—based on Facebook's public statements and the visuals in its targeting interface—that Facebook would display their ads to targeted users with a high degree of accuracy. A reasonable advertiser thus would have considered it important to know that the data Facebook used for targeting advertisements was materially inaccurate.

158.    Additionally, Facebook had a continuing duty to disclose the material inaccuracy of the data it used for targeting advertisements because Facebook had exclusive knowledge of that inaccuracy. Only Facebook had access to ████████████████████████████████████ ████████████████████████.

159.    *Third*, under California Civil Code §1710, Facebook suppressed a fact—the material inaccuracy of its targeting data—while making other statements that were likely to mislead advertisers in light of the concealment of the material inaccuracy of its targeting data. Having long represented that it could precisely target ads (even quantifying that precision), it was misleading for Facebook to conceal the material inaccuracy of the data it used for targeting advertisements.

160.    Facebook intentionally concealed the material inaccuracy of the data it used for targeting advertisements from Plaintiffs and other members of the Class to induce Plaintiffs and other members of the Class to run and pay for ads that were targeted using Facebook's materially inaccurate data, thereby generating billions of dollars in highly profitable revenue for Facebook.

161.    Facebook's fraudulent concealment of the material inaccuracy of the data it used for targeting advertisements injured Plaintiffs and other members of the Class by causing them to lose money they paid to Facebook for mistargeted ads. Plaintiffs and the Class suffered injury at the time they paid Facebook for the display of ads on its platform. Had Plaintiffs and other members of the Class known the truth about the material inaccuracy of the data Facebook used for targeting advertisements, they would not have agreed to pay anything at all for those ads, or at a minimum would have paid Facebook substantially less for those ads.

162.    As a result of the foregoing, Plaintiffs and other members of the Class are entitled to relief against Facebook, including without limitation, actual damages (or in the alternative, nominal damages) and punitive damages.

### THIRD CAUSE OF ACTION
**Common Law Fraud**

163.    Plaintiffs reallege and incorporate by reference all of the allegations set forth above.

164.    Facebook engaged in common law fraud when it misrepresented (both through affirmative statements and material omissions of information it had a duty to disclose) its intention and ability to accurately display ads to users who matched the targeting criteria advertisers selected through Ads Manager.

165.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

166.    Nevertheless, Facebook continued to broadly represent to advertisers that it could display ads to targeted users with a high degree of accuracy. Facebook also fraudulently concealed the material inaccuracy of targeting data from advertisers, which it had a continuing duty to disclose for the reasons set forth in paragraphs 157-158 above.

167.    Facebook intentionally misrepresented its intent and ability to accurately display ads to users who matched advertisers' targeting criteria—and intentionally concealed the material inaccuracy of the data it used for targeting advertisements from advertisers—to induce Plaintiffs and other members of the Class to run and pay for ads that sought to target using Facebook's materially inaccurate data.  Facebook's fraud generated billions of dollars in highly profitable revenue for Facebook.

168.    Plaintiffs and other members of the Class justifiably relied on Facebook's representations concerning its intent and ability to display ads to users who matched their targeting criteria.  Had Plaintiffs and other members of the Class known the truth about the material inaccuracy of the data Facebook used for targeting advertisements, they would not have agreed to pay anything at all for those ads, or at a minimum would have paid Facebook substantially less for those ads.

169.     Facebook's affirmative misrepresentations and omissions of material fact injured Plaintiffs and other members of the Class by causing them to lose money they paid to Facebook for mistargeted ads.  Plaintiffs and the Class suffered injury at the time they paid Facebook to display their ads on its platform.  But for Facebook's misrepresentations and omissions of material fact, Plaintiffs and the Class would have paid less (or nothing) for the advertisements they placed, or refused to advertise on Facebook altogether.

170.     As a result of the foregoing, Plaintiffs and other members of the Class are entitled to relief against Facebook, including without limitation, actual damages (or in the alternative, nominal damages) and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, demand judgment against Defendant as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class, appointing Plaintiffs as the representative of that Class, and appointing Plaintiffs' counsel as class counsel;

B.     Awarding Plaintiffs and other members of the Class appropriate relief, including without limitation, actual damages (or in the alternative, nominal damages), restitution, disgorgement, and punitive damages under Cal. Civ. Code § 3294;

C.     Awarding equitable, injunctive and declaratory relief, as may be appropriate, including an order requiring Facebook to disclose to advertisers the accuracy rates of any and all individual targeting categories that Facebook offers advertisers for defining target audiences in Facebook's targeting interface.

D.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, attorneys' fees, expenses and other costs (including, without limitation, under Section 1021.5 of the California Code of Civil Procedure); and

E.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  July 13, 2020

Respectfully submitted,

By: */s/ Jordan L. Lurie*

**POMERANTZ LLP**
Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th floor
Los Angeles, CA 90024
Phone: (310) 432-8492
Fax:    (310) 861-8591
Email: jlurie@pomlaw.com
Email: abasser@pomlaw.com

By: */s/ Steven F. Molo*

**MOLOLAMKEN LLP**
Steven F. Molo (*admitted pro hac vice*)
Caleb Hayes-Deats (*admitted pro hac vice*)
Lauren F. Dayton (*admitted pro hac vice*)
430 Park Avenue
New York, NY 10022
Phone: (212) 607-8160
Fax:    (212) 607-8161
Email: smolo@mololamken.com
Email: chayes-deats@mololamken.com
Email: ldayton@mololamken.com

By: */s/ Joshua Elazar Fruchter*

**WOHL & FRUCHTER LLP**
Joshua Elazar Fruchter (*admitted pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Fax:    (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiffs and the Proposed Class*