1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**POMERANTZ LLP**
Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th floor
Los Angeles, CA 90024
Phone: (310) 432-8492
Fax:     (310) 861-8591
Email: jllurie@pomlaw.com
Email: abasser@pomlaw.com


**WOHL & FRUCHTER LLP**
Joshua Elazar Fruchter (*admitted pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Phone: (845) 290-6818
Fax:     (718) 504-3773
Email: jfruchter@wohlfruchter.com

**MOLOLAMKEN LLP**
Steven F. Molo (*admitted pro hac vice*)
Lauren F. Dayton (*admitted pro hac vice*)
Leonid Grinberg (*admitted pro hac vice*)
430 Park Avenue
New York, NY 10022
Phone: (212) 607-8160
Fax:     (212) 607-8161
Email: smolo@mololamken.com
Email: ldayton@mololamken.com
Email: lgrinberg@mololamken.com

Megan Cunniff Church (*admitted pro hac vice*)
300 N. LaSalle Street, Suite 5350
Chicago, IL 60654
Phone: (312) 450-6716
Fax:     (847) 440-2692
Email: mchurch@mololamken.com

Caleb Hayes-Deats (*admitted pro hac vice*)
Eugene A. Sokoloff (*admitted pro hac vice*)
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Phone: (202) 556-2000
Fax:     (202) 556-2001
Email: chayes-deats@mololamken.com
Email: esokoloff@mololamken.com

*Counsel for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>          v.<br><br>FACEBOOK, INC.,<br><br>               Defendant. | Case No. 4:18-cv-05286 PJH-JCS<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION TO CERTIFY CLASS AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hon. Phyllis J. Hamilton<br><br>Date: April 28, 2021<br>Time: 9:00 a.m.<br>Courtroom: Courtroom 3, 3rd Floor |

**NOTICE OF MOTION AND MOTION TO CERTIFY CLASS**

**TO DEFENDANT AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on April 28, 2021, at 9:00 a.m. in Courtroom 3 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, Plaintiff IntegrityMessageBoards.com, LLC ("IMB") will and hereby does move for an order under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) certifying the following class:

> All individuals or entities within the United States who, from August 28, 2014 to the present, targeted Facebook users in one or more "interest," "behavior," or "partner" categories selected using Facebook's self-serve targeting interface, and who paid Facebook for at least one ad for which they neither (a) expressly authorized Facebook to disregard their targeting criteria by opting into "Target Expansion" nor (b) elected to be charged only when a user made a purchase or downloaded an app.

IMB also moves to appoint IMB as class representative and to appoint Steven F. Molo of MoloLamken LLP, Jordan L. Lurie of Pomerantz LLP, and Joshua Elazar Fruchter of Wohl & Fruchter LLP as co-lead class counsel for the proposed class under Fed. R. Civ. P. 23(g).

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings and papers on file in this action, the arguments of counsel, and any other matter that the Court may properly consider.

Dated:  December 23, 2020

Respectfully submitted,

By: */s/ Steven F. Molo*
Steven F. Molo
Megan Cunniff Church
Caleb Hayes-Deats
Eugene A. Sokoloff
Lauren F. Dayton
Leonid Grinberg
**MOLOLAMKEN LLP**

By: */s/ Jordan L. Lurie*
Jordan L. Lurie
Ari Y. Basser
**POMERANTZ LLP**

By: */s/ Joshua E. Fruchter*
Joshua Elazar Fruchter
**WOHL & FRUCHTER LLP**
*Counsel for Plaintiff and the Proposed Class*

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................. 1

SUMMARY OF EVIDENCE COMMON TO THE CLASS CLAIMS ............................... 2

    A.   Facebook Represented That It Would Deliver Ads Only To Users Who Satisfied
         Advertisers' Chosen Criteria ................................................................................ 2

    B.   Facebook Knew Its Representations Of Targeting Accuracy Were False ...................... 6

        1.   ████████████████████████████ ...................... 6

        2.   ████████████████████████████████ ......... 8

        3.   ██████████████████ ................................. 9

    C.   Facebook Knew That Advertisers Were Relying On Its Misrepresentations ................ 10

    D.   ██████████████████████████████████ ......... 12

PROPOSED CLASS DEFINITION ................................................................................ 12

ARGUMENT ................................................................................................................. 13

I.    The Proposed Class Satisifies Rule 23(A) ...................................................... 13

    A.   The Class Is Sufficiently Numerous ................................................................. 13

    B.   The Claims Raise Questions Capable Of Class-Wide Resolution ............................... 14

    C.   IMB's Claims Are Typical Of The Class's Claims .............................................. 15

    D.   IMB Will Adequately Represent The Class ........................................................ 16

II.   The Proposed Class Satisfies The Requirements Of Rule 23(B)(2) ........................... 17

III.  The Proposed Class Satisfies The Requirements Of Rule 23(B)(3) ........................... 19

    A.   Issues Common To All Class Members Predominate Over Any Individual
         Questions ....................................................................................................... 19

        1.   Common Evidence Will Establish Falsity And Scienter ................................ 19

        2.   Common Evidence Supports A Class-Wide Presumption Of Reliance ............ 21

            a.   Every class member saw and interacted with Facebook's
                misleading targeting interface ............................................. 21

i

b.     Facebook's targeting interface was materially misleading ....................23

3.     All Class Members Suffered Damages Traceable To Facebook's Accuracy Fraud ...........................................................................24

B.     A Class Action Is A Superior Method Of Adjudicating The Class Members' Claims .................................................................................27

IV.     The Court Should Appoint IMB's Counsel As Class Counsel .................................29

CONCLUSION...........................................................................................30

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abdeljalil v. Gen. Elec. Capital Corp.*,
    306 F.R.D. 303 (S.D. Cal. 2015)................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .....................................................................................................13

*Astiana v. Kashi Co.*,
    291 F.R.D. 493 (S.D. Cal. 2013)................................................................................21

*Banks v. Nissan N. Am., Inc.*,
    301 F.R.D. 327 (N.D. Cal. 2013)...............................................................................13

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir.1975) ................................................................................19, 24

*Brazil v. Dell Inc.*,
    No. 07 Civ. 1700 (RMW), 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010) ...................21

*Brown v. Hain Celestial Grp., Inc.*,
    No. 11 Civ. 03082 (LB), 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014)......................16

*California v. Altus Fin. S.A.*,
    540 F.3d 992 (9th Cir. 2008) ...............................................................................25, 27

*Cheung v. Daley*,
    35 Cal. App. 4th 1673 (1995) .....................................................................................25

*In re Coca-Cola Prod. Mktg. & Sales Practices Litig.*,
    No. 14 MD 2555 (JSW), 2020 WL 759388 (N.D. Cal. Feb. 14, 2020) ........................18

*Cole v. Asurion Corp.*,
    267 F.R.D. 322 (C.D. Cal. 2010) ...............................................................................22

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) .....................................................................................................25

*Cummings v. Connell*,
    316 F.3d 886 (9th Cir. 2003) .....................................................................................17

*Davidson v. Kimberly-Clark Corp.*,
    889 F.3d 956 (9th Cir.) ...............................................................................................18

*In re DRAM Antitrust Litig.*,
    No. 02 M 1486 (PJH), 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...........................25

iii

*Engalla v. Permanente Med. Grp., Inc.*,
    938 P.2d 903 (Cal. 1997) ............................................................................. 2, 15, 20, 23

*Estrella v. Freedom Fin. Network, LLC*,
    No. 09 Civ. 3156 (SI), 2010 WL 2231790 (N.D. Cal. June 2, 2010) ............................... 14

*In re First All. Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) ........................................................................ 19, 20, 22

*Forcellati v. Hyland's, Inc.*,
    No. 12 Civ. 1983 (GHK), 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) .................................. 16, 23

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) .................................................................................. 15

*Friedman v. AARP, Inc.*,
    855 F.3d 1047 (9th Cir. 2017) ............................................................................... 15

*Garybo v. Leonardo Bros.*,
    No. 1:15 Civ. 1487 (DAD) (JLT), 2019 WL 2325564 (E.D. Cal. May 31, 2019) ........................ 13

*Gold v. Lumber Liquidators Inc.*,
    No. 14 Civ. 5373 (THE), 2017 WL 2688077 (N.D. Cal. June 22, 2017) ............................... 13

*Ham v. Hain Celestial Grp., Inc.*,
    70 F. Supp. 3d 1188 (N.D. Cal. 2014) ...................................................................... 15

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ....................................................................... 15, 17, 19, 28

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    527 F. Supp. 2d 1084 (N.D. Cal. 2007) ..................................................................... 27

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) ........................................................................ 17, 19, 22

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017) ............................................................................... 26

*Kasky v. Nike, Inc.*,
    45 P.3d 243 (Cal. 2002) ................................................................................... 2, 14

*Lanovaz v. Twinings N. Am., Inc.*,
    No. 12 Civ. 2646 (RMW), 2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) .............................. 18

*Levya v. Medline Indus.*,
    716 F.3d 510 (9th Cir. 2013) ............................................................................ 25, 29

*Lilly v. Jamba Juice Co.*,
    308 F.R.D. 231 (N.D. Cal. 2014) ........................................................................... 16

iv

*Lilly v. Jamba Juice Co.*,
   No. 13 Civ. 2998 (JST), 2015 WL 1248027 (N.D. Cal. Mar. 18, 2015)...........................18

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ....................................................................28

*Makaeff v. Trump Univ., LLC*,
   No. 3:10 Civ. 940 (GPC) (WVG), 2014 WL 688164 (S.D. Cal. Feb 21, 2014) .......................23, 24

*Mass. Mut. Life Ins. Co. v. Superior Court*,
   97 Cal. App. 4th 1282 (2002) ....................................................................24

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...............................................................14, 21

*McLaughlin v. Nat'l Union Fire Ins. Co.*,
   23 Cal. App. 4th 1132 (1994) ....................................................................27

*Mirkin v. Wasserman*,
   858 P.2d 568 (Cal. 1993)..............................................................15, 21, 23

*Nedlloyd Lines B.V. v. Superior Ct.*,
   834 P.2d 1148 (Cal. 1992) ....................................................................14

*Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2019) ....................................................................26

*Opperman v. Path, Inc.*,
   No. 13 Civ. 453 (JST), 2016 WL 3844326 (N.D. Cal. July 15, 2016) .......................27, 29

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...............................................................17, 18

*In re POM Wonderful LLC Mktg. & Sales Practices Litig.*,
   MDL No. 2199, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012).......................................24

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) .............................................................*passim*

*Rai v. Santa Clara Valley Transp. Auth.*,
   308 F.R.D. 245 (N.D. Cal. 2015) ....................................................................14

*Ries v. Ariz. Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ...............................................................18, 22

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ....................................................................17

*Sandoval v. M1 Auto Collisions Ctrs.*,
   309 F.R.D. 549 (N.D. Cal. 2015)....................................................................16

v

*Scholl v. Mnuchin*,
　　No. 20 Civ. 5309 (PJH), 2020 WL 5702129 (N.D. Cal. Sept. 24, 2020) ........................ 30

*Small v. Fritz Cos., Inc.*,
　　65 P.3d 1255 (Cal. 2003) ...................................................................................... 2, 14

*Smith v. Keurig Green Mountain, Inc.*,
　　No. 18 Civ. 6690 (HSG), 2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) ..................... 18

*Smith v. Pathway Fin. Mgmt., Inc.*,
　　No. 11 Civ. 1573 (JVS), 2012 WL 12884448 (C.D. Cal. Nov. 26, 2012) ..................... 14

*Stockwell v. City & Cty. of S.F.*,
　　749 F.3d 1107 (9th Cir. 2014) ................................................................................ 13

*Todd v. Tempur-Sealy Int'l, Inc.*,
　　No. 13 Civ. 4984 (JST), 2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ..................... 16

*Torres v. Mercer Canyons Inc.*,
　　835 F.3d 1125 (9th Cir. 2016) ................................................................................ 22

*Tyson Foods, Inc. v. Bouaphakeo*,
　　136 S.Ct. 1036 (2016) ..................................................................................... 19, 20

*Vaquero v. Ashley Furniture Indus., Inc.*,
　　824 F.3d 1150 (9th Cir. 2016) ................................................................................ 26

*Wal-Mart Stores, Inc. v. Dukes*,
　　564 U.S. 338 (2011) ...........................................................................13, 14, 15, 17

*Warner Constr. Corp. v. City of Los Angeles*,
　　466 P.2d 996 (Cal. 1970) ....................................................................................... 20

*Wash. Mut. Bank, FA v. Superior Ct.*,
　　15 P.3d 1071 (Cal. 2001) ....................................................................................... 14

*Wolf v. Hewlett Packard Co.*,
　　No. 15 Civ. 1221 (BRO), 2016 WL 7743692 (C.D. Cal. Sept. 1, 2016) ..................... 13

*Wolin v. Jaguar Land Rover N. Am.*,
　　617 F.3d 1168 (9th Cir. 2010) ....................................................................... 16, 28, 29

## STATUTES AND RULES

Cal. Civ. Code § 1709 ................................................................................................ 2, 14

Cal. Civ. Code § 1710 ................................................................................................ 2, 14

Cal. Civ. Code § 1710.1 ................................................................................................. 15

vi

Cal. Civ. Code § 1710.3 ......................................................................................... 15

Cal. Civ. Code § 1711 ...................................................................................... 15, 20

Cal. Civ. Code § 3294 ........................................................................................ 2, 25

Cal. Civ. Code § 3294(b) .................................................................................. 14, 20

Cal. Civ. Code § 3294(c)(1) .................................................................................... 14

Cal. Civ. Code § 3294(c)(3) .................................................................................... 14

Fed. R. Civ. P. 23 ............................................................................................ *passim*

Fed. R. Civ. P. 23(a) ............................................................................................... 13

Fed. R. Civ. P. 23(b) ......................................................................................... 13, 28

Fed. R. Civ. P. 23(b)(2) ................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3) ................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3)(A)-(D) .............................................................................. 28

Fed. R. Civ. P. 23(g) ............................................................................................... 29

Fed. R. Civ. P. 23(g)(1), ......................................................................................... 30

Fed. R. Civ. P. 23(g)(2) ........................................................................................... 30

Fed. R. Civ. P. 23(g)(4) ........................................................................................... 30

Fed. R. Civ. P. 30(b)(6) ........................................................................................... 17

## OTHER AUTHORITIES

Facebook For Business, *Ad Targeting: Help your ads find the people who will love your business*, https://www.facebook.com/business/ads/ad-targeting (last visited Dec. 23, 2020) ............................................................................................................ 5, 23

Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1779 (3d ed. 2005) ........................................................................................................ 29

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In 2007, Facebook founder and CEO Mark Zuckerberg heralded a new age of advertising with a simple, revolutionary promise:  "With Facebook, you will be able to select exactly the audience you want to reach, and we will only show your ads to them."  Leveraging its access to 2.5 billion users' personal information, Facebook purported to offer advertisers something that no other platform could— the ability to tailor audiences down to the most minute details.  Millions of advertisers bought into that promise, pumping more than $200 billion—a staggering sum that represents "substantially *all*" of Facebook's revenue—into the company's coffers since 2015.

But it was all too good to be true.  Even as Facebook promoted the illusion of precision, ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ Yet Facebook's management did nothing.  ██████████████████████████████████ ████████████████████████████████████████

This suit aims to right that wrong.  Plaintiff IntegrityMessageBoards.com, LLC ("IMB") seeks certification of California consumer protection, deceit, and common-law fraud claims on behalf of a nationwide class of Facebook advertisers.  Those claims are naturally suited to class-wide resolution.  IMB and the absent members of the class suffered the same injury: they all paid Facebook for ads shown to users who did not satisfy the targeting criteria they had chosen.  A California choice-of-law provision in the contracts between Facebook and its advertisers means that all class-members' claims are subject to the same legal standards.  And the common questions that those claims present are readily amenable to class-wide answers.

The relief IMB seeks makes this case an ideal candidate for hybrid certification.  Since all members of the class would be entitled to the same injunction to redress Facebook's ongoing fraud, the Court can resolve IMB's claims for injunctive and declaratory relief under California's Unfair Competition Law in proceedings under Rule 23(b)(2).  It can then resolve the common questions of

1  falsity, scienter, and reliance at the heart of IMB's fraud claims for compensatory and punitive damages

2  in a trial on behalf of a class certified under Rule 23(b)(3). ████████████████████████████

3  ██████████████████████████████████████ a simple, common framework for calculating each

4  class member's out-of-pocket losses.

5        These are precisely the circumstances Rule 23 was designed to address.  Facebook's victims

6  cannot realistically be expected to vindicate their rights as individuals—class members, such as IMB,

7  who suffered modest out-of-pocket losses lack the resources or incentive to take on a $700 billion

8  company on their own.  As a class, they can prove and put an end to Facebook's massive, years-long

9  fraud.

10       The Court should grant the motion, certify the class under Rules 23(b)(2) and (b)(3), appoint

11 IMB class representative, and appoint the undersigned class counsel.

12                         **SUMMARY OF EVIDENCE COMMON TO THE CLASS CLAIMS**

13       IMB's investigation and discovery remain in their preliminary stages, but they have already

14 uncovered substantial evidence to support class-wide proof on every element of its claims.  For IMB's

15 deceit and common-law fraud claims for compensatory and punitive damages, these include (a) the

16 making of a misrepresentation or misleading omission with (b) knowledge of its falsity and intent to

17 induce reliance, where (c) the misrepresentation was material and thus presumptively relied on by its

18 audience with (d) resulting damage.  *See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003)

19 (observing that Cal. Civ. Code §§ 1709 and 1710 "codify the common law actions for fraud and deceit"

20 and reciting elements); *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997)

21 (presumption of reliance); Cal. Civ. Code § 3294 (claim for punitive damages).  To obtain an injunction

22 on its UCL claim, IMB need only show that "members of the public are likely to be deceived" by

23 Facebook's conduct.  *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002).

24    **A.    Facebook Represented That It Would Deliver Ads Only To Users Who Satisfied**
           **Advertisers' Chosen Criteria**
25

26       Facebook's core value proposition was the promise that—as founder and CEO Mark

27 Zuckerberg put it—"*you will be able to select exactly the audience you want to reach, and we will*

28

*only show your ads to them*." Ex. 1 at 4.[1]  Facebook repeated that promise in public remarks and on webpages aimed at advertisers.  But the representation that Facebook would show ads only to those users who met advertisers' criteria was most powerfully conveyed through the Facebook interface that advertisers used to select those criteria.

Facebook's targeting interface lay at the heart of the self-serve ad-publishing platforms that Facebook made available through its app and website.  After designing an ad, setting a budget, and deciding how they would be charged, advertisers would use the interface to build an audience of Facebook users.  The features and layout of this interface represented that Facebook could precisely target users based on hard, objective data.

*First*, Facebook's targeting interface directed advertisers to define their audience from a menu of user categories.[2]  Among the many types of targeting criteria Facebook offered, the class claims focus on user "interests," user "behaviors," and so-called "partner categories":

- "**Interest**" categories ███████████████████████████████
███████████████████████████████████ Ex. 9 at 1.

- "**Behavior**" categories ███████████████████████████████
███████████████████████████████████. Ex. 9 at 1.[3]

- "**Partner**" categories ███████████████████████████████
████████████████████ Ex. 9 at 1.[4]

---

[1]  Unless otherwise specified, exhibit citations refer to exhibits attached to the Declaration of Caleb Hayes-Deats dated December 23, 2020.

[2]  The interface included headings that asked users: "Who do you want your ads to reach?" or to "Define who you want to see your ads." Ex. 18.

[3]  *E.g.*, Ex. 4 ███████████████████████; Ex. 5 ████████████; Ex. 16 at 5 ███████████████████████.

[4]  *E.g.*, Ex. 13 at 1, 3 ████████████████████████████████████████ ███████████████████████; Ex. 14 at 2 ███████████████████████████████████████████████████; Ex. 29 (similar).

Facebook represented that these categories could accurately capture the most subtle differences among Facebook users. For example, Facebook gave an advertiser hoping to reach users interested in the children's comic franchise "Teenage Mutant Ninja Turtles" a choice: The advertiser could target users Facebook identified as interested specifically in the Turtles' 2012 TV series, the Turtles' 1987 TV series, or the Turtles' 2014 film, as well as each individual Turtle. Ex. 15 at 20. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 16 at 5. ████████

████ Facebook promised advertisers the ability to even more precisely tailor audiences by combining or excluding different categories of users. Ex. 19 ("INCLUDE people who match at least ONE of the following"; "and MUST ALSO match at least ONE of the following"); *see* Ex. 21 at 1; Ex. 43.

***Second***, Facebook's targeting interface displayed a pop-up or "hovercard" whenever an advertiser placed their cursor over a particular interest, behavior, or partner category. These hovercards offered a description of how Facebook had determined which users belonged in that category and the number of users who Facebook represented fit the specified criteria. An advertiser trying to reach users interested in baking, for example, could point her cursor at the "baking" interest category in the interface to see a hovercard in which Facebook represented that this category comprised 288,080,272 "[p]eople who have expressed an interest in or like pages related to *Baking*." Ex. 44. An advertiser interested in reaching purchasers of "children's cereals" could see that this category comprised 14,802,500 people "who spend 3 times or more than the national average" on such products, as determined by "[l]oyalty card and transaction-level household purchase data." Ex. 17. Similarly, when IMB reviewed the targeting categories relevant to its ads, Facebook's interface represented that 87,762,300 of its U.S. users were "[h]omeowners," that 4,366,100 had a household income between $150,000-$250,000, and 18,180,100 had a net worth between $100,000-$200,000. Ex. 56.

***Third***, as advertisers selected and combined these targeting criteria, Facebook's interface displayed the ad's "Potential Reach"—the total number of users who fell within the advertiser's target audience when all the chosen categories were combined. Ex. 18. That estimate was most often accompanied by an "audience definition" meter that responded to different targeting selections by

4

telling the advertiser whether the audience was too "specific" for the user's ads to be shown or too "broad" to be effective. *Id.*

The promise these features conveyed was simple:  An "advertiser decides who they want to reach with their ad," and Facebook "show[s] ads to people that match the advertiser's target audience." Ex. 7; Ex. 20 at 7 ██████████████████████████████████████████████████. And it worked.  As IMB's principal, Ralph Kidd IV, testified, "the interface itself, the targeting tools available, the audience meter" and associated "help material" and tips led him "to believe that . . . Facebook has the data" such that "if my ad goes out to 500 people today, that's 500 people" who "are going to be within my target." Ex. 74 at 324:2-16.  He was not the only one.  *See* pp. 10-11, *infra*.

Facebook's website amplified these misrepresentations ███████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████ Ex. 20 at 10-11 ████████████████████████; *id.* at 11 ████ ████████████████████████████. ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████ *Id.* at 9-10 ████████████████████████.

Facebook consistently represented to advertisers that █████████████████████ ████████████████████████████████████████████████████████ Ex. 20 at 9 ████████████████████████████████████████████████.[5]  And Facebook continues to give false assurances of accuracy to this day, telling advertisers they can "set the rules for where your ads are delivered," and "[c]hoose your audience."   Ex. 22, *available at* https://www.facebook.com/business/ads/ad-targeting (last visited December 23, 2020).

---

[5]  Facebook supported this sweeping claim with a citation to a 2013 Nielsen study. ████████ ████████████████████████████████████████████████████████████████ Ex. 23; Ex. 24 at 1 ████████████████████████████████████████████████████████████. ████████████████████████████████████ *See* Ex. 25 at 6; Ex. 26 at 2; Ex. 27 at 1; Ex. 28 at 7.

**B.    Facebook Knew Its Representations Of Targeting Accuracy Were False**

In fact, Facebook knew that it was terrible at predicting which users actually met its advertisers' targeting criteria.    While Facebook promised it would show ads "only" to advertisers' chosen audiences,

*See, e.g.*, Ex. 8 at 5; Ex. 42 at 1; Ex. 39.

Ex. 30(b) at 3 (emphasis added).

Ex. 46.

1.

Ex. 31 at 2.

*See* Ex. 47 at

140:4-10.

Ex. 31 at 2.

*Id.*; Ex. 32 at 1-3                                                    ; Ex. 33 at

83:20-84:10 (explaining that "ground truth" refers to data that can be treated as "a source of truth on a

given subject").                                                                          [6]

---

[6]  That explains why Facebook spent months obstructing IMB's efforts to obtain discovery regarding these surveys.    After claiming it had not retained results of *any* accuracy surveys for interests, behaviors, household income, or homeownership, Facebook produced a set of results two days before a key  deposition  that  showed  its  household  income  and  homeownership  targeting

.  Dkt. 130-2 at 6; Ex. 83; Ex. 46.

Ex. 62; Ex. 79.

Pressed on the discrepancy between these revelations and its initial representation, Facebook first claimed  that  its  "investigation  remain[ed]  ongoing"  and  then  refused  to  provide  any  further information.  Ex. 84.  Ultimately, Facebook updated its discovery responses to represent that it had produced "all responsive, non-privileged survey results" that "were generated between July 1, 2016-August 28, 2018 and that it was able to identify after a reasonable search and diligent inquiry." Ex. 85 at 8.  To the extent other "survey results . . . existed in the past," Facebook claimed that "they were not

1   ***Interest Categories.*** ████████████████████████████
2   ████████████████████████████████[7] Ex. 34 at 4, 6; Ex. 35 at 2; Ex. 36
3   at 3; Ex. 37 at 2; Ex. 38 at 1; Ex. 39; Ex. 42 at 1. ███████████████
4   ██████████████████████████████████████████████████████████
5   ████████████████████████████. Ex. 40 at 10. ██████████████
6   ████████████████████████ Ex. 41 at 1 ████████████████████
7   ████████████; Ex. 42 at 1 ████████████████████████████
8   ██████████████████████████████████████████████████████████
9   ████████████████████████ Ex. 10; Ex. 8 at 5; Ex. 39.
10  ***Behavior Categories.*** ███████████████████████████ ████
11  ██████████████████████████████████████████████████████████
12  ████████████████████ Ex. 47 at 293:10-11, 24-25 & errata; *see id.* at 296:17-19
13  ██████████████████████████████████████████████. ████████
14  ██████████████████████████████████████████████████████████
15  ████████████████████ Ex. 58 at 1; *see* Ex. 51 at 3 ██████████
16  ████████████████████████. 
17  ***Partner Categories.*** ██████████████████████████████████
18  ██████████████████████████████████████████████████████ Ex.
19  46. ██████████████████████████████████████████████████████
20  ██████████████████████████████████████████████████████████
21  ████████ *Id.*; Ex. 48 at 3. ██████████████████████████ Ex. 46.
22  ██████████████████████████████████████████████████████████
23
24  —————————————————————————————————————————————————
25  available or identifiable through a reasonable search" by the time of IMB's request. *Id.* IMB intends to press this inquiry in merits discovery. Based on Facebook's inconsistent responses and slow reveal to date, it is reasonable to assume that additional damning evidence exists.
26
27  [7] ████████████████████████████████████████████ Ex. 47 at 128:14-130:4;
    141:2-7; 142:2-143:6. ████████████████
28  ████████████████████████████ *Id.*

1  *Id.*

2  Ex. 48 at 3.                                          Ex. 33 at 94:23-25.[8]

6                                                        Ex. 37 at 2

7  (emphasis added); *see also* Ex. 42 at 1

10  Ex. 37 at 2.

11  Ex. 53 at 5.

12  Ex. 39.

13     2.

16  Ex. 52; Ex. 30(b) at 3

18  Ex. 20 at

19  9,                                                   , *see* Ex. 30(b)

20  at 3; Ex. 42.

23  Ex. 53 at 24

24

26  [8]

27  . Ex. 50; *see* Ex. 86; Ex. 87;

28  Ex. 59 at 8-9.





1  
2  
3  
4  Ex. 54 at 3-4  
5  .  
6  
7  Ex. 80 at 3.  
8  Ex. 60 at 4.  
9  
10  Ex. 67 at 1-2.  
11  
12  Ex. 68 at  
13  1-2.  
14  
15  
16  
17  Ex.  
18  3 at 5.  
19  
20  
21  Ex. 58.  
22  Ex. 59 at 13.  
23  *Id.*  
24  3.  
25  
26  Ex. 30(b) at 3.  
27  
28  Ex. 30(a); Ex. 57 at 165:21–166:2.

1    █████████████████████████████████████████████████████ Ex. 30(b)
2    at 3.
3    █████████████████████████████████████████████████████
4    █████████████████████████████████████████████ Ex. 42; Ex. 57 at
5    54:15–55:19, 164:8–166:16. ████████████████████████████
6    █████████████████████████████████████████████████████
7    █████████████████████████████████████████████████████
8    ████████████████████ Ex. 42 at 2-3; Ex. 57 at 164:19–165:1. ██████
9    ███████████████████████████████ Ex. 42 at 2-3. ██████████
10   █████████████████████████ *Id.* at 1, 3. ████████████████
11   ████████████████████████████████████ Ex. 61 at 1-2 ████████
12   ███████████████████████████. ████████████████████████████
13   █████████████████████████████████████████ Ex. 18(o), ██████
14   █████████████████████████████████████████ Ex. 20 at 9.

**C.    Facebook Knew That Advertisers Were Relying On Its Misrepresentations**

16   █████████████████████████████████████████████████████
17   ██████████████████████████████████████ ████████████████
18   █████████████████████████████████████████████████████
19   ████████████████████████ Ex. 30(b) at 3 ██████████████████
20   ██████████ ████████████████████████████████████████████
21   █████████████████████████████████████████████████ Ex. 65
22   at 22.
23   █████████████████████████████████████████████████████
24   █████████████████████████████████████████████████████
25   ████████████████████████ Ex. 3 at 5. █████████████████████
26   █████████████████████████████████████████████████████
27   Ex. 65 at 5, 20, 22; *see also* Ex. 66 at 1 ██████████████████
28   ███████████████████████. ████████████████████████████████



1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 2 at 5 ▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3 at 6.

5     Although Facebook's well-prepared witnesses dodged and obfuscated in their depositions, ▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 53 at 22; Ex. 65 at

8 22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮; Ex. 57 at 47:2-48:25; Ex. 33 at 63:5-20.

10 ▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 47 at 140:4-10. ▮▮▮▮▮

11 ▮▮▮

12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13 ▮▮▮▮▮ *See* Ex. 30(b) at 3.

14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* But,

15 as Facebook knew, these categories were only as valuable as they were accurate.  A mail-order steak

16 company would gain little from raising brand awareness among vegetarians.  And even an apparently

17 positive response to an ad could be worthless as a business matter if, for example, a diaper company's

18 ads generated "likes" among users who did not have children.[9]

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮ Ex. 3 at 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*; Ex. 8 at 2-3.

25 [9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Ex. 55 at 3 ▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮▮; Ex. 3 at 3 ▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮.

**D.**



revenue over the class period ███████████████████████████. Ex. 34 at 6
███████████; Ex. 8 at 1 ██████████████; Ex. 70 at 1 ████████████████; Ex.
71 (Facebook 10-Ks). ████████████████████████████████████

████████████████████ Ex. 73 at 3,
██████████████████, *see* Ex. 72 ████████

████████████████████████████████████

██████████████████ Ex. 73 at 4; Ex. 46.  That was a far

cry from Facebook's representation that it would show ads "only to" the audiences advertisers chose.

### PROPOSED CLASS DEFINITION

All individuals or entities within the United States who, from August 28, 2014 to the present, targeted Facebook users in one or more "interest," "behavior," or "partner" categories selected using Facebook's self-serve targeting interface, and who paid Facebook for at least one ad for which they neither (a) expressly authorized Facebook to disregard their targeting criteria by opting into "Target Expansion" nor (b) elected to be charged only when a user made a purchase or downloaded an app.[10]

---

[10] The proposed class also excludes Facebook and its subsidiaries, affiliates, and current and former officers or employees (and members of their immediate families); their representatives, heirs, or assigns; any judge, justice, or judicial officer presiding over this matter (and members of their immediate families) and any advertisers bound by an enforceable arbitration agreement with Facebook to the extent that agreement covers the claims asserted here.

Although this definition narrows the class alleged in IMB's operative complaint, it is consistent with the complaint's factual allegations and responsive to the evidence developed in discovery.  Courts in the Ninth Circuit "frequently allow plaintiffs to seek certification of narrowed classes" in such

**ARGUMENT**

To proceed on behalf of a class, a plaintiff must "affirmatively demonstrate compliance" with the basic prerequisites of Rule 23(a) and show that its proposed class fits one or more of the class types described in Rule 23(b). *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (ellipses omitted). "Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of representation." *Banks v. Nissan N. Am., Inc.*, 301 F.R.D. 327, 332 (N.D. Cal. 2013) (Hamilton, J.). IMB seeks certification under Rule 23(b)(2), which applies where "declaratory or injunctive relief benefitting the class as a whole would be appropriate," and (b)(3), which applies where "questions of law or fact common to the class predominate" and "a class action is superior to other methods available for adjudicating the controversy at issue." *Id.*

Although the Rule 23 analysis "may entail some overlap with the merits of the plaintiff's underlying claim," the Supreme Court has cautioned that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining" the plaintiff's compliance with Rule 23. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (internal quotation marks omitted). "Whether class members could actually prevail on the merits of their claims is not a proper inquiry in determining the preliminary question whether common questions exist." *Stockwell v. City & Cty. of S.F.*, 749 F.3d 1107, 1112 (9th Cir. 2014) (internal quotation marks and brackets omitted).

## I.      THE PROPOSED CLASS SATISFIES RULE 23(a)

### A.      The Class Is Sufficiently Numerous

The proposed class numbers in the millions. *See, e.g.*, Ex. 82 at 4 (January 27, 2016 statement of Mark Zuckerberg that Facebook had "more than 2.5 million active advertisers" as of the end of 2015); Ex. 11 at 22 (February 1, 2016 presentation indicating that 65.1% of advertisers used interest

---

circumstances "without amending their complaint." *Gold v. Lumber Liquidators Inc.*, No. 14 Civ. 5373 (THE), 2017 WL 2688077, at *4 (N.D. Cal. June 22, 2017); *see, e.g., Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 306 (S.D. Cal. 2015); *Garybo v. Leonardo Bros.*, No. 1:15 Civ. 1487 (DAD) (JLT), 2019 WL 2325564, at *2 (E.D. Cal. May 31, 2019); *Wolf v. Hewlett Packard Co.*, No. 15 Civ. 1221 (BRO) (GJS), 2016 WL 7743692, at *8 n.4 (C.D. Cal. Sept. 1, 2016).

categories); Ex. 6(a) & 6(b).  That far exceeds the threshold for certification.  *See, e.g.*, *Rai v. Santa Clara Valley Transp. Auth.*, 308 F.R.D. 245, 253-254 (N.D. Cal. 2015) ("A class of forty or more members raises a presumption of impracticability of joinder based on numbers alone.").

### B.   The Claims Raise Questions Capable Of Class-Wide Resolution

The commonality requirement is satisfied when the class members' claims "depend upon a common contention" such that the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  Although "even a single common question will do," the overlapping elements of IMB's California Unfair Competition Law, deceit, and common-law fraud claims meet that requirement several times over.  *Id.* at 359 (internal quotation marks and brackets omitted).[11]

The questions common to the class include:

1. Whether the targeting interface used by all class members was misleading in representing that ads would be shown *only* to users who actually had the interests or other characteristics that advertisers had selected—an element of IMB's UCL, deceit, and common-law fraud claims, *see Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002) (fraud-based UCL claim); *Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003) (deceit and common-law fraud); Cal. Civ. Code §§ 1709, 1710 (deceit);

2. Whether Facebook acted with fraudulent intent in making that representation—an element of IMB's deceit and common-law fraud claims, *see Small*, 65 P.3d at 1258;

3. Whether the fraud was committed with the knowledge, participation, or ratification of any of Facebook's officers, directors, or managing agents—an element of IMB's prayer for punitive damages, *see* Cal. Civ. Code § 3294(b), (c)(1), (c)(3); and

---

[11]  California law governs all class members' claims.  The "Statement of Rights and Responsibilities" that governs Facebook's relationships with class members provides that "[t]he laws of the State of California" govern "*any claim that might arise between you and us*, without regard to conflict of law provisions." Ex. 78 ¶ 15.1 (emphasis added).  That clause is presumptively dispositive of the choice-of-law question because Facebook is based in and committed the alleged fraud from California, creating a "substantial relationship" between the State and "the parties or their transaction." *Wash. Mut. Bank, FA v. Superior Ct.*, 15 P.3d 1071, 1079 (Cal. 2001) (citing *Nedlloyd Lines B.V. v. Superior Ct.*, 834 P.2d 1148 (Cal. 1992)); *see, e.g.*, *Estrella v. Freedom Fin. Network, LLC*, No. 09 Civ. 3156 (SI), 2010 WL 2231790, at *5 (N.D. Cal. June 2, 2010) (applying a California choice-of-law provision to a nationwide (b)(3) class); *Smith v. Pathway Fin. Mgmt., Inc.*, No. 11 Civ. 1573 (JVS) (MLG), 2012 WL 12884448, at *6 (C.D. Cal. Nov. 26, 2012) (same).  But even if there were no choice-of-law provision, Facebook's extensive connections to California would discharge IMB's "initial burden" to show that California law applies.  *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012).

---

4.  Whether a reasonable advertiser would have found Facebook's misrepresentations about its targeting accuracy material, and thus presumptively relied upon them—an element of IMB's deceit and common-law fraud claims, *see Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919 (Cal. 1997) (common-law fraud and deceit).

Each of those questions is ideally suited to class treatment because it can be answered without individualized evidence.  Under California law, whether a statement is materially misleading is an objective inquiry based on a reasonable-person standard.  *See, e.g., Friedman v. AARP, Inc.*, 855 F.3d 1047, 1055 (9th Cir. 2017) (UCL); *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014) (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)) (common-law fraud); Cal. Civ. Code §§ 1710.1, 1710.3 (deceit).  Proof of materiality establishes, in turn, a presumption of reliance.  *See Engalla*, 938 P.2d at 919.  And intent focuses purely on the mental state of the defendant, with no need for any individualized inquiry.  *See* Cal. Civ. Code § 1711; *Mirkin v. Wasserman*, 858 P.2d 568, 573 (Cal. 1993) ("[O]ne who makes false representations with fraudulent intent need not have any particular victim in mind.").  So the factfinder who hears the class claims will be able to resolve the issues central to each "in one stroke."  *Dukes*, 564 U.S. at 350.

**C.    IMB's Claims Are Typical Of The Class's Claims**

Under Rule 23's "permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. 338.  IMB's claims easily meet that standard.

IMB's claims are based on the same fraudulent course of conduct that injured every other member of the proposed class.  ███████████████████████████████████ ████████████████████████████████████  Ex. 75.  Like every other member of the class, IMB used Facebook's targeting interface to build the audiences for its ads.  *See* Ex. 74 at 209:8-210:13; Ex. 75 ████████████████████████████████████.  In the process, IMB was exposed to substantially the same materially false and misleading representations and developed the same false impression of Facebook's targeting accuracy as every other member of the class.  *See, e.g.*, Ex. 74 at 211:15-24; 323:23-324:20.  When it paid for ads shown to users who did not

1    actually have the characteristics that Facebook claimed, IMB suffered the same injury as other class

2    members.  *See* Ex. 76 ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪.

3           It makes no difference how much Facebook charged IMB for ads shown to users who did not fit

4    its targeting criteria:  "That injuries may differ in amount does not defeat typicality."  *Sandoval v. M1*

5    *Auto Collisions Ctrs.*, 309 F.R.D. 549, 568 (N.D. Cal. 2015); *see Wolin v. Jaguar Land Rover N. Am.*,

6    617 F.3d 1168, 1175 (9th Cir. 2010).  Nor is it "disqualifying, or even relevant" that class members

7    built their audiences using different targeting criteria.  *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13 Civ.

8    4984 (JST), 2016 WL 5746364, at *5 (N.D. Cal. Sept. 30, 2016).  A defendant who makes general

9    misrepresentations about its products cannot defeat typicality by pointing to differences among the

10   products individual class members purchased.  *See id.* (different chemical compositions of mattresses

11   irrelevant where defendants allegedly represented that "all of their products" were free of harmful

12   chemicals); *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 240 (N.D. Cal. 2014) (typicality shown where

13   named plaintiffs "purchased products that are the same as, or very similar to, the products challenged

14   by the rest of the proposed class"); *Brown v. Hain Celestial Grp., Inc.*, No. 11 Civ. 03082 (LB), 2014

15   WL 6483216, at *13 (N.D. Cal. Nov. 18, 2014) (typicality shown where plaintiffs "'link[ed]' their

16   claims to those arising from products that they themselves did not buy, and the challenged

17   representations are not 'unique' to any product"); *Forcellati v. Hyland's, Inc.*, No. 12 Civ. 1983 (GHK)

18   (MRW), 2014 WL 1410264, at *11 (C.D. Cal. Apr. 9, 2014) (similar).  That is what happened here.

19          The key representations and omissions in Facebook's targeting interface—the vast array of

20   highly specific criteria, the hovercards that represented the number of users that fell within each

21   category, and the "reach estimator" that represented the total number of users who met the advertiser's

22   criteria—were not specific to any type of targeting criteria.  Instead, they conveyed the unmistakable

23   impression that, as CEO Mark Zuckerberg put it, Facebook would show ads to "***exactly the audience***

24   ***you want to reach***," regardless of the mix of targeting criteria that advertisers chose.  Ex. 1 at 4.

25          **D.     IMB Will Adequately Represent The Class**

26          Finally, IMB satisfies Rule 23's requirement that class representatives and their counsel have no

27   "conflicts of interest with other class members" and be able to "prosecute the action vigorously on

28

                                                16

behalf of the class[.]"  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (quoting *Hanlon*, 150 F.3d at 1020).

IMB suffered the same kind of injury as a result of the same course of conduct as every other member of the class.  *See* pp. 15-16, *supra*.  Its interests are thus perfectly aligned with those of absent class members.  *See Dukes*, 564 U.S. at 349 n.5 (observing that adequacy "tend[s] to merge" with the commonality and typicality analysis); *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts.").  And IMB has shown it is committed to this litigation.  IMB's principal, Ralph Kidd IV, sat for a day-long Rule 30(b)(6) deposition in which he testified that the company takes its role as class representative seriously and demonstrated his understanding of the claims at issue in this case.  *See, e.g.*, Ex. 74 at 322:25-325:5; 350:13-15.

IMB's counsel likewise satisfy the adequacy requirement.  *See* Decl. of Steven F. Molo dated December 23, 2020; Decl. of Jordan L. Lurie dated December 23, 2020; Decl. of Joshua E. Fruchter dated December 22, 2020.  They are conflict-free, have extensive experience with complex litigation, including class actions, and have already demonstrated their ability and willingness to vigorously prosecute this action.  *See id.*; Part IV, *infra*.

## II.      THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(2)

Rule 23(b)(2) provides for class treatment of claims that a defendant "has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  That inquiry "does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries" or any injury, for that matter.  *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014); *see Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) ("The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2).").  Rather, the rule's "requirements are unquestionably satisfied when members of a putative class seek uniform injunctive

or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Parsons*, 754 F.3d at 688. That is exactly what IMB is doing with its UCL claim.

Facebook's targeting interface remains substantially unchanged, yet Facebook has pointed to no evidence that its targeting accuracy has materially improved. Ex. 18(s). ██████████████ ████████████████████████████████████████████████████████████████ Ex. 37 at 2 (emphasis added); *see* p. 8, *supra*. The interface thus continues to convey a message Facebook *knows* is false—namely, that it will deliver content only to those users who actually possess the characteristics advertisers target.

That puts would-be advertisers such as IMB in a bind. IMB would like to be able to advertise to Facebook's users in the future. Declaration of Ralph V. Kidd IV dated December 18, 2020. Given Facebook's fraud, however, IMB will be "unable to rely on" Facebook's targeting accuracy "and so will not purchase" Facebook ads, "although [it] would like to." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-70 (9th Cir.), *cert. denied,* 139 S.Ct. 640 (2018); *see Lilly v. Jamba Juice Co.*, No. 13 Civ. 2998 (JST), 2015 WL 1248027, at *4 (N.D. Cal. Mar. 18, 2015) ("[U]nless the manufacturer or seller has been enjoined from making the same representation," the consumer "won't know whether it makes sense to spend her money on the product.").

To redress this imminent threat of future harm, IMB seeks a declaration that Facebook's practices are likely to deceive a reasonable consumer in violation of the UCL, and an injunction that would require Facebook to provide truthful, non-misleading information about its targeting accuracy in the future. *See* Dkt. 148 ¶153, Prayer for Relief. That is the kind of claim (b)(2) was made for. *See, e.g.*, *Smith v. Keurig Green Mountain, Inc.*, No. 18 Civ. 6690 (HSG), 2020 WL 5630051, at *11 (N.D. Cal. Sept. 21, 2020) (certifying (b)(2) class for injunctive relief from misleading product labeling); *In re Coca-Cola Prod. Mktg. & Sales Practices Litig.*, No. 14 MD 2555 (JSW), 2020 WL 759388, at *7 (N.D. Cal. Feb. 14, 2020) (same); *Lanovaz v. Twinings N. Am., Inc.*, No. 12 Civ. 2646 (RMW), 2014 WL 1652338, at *4 (N.D. Cal. Apr. 24, 2014) (same); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 541-542 (N.D. Cal. 2012) (same).

1

### III.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(b)(3)

Rule 23(b)(3) provides for class treatment of claims for which "questions of law or fact common to the class predominate" and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  That is the case with IMB's compensatory and punitive damages claims for deceit and common-law fraud.

### A.   Issues Common To All Class Members Predominate Over Any Individual Questions

The "predominance" requirement "is readily met in cases alleging consumer fraud."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 559 (9th Cir. 2019) (internal quotation marks omitted). The Ninth Circuit has long "followed an approach that favors class treatment of fraud claims stemming from a 'common course of conduct'" such as the "centrally-orchestrated" misrepresentations in this case.  *In re First All. Mortg. Co.*, 471 F.3d 977, 990-92 (9th Cir. 2006).

"Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations," courts in this Circuit "have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable."  *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).  Predominance "is not defeated by slight differences in class members' positions."  *Id.*  Rather, when "central issues in the action are common to the class," certification is appropriate "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted); *accord Hanlon*, 150 F.3d at 1022.

The "central issues" here are (a) whether Facebook's ad-targeting interface conveyed the false impression that it would show ads only to users who matched the targeting criteria advertisers had selected; (b) whether Facebook acted with fraudulent intent in conveying that impression; (c) whether class members relied on Facebook's misrepresentations; and (d) whether class members were injured as a result.  *See* pp. 14-15, *supra*.  Each of those issues is susceptible to common, class-wide proof.

#### 1.   *Common Evidence Will Establish Falsity And Scienter*

The "common course of conduct" in this case readily lends itself to class-wide proof of falsity. *First All. Mortg. Co.*, 471 F.3d at 990.  The targeting interface that every class member saw and

19

interacted with in the process of purchasing their ads made the unmistakable representation that Facebook could identify those users who actually satisfied the criteria that advertisers chose and would direct ads only to them. *See* pp. 2-5, *supra*. To prove that this representation was misleading, IMB will need to show either that a reasonable person would find it misleading or that Facebook did not or could not have believed it to be true. *See* Cal. Civ. Code § 1711 (defining actionable "deceit" to include objectively misleading omissions and affirmative misrepresentations the defendant "does not" believe or "has no reasonable ground for believing"); *Engalla*, 938 P.2d at 919 (applying an objective standard to determine whether an omission is "materially misleading" as a matter of common-law fraud); *cf. Warner Constr. Corp. v. City of Los Angeles*, 466 P.2d 996, 1001 (Cal. 1970) (a duty to disclose arises between the parties to a transaction where the defendant "makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead," has exclusive knowledge of or access to material facts, or "actively conceals discovery" of material facts from the plaintiff). Either way, the evidence will not vary "from member to member" of the class. *Bouaphakeo*, 136 S. Ct. at 1045.

The same goes for proof of Facebook's knowledge and intent to induce reliance, which is necessary to prove fraud and Facebook's liability for punitive damages. The limited discovery conducted to date shows that Facebook undertook a "centrally-orchestrated scheme" over the course of the class period to misrepresent Facebook's targeting accuracy—a campaign that Facebook ***knew*** induced reliance among advertisers. *In re First All. Mortg. Co.*, 471 F.3d at 991; *see, e.g.*, Ex. 30(b) at 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 65 at 22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The evidence will show, moreover, that this scheme was carried out with "advance knowledge and conscious disregard, authorization, [or] ratification" of "officer[s], director[s], or managing agent[s] of the corporation" as required to support a punitive-damages award. Cal. Civ. Code § 3294(b); *see* pp. 8-10, *supra*. And all of that evidence will come from Facebook itself, with no need for individualized determinations.

2. *Common Evidence Supports A Class-Wide Presumption Of Reliance*

Under California law, a class defined "in such a way as to include only members who were exposed to [the statements] alleged to be materially misleading" is entitled to a presumption of reliance. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012); *see Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993). That is how the class is defined here.

a. Every class member saw and interacted with Facebook's misleading targeting interface

The proposed class is limited to advertisers who chose their target audiences through Facebook's targeting interface. The class definition thus *guarantees* that every single class member saw *and interacted with* the misrepresentations and omissions at the heart of this case including:

- A menu of targeting criteria that purported to distinguish among user attributes as precise as a particular $25,000 band of household income, an interest in a particular installment of a popular movie franchise, or particular investing habits, *see, e.g.*, Ex. 18(b); Ex. 56 (IMB video screenshot); Ex. 15 at 20; Ex. 16 at 5.
- Pop-up displays (or "hovercards") that represented which and how many users fit into each targeting category, *see, e.g.*, Ex. 15 at 20; Ex. 64; and
- A dynamic display of the number of users who Facebook represented met the class member's chosen combination of targeting criteria. *See, e.g.*, Ex. 18.

Yet no member of the class was told the truth: ███████████████████████████████ ███████████████████████████████████. That critical, undisclosed fact rendered the whole enterprise a sham.

That makes this case far stronger than an ordinary false advertising or labeling suit. There can be no dispute here that the "alleged misrepresentations were communicated to all class members, because the representations were made at the point of sale as part of a standardized online purchasing process." *Brazil v. Dell Inc.*, No. 07 Civ. 1700 (RMW), 2010 WL 5387831, at *5 (N.D. Cal. Dec. 21, 2010); *see Astiana v. Kashi Co.*, 291 F.R.D. 493, 500 (S.D. Cal. 2013) (finding "no concern" that a class of purchasers of an allegedly mislabeled product "includes individuals who were not exposed to the misrepresentation"). By definition, *every* class member, no matter when or how many times they placed ads over the class period, was exposed to Facebook's accuracy fraud.

It "makes no difference to the predominance analysis" that some class members "encounter[ed]" the same misrepresentations "in different guises" as Facebook tweaked its interface. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 560; *see Ries*, 287 F.R.D. at 538 (differently worded labels conveyed the same misrepresentation so that all purchasers' claims arose "from the same facts and legal theory"). The misrepresentations need not be identical. A "fraud perpetrated on numerous persons by the use of similar misrepresentations" meets the Rule's predominance requirement. Fed. R. Civ. P. 23, Advisory Committee Notes, subd. (b)(3). After all, "[t]he class action mechanism would be impotent if a defendant could escape much of his potential liability for fraud by simply altering the wording or format of his misrepresentations across the class of victims." *First All. Mortg. Co.*, 471 F.3d at 992.

Where "the crux" of a class claim "involves a common failure to disclose information"—in this case, Facebook's inability to target ads with the level of accuracy that it promised—the Ninth Circuit has held that the existence of a class-wide practice of nondisclosure is a "common question of fact" that may properly be found to predominate "over the exact interaction between individual" class members and the defendant. *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137-38 (9th Cir. 2016); *accord Cole v. Asurion Corp.*, 267 F.R.D. 322, 330 (C.D. Cal. 2010). In other words, "[i]t is the *underlying scheme* which demands attention"—not the "exact wording" of the misrepresentations. *First All. Mortg. Co.*, 471 F.3d at 991 (internal quotation marks omitted; emphasis added). Just so here.

Throughout the class period, the targeting interface consistently carried on Facebook's "centrally orchestrated strategy" to sell advertisers on a product Facebook knew it would not and could not deliver. *First All. Mortg. Co.*, 471 F.3d at 991 (internal quotation marks omitted); *see* Ex. 37 at 2 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Ex. 42 at 1 ▇▇▇▇▇▇▇▇▇▇▇▇▇. Throughout the class period, Facebook consistently represented that it could accurately identify and serve ads to users who actually met the criteria advertisers chose. And, throughout the class period, that representation was false. *See* pp. 6-8, *supra*.

Nor was the targeting interface the only means by which Facebook perpetuated its fraudulent scheme. Facebook pushed the same deliberately misleading message through web pages aimed at advertisers, in emails, articles, and other communications. This "multi-media promotional campaign"

was "uniform, highly orchestrated, concentrated and focused on its intended audience." *Makaeff v. Trump Univ., LLC*, No. 3:10 Civ. 940 (GPC) (WVG), 2014 WL 688164, at *13 (S.D. Cal. Feb 21, 2014). It told advertisers that Facebook's targeting was ███████████ Ex. 20 at 9, and that ads would be served only ███████████████████████████████████████████████████████ *id.* at 10-11 ███████████████████; *id.* ███████████████████████. And it offered advice to advertisers about using precise targeting criteria to make their ads "more relevant" to users. Ex. 22, *available at* https://www.facebook.com/business/ads/ad-targeting (last visited December 23, 2020).

          **b.**     Facebook's targeting interface was materially misleading

This kind of class-wide exposure to misrepresentations or omissions gives rise to a class-wide presumption of reliance when the misrepresented or omitted information is material—that is, when a reasonable person "would attach importance" to it. *Engalla*, 938 P.2d at 919; *see Mirkin*, 858 P.2d at 575. That is obviously the case here.

Again, ***every single*** class member throughout the class period was directed to build an audience from a list of targeting criteria that represented that Facebook could distinguish among its users with an extraordinary degree of precision. *See, e.g.*, Ex. 63 at 18 ██████████████████████████████████████████████████████; Ex. 64 ██████████████████████████████████████████████████. Each saw pop-up displays that described the criteria for a particular category and represented the number of users who met those criteria. And each was shown Facebook's representation of the total number of users who met the criteria they selected. *See, e.g.*, Ex. 18.

Any "reasonable person" interacting with the targeting interface would "attach importance" to the fact—deliberately concealed by Facebook—that ██████████████████████████████████████████████████. That is more than enough to establish a presumption of reliance. After all, a defendant "cannot reasonably argue that a putative class member would purchase a product that does not work." *Forcellati*, 2014 WL 1410264, at *11. And the possibility that a defendant "may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones;

23

plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all." *Mass. Mut. Life Ins. Co. v. Superior Court*, 97 Cal. App. 4th 1282, 1292 (2002) (quoting *Blackie*, 524 F.2d at 907, n.22.).

Moreover, Facebook's internal documents ███████████████████████████████
████████████████. *See* pp. 8-10, *supra*. Facebook knew that, ██████████████████
███████████████████████████████████████████████████████████
████████████████████ Ex. 30(b) at 3 (emphasis added). It understood that ██████████
███████████████████████████████████████████████████████████
████████████████████████████████████ Ex. 65 at 5, 20, 22.
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████ Ex. 3 at 5-6. ███████████████████████████████
███████████████████████████████████████████████████████ Ex. 53
at 22. ███████████████████████████████████████████████████
████████████████████ Ex. 30(b) at 3.

That evidence—showing that "class members paid for" ads "for reasons that track" Facebook's misleading message—renders the inference of class-wide reliance inescapable. *Makaeff*, 2014 WL 688164, at *13 (applying a class-wide inference of reliance for this reason); *see In re POM Wonderful LLC Mktg. & Sales Practices Litig.*, MDL No. 2199, 2012 WL 4490860, at *5 (C.D. Cal. Sept. 28, 2012), *decertified on other grounds*, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) (similar, based on defendant's own customer survey data).

3.   *All Class Members Suffered Damages Traceable To Facebook's Accuracy Fraud*

Facebook falsely promised that it would show ads only to those users who fit advertisers' targeting criteria. It follows that class members suffered damages each time they paid for an ad that Facebook showed to someone who did ***not*** fit one or more of their criteria. That makes it easy for IMB to meet the final step in the predominance analysis by showing that class members' "damages stemmed from the defendant's actions that created the legal liability." *Pulaski & Middleman, LLC v. Google,*

*Inc.*, 802 F.3d 979, 987-988 (9th Cir. 2015); *see Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (damages model "must measure only those damages attributable to" the plaintiff's theory of liability).[12]

Two models prepared by IMB's highly credentialed expert, Gregory Pinsonneault,[13] offer a straightforward method of calculating the out-of-pocket loss attributable to Facebook's fraud. ███

██████████████████████████████████████████████████████

███████████████████████████████████████████████ *See* Decl. of Gregory Pinsonneault dated December 23, 2020 ("Pinsonneault Decl.") ¶¶ 89, 91, 145. ███████

██████████████████████████████████████████████████████

*See id.* ¶¶ 143-144. ██████████████████████████████████████████

██████████████████████ *See* Decl. of Mirek Riedewald, Ph.D. dated December 23, 2020 ("Riedewald Decl.") ¶ 61.

That ensures that the models are both reliable and reasonable. *See Pulaski*, 802 F.3d at 989 (approving a damages model based on the defendant's own internal methodology); *In re DRAM Antitrust Litig.*, No. 02 M 1486 (PJH), 2006 WL 1530166, at *9 (N.D. Cal. June 5, 2006) (approving methodology based on assumptions drawn from "defendants' own documents") (Hamilton, J.). It also makes the class-wide calculation of damages simple and efficient. *See Levya v. Medline Indus.*, 716 F.3d 510, 515 (9th Cir. 2013) (availability of relevant records in the defendant's possession "demonstrate[s] the feasibility of calculating damages).

---

[12] IMB's claims for punitive damages necessarily meet that standard because they depend on Facebook's liability for compensatory or nominal damages and proof that Facebook caused those damages with knowledge and the intent to defraud. *See* p. 20, *supra*; *California v. Altus Fin. S.A.*, 540 F.3d 992, 1000 (9th Cir. 2008) ("California courts have long interpreted Section 3294 to require an award of compensatory damages, even if nominal, to recover punitive damages."); *Cheung v. Daley*, 35 Cal. App. 4th 1673, 1677 & n.8 (1995) (same).

[13] As set forth in his declaration and curriculum vitae, Pinsonneault has nearly two decades of experience as a consultant and expert witness on economic, financial, and business issues related to commercial litigation, primarily in the calculation of economic damages. He has been retained as an expert in nearly 60 cases and accepted as an expert in all seven of those cases that proceeded to adjudication. He has also served as project lead in dozens more, non-litigation matters. *See* Pinsonneault Decl. Ex. A.

The first model starts by applying ████████████████████████ ████████████████████████████████████████████ *See* ███████████ Pinsonneault Decl. ¶¶112-118. ███████████████████ ████████████████████████████████████████████████ ██████████████████████ *Id.* ¶¶119-121. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████ *See id.* ¶¶143-144; Ex. 67 at 2; Ex. 68; Ex. 80 at 3; Ex. 81 at 3. The result reflects the amount Facebook charged each class member in excess of the actual value of each targeting criterion they used.

The second model works essentially the same way. ███████████████ ████████████████████████████████████████████████ ███████████████████ *See* Pinsonneault Decl. ¶¶157-159; Ex. 77. ████████████████████████████████████████████████ ████████████████████████████████████████████████. *See* Pinsonneault Decl. ¶¶146-149. ████████████████████████ ████████████████████████████████████████████████ ████ *Id.* ¶¶158-162.

Whether the Court adopts the first model or some combination of the first and second, "it cannot be disputed" that the damages here "stemmed from [*Facebook's*] actions." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th Cir. 2016). That is all that matters for predominance.

The Ninth Circuit has held repeatedly that mere "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (internal quotation marks omitted); *accord, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017); *Vaquero*, 824 F.3d at 1155; *Pulaski*, 802 F.3d at 987-88. And California law "requires only that some reasonable basis of computation of damages be used." *Pulaski*, 802 F.3d at 989. Recovery is proper "even if the result reached is an approximation." *Id.* A method that flows directly from IMB's theory

of liability while tracking the approach that Facebook took ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ plainly clears that bar.

The models proposed by IMB's expert establish that compensatory damages can be calculated on a class-wide basis consistent with IMB's theory of liability. But even in the unlikely event that the Court were to conclude that the amount of damages could not be determined—a conclusion with which we would respectfully disagree—it could certify a (b)(3) class seeking nominal and punitive damages. The "fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery" under California law. *Pulaski*, 802 F.3d at 989. But where a plaintiff "cannot prove the amount of actual damage" even under this permissive standard, nominal damages are available so long as the plaintiff can show "actual damage has occurred (and therefore has satisfied fraud's damages element)." *Hynix Semiconductor Inc. v. Rambus Inc.*, 527 F. Supp. 2d 1084, 1100 (N.D. Cal. 2007); *see McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal. App. 4th 1132, 1163 (1994) (nominal damages available "where the difficulty lies in fixing the amount of damages with certainty").

As IMB's expert explains, Facebook's advertisers have clearly suffered actual damages as a result of Facebook's fraud. *See* Pinsonneault Decl. ¶¶81-83. That is sufficient to support an award of both nominal and punitive damages under California law, ensuring that class members obtain some measure of redress in addition to the injunctive relief available through the (b)(2) proceedings. *See California v. Altus Finance S.A.*, 540 F.3d 992, 1000 (9th Cir. 2008); *Hynix*, 527 F. Supp. 2d at 1102. "[S]everal district courts in the Ninth Circuit have certified classes involving claims for nominal damages" for precisely this reason. *Opperman v. Path, Inc.*, No. 13 Civ. 453 (JST), 2016 WL 3844326, at *15 (N.D. Cal. July 15, 2016) (certifying a (b)(3) class for nominal and punitive damages and collecting cases). If the Court concludes that out-of-pocket damages cannot be calculated here, it could do the same.

**B.     A Class Action Is A Superior Method Of Adjudicating The Class Members' Claims**

A class action is plainly "superior to other available methods for fairly and efficiently adjudicating the controversy" where, as here, any individual recovery "would be dwarfed by the cost of

litigating on an individual basis" and the class claims share common factual and legal questions. *Wolin*, 617 F.3d at 1175 (quoting Fed. R. Civ. P. 23(b)(3)).

Facebook's treatment of its advertisers was unconscionable. ███████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████    *See* Ex. 30(b) at 3; Ex. 58 at 1; Ex. 49 at 3.  Unless the plaintiffs here are allowed to proceed as a class, that conduct will go unaddressed.  "[S]ome—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover."  *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001).  ███████

███████████████████████████████████████████████████████████████

██████████████████████    *See* Pinsonneault Decl. ¶136.  No reasonable litigant would file suit against a multi-billion dollar corporation to recover only that amount.  "In this sense, the proposed class action is paradigmatic."  *Hanlon*, 150 F.3d at 1023.

The discretionary factors set out in Rule 23(b) all point to the same conclusion.  They include "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)-(D).

Here, as in most consumer litigation "there is no advantage"—from "either a judicial or litigant viewpoint"—"in individual members controlling the prosecution of separate actions."  *Hanlon*, 150 F.3d at 1023.  "There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery."  *Id.*  Nor is there any risk that class proceedings would disrupt ongoing litigation regarding the same issue, as this appears to be the first case to address Facebook's accuracy fraud.  And the Northern District of California is the "logical venue for concentration of claims" given Facebook's decision to make it the default forum in the contracts that it executed with its advertisers.  *Id.*; Ex. 78 ¶15.1.

1    Moreover, the Court can resolve the question of Facebook's liability for the entire class in a
2    single trial on IMB's claims, making this case far easier to manage than typical nationwide class
3    actions. Thanks to Facebook's choice of California law, the class claims all arise under the same legal
4    framework. And the elements of liability and IMB's prayer for punitive damages are susceptible to
5    class-wide proof that will not vary based on individual class members' experiences. *See* pp. 14-15,
6    *supra*; *see also Opperman*, 2016 WL 3844326, at *16 (claims for punitive damages hinge "not on facts
7    unique to each class member, but on the defendant's conduct toward the class as a whole").

8    The mechanics of providing notice to absent class members and calculating damages are
9    similarly straightforward. ███████████████████████████████████████████████
10   █████████████████████████████████████████████████████████████████████████
11   Riedewald Decl. at ¶¶62-64; Ex. 33 at 256:24-257:8. IMB's damages models would be simple and
12   cost-effective to apply. *See Levya*, 716 F.3d at 515 (availability of relevant records in the defendant's
13   possession "demonstrate[s] the feasibility of calculating damages"). ████████████████████
14   █████████████████████████████████████████████████████████████████████████
15   ████████████  Riedewald Decl. ¶86.  ████████████████████████████████████████
16   ███████████████████████████████████████████████  *Id.* ¶¶87-90. █████████████
17   █████████████████████████████████████████████████████████████████████████
18   █████████████████████████████████████████████████████████████████████████
19   ████████████████████████████████████████████  *Id.* ¶91.

20   In short, a "class action is the most efficient and effective means of resolving" the class
21   members' claims. *Wolin*, 617 F.3d at 1175 (quoting Wright & Miller, *Federal Practice and Procedure*,
22   § 1779 (3d ed. 2005)). The Court should certify the class under Rule 23(b)(3).

23   **IV.      THE COURT SHOULD APPOINT IMB'S COUNSEL AS CLASS COUNSEL**

24   Finally, the Court should appoint the undersigned highly skilled and experienced law firms as
25   class counsel. When addressing a single application for appointment, Rule 23(g) directs courts to
26   consider "(i) the work counsel has done in identifying or investigating potential claims in the action;
27   (ii) counsel's experience in handling class actions, other complex litigation, and the type of claims in
28   the litigation; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will

commit to representing the class" and to ensure that counsel will "fairly and adequately represent" the class's interest.  Fed. R. Civ. P. 23(g)(1), (4); *see id.* 23(g)(2).  The court may also consider "the proposed counsel's professional qualifications, skill, and experience, as well as such counsel's performance in the action itself."  *Scholl v. Mnuchin*, No. 20 Civ. 5309 (PJH), 2020 WL 5702129, at *24 (N.D. Cal. Sept. 24, 2020) (Hamilton, J.).

Each of these considerations supports the joint appointment of the undersigned counsel as co-lead class counsel.  As described more fully in their attached declarations, counsel have extensive experience in handling both class actions and other complex litigation, and are well-acquainted with the applicable law.  *See* Decl. of Steven F. Molo dated December 23, 2020; Decl. of Jordan L. Lurie dated December 23, 2020; Decl. of Joshua E. Fruchter dated December 22, 2020.  Counsel's diligent investigation and the extensive resources they have committed to representing the class have already succeeded in bringing Facebook's fraud to light, and counsel are committed to investing the time and resources to see that effort through to a timely resolution that is fair and equitable to the whole class.

## CONCLUSION

IMB respectfully requests that the Court certify its proposed class under Rules 23(b)(2) and (b)(3), appoint IMB class representative, and appoint the undersigned as class counsel under Rule 23(g)(1).

Dated:  December 23, 2020

Respectfully submitted,

By: */s/ Steven F. Molo*
Steven F. Molo
Megan Cunniff Church
Caleb Hayes-Deats
Eugene A. Sokoloff
Lauren F. Dayton
Leonid Grinberg
**MOLOLAMKEN LLP**

By: */s/ Jordan L. Lurie*
Jordan L. Lurie
Ari Y. Basser
**POMERANTZ LLP**

By: */s/ Joshua E. Fruchter*
Joshua Elazar Fruchter
**WOHL & FRUCHTER LLP**

*Counsel for Plaintiff and the Proposed Class*

PLAINTIFF'S MOTION TO CERTIFY CLASS
CASE NO. 4:18-cv-05286 PJH-JCS