GIBSON, DUNN & CRUTCHER LLP
CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
LAUREN M. BLAS, SBN 296823
  lblas@gibsondunn.com
CHRISTIAN S. BRIGGS, SBN 307387
  cbriggs@gibsondunn.com
JASON S. KIM, SBN 307532
  jkim@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

ETHAN DETTMER, SBN 196046
  edettmer@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
  abarrera@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:    415.393.8200
Facsimile:    415.393.8306

*Attorneys for Defendant Facebook, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.,<br><br>Defendant. | Case No. 4:18-cv-05286 PJH<br><br>PUTATIVE CLASS ACTION<br><br>**DEFENDANT FACEBOOK, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hon. Phyllis J. Hamilton<br><br>Hearing:  April 29, 2021, 1:30 p.m. |

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND.................................................. 4

III.    THE LEGAL STANDARDS GOVERNING THIS MOTION .................................. 13

IV.     STATEMENT OF ISSUE TO BE DECIDED UNDER RULE 7-4(a)(3) ............................ 14

V.      PLAINTIFF IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE ....... 14

VI.     PLAINTIFF HAS NOT MET ITS BURDEN TO SHOW COMMONALITY OR
        PREDOMINANCE WITH "EVIDENTIARY" PROOF ............................................ 17

        A.    There Is No "Common" Way To Assess Whether The Targeting Interface Was
              Misleading ........................................................................................................ 18

        B.    The Class Is Not Entitled To A Classwide Inference Of Reliance, And The
              Need For Individualized Proof Of Reliance Precludes A Finding Of
              Predominance .................................................................................................. 20

              1.    There Was No Uniform Exposure, Statement, Or "Centrally-
                    Orchestrated Scheme" ......................................................................... 21

              2.    Materiality Also Is Not Subject To "Common" Proof And Cannot
                    "Predominate" ...................................................................................... 23

        C.    Whether Facebook Intended To Induce Reliance Cannot Be Established Via
              Common Proof And Will Lead To Individual Questions ............................... 26

        D.    Injury And Damages Are Not Susceptible To "Common" Proof And Would
              Lead To Multiple Individualized Issues ........................................................ 27

              1.    There Are No "Common" Issues Relating To Injury ..................................... 27

              2.    Plaintiff's Damages Model Does Not Measure Only Those Damages
                    Attributable To Its Theory Of Liability ........................................... 28

        E.    Plaintiff Cannot Establish Classwide Punitive Damages, Nor Is That Issue A
              "Common" Question "Apt To Drive The Resolution" Of This Action ..................... 30

VII.    CLASS LITIGATION IS NOT THE "SUPERIOR" METHOD OF ADJUDICATION ....... 31

VIII.   PLAINTIFF ALSO CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)(2) ...... 33

IX.     CONCLUSION ................................................................................................... 35

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Constitutional Provisions**

U.S. Const. amend. V ........................................................................................................31

**Cases**

*In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*,
   No. 13-02438, 2017 WL 2559615 (C.D. Cal. June 7, 2017) ........................................25

*Adams v. Target Corp.*,
   No. 13-5944, 2014 WL 12558858 (C.D. Cal. Nov. 25, 2014)......................................29

*Akkerman v. Mecta Corp.*,
   152 Cal. App. 4th 1094 (2007)......................................................................................24

*Algarin v. Maybelline, LLC*,
   300 F.R.D. 444 (S.D. Cal. 2014)...................................................................................24

*Alliance Mortg. Co. v. Rothwell*,
   10 Cal. 4th 1226 (1995) ................................................................................................31

*Am. Express Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) .......................................................................................................13

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)..................................................................................................14, 17

*Anderson v. Deloitte & Touche*,
   56 Cal. App. 4th 1468 (1997).........................................................................................26

*Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*,
   158 Cal. App. 4th 226 (2007).........................................................................................18

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2012) .......................................................................................................14

*Beck v. Boeing Co.*,
   60 F. App'x 38 (9th Cir. 2003) ......................................................................................31

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014).............................................................................18, 19, 22

*Block v. eBay, Inc.*,
   747 F.3d 1135 (9th Cir. 2014).........................................................................................25

*Brazil v. Dell Inc.*,
   No. 07-1700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010)................................22

ii

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Brazil v. Dole Packaged Foods, LLC*,
No. 12-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ................................ 30

*Bruton v. Gerber Prods. Co.*,
No. 12-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) .............................. 30

*Cabral v. Supple LLC*,
608 F. App'x 482 (9th Cir. 2015) ................................................................................ 22

*Caitlin v. Wash. Energy Co.*,
791 F.2d 1343 (9th Cir. 1986) ..................................................................................... 30

*California v. Altus Fin. S.A.*,
540 F.3d 992 (9th Cir. 2008) ....................................................................................... 31

*Campbell v. Facebook*,
315 F.R.D. 250 (N.D. Cal. 2016) ................................................................................ 31

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ................................................................................ 35

*Chow v. Neutrogena Corp.*,
No. 12-04624, 2013 WL 5629777 (C.D. Cal. Jan. 22, 2013) ..................................... 24

*City Solutions, Inc. v. Clear Channel Commc'ns*,
365 F.3d 835 (9th Cir. 2004) ....................................................................................... 20

*Clemens v. DaimlerChrysler Corp.*,
534 F.3d 1017 (9th Cir. 2008) ..................................................................................... 20

*In re Coca-Cola Prods. Mktg. and Sales Pracs. Litig.*,
No. 14-2555 JSW, 2020 WL 759388 (N.D. Cal. Feb. 14, 2020) ................................ 34

*Cohen v. DIRECTV, Inc.*,
178 Cal. App. 4th 966 (2009) ...................................................................................... 18

*Comcast v. Behrend*,
569 U.S. 27 (2013) ................................................................................................. 28, 29

*In re ConAgra Foods*,
302 F.R.D. 537 (C.D. Cal. 2014) ................................................................................ 25

*Darisse v. Nest Labs, Inc.*,
No. 14-01363 BLF, 2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) ........................... 19

Gibson, Dunn & Crutcher LLP

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Davidson v. Apple Inc.*,
  No. 16-04942 LHK, 2018 WL 2325426 (N.D. Cal. May 8, 2018)..................................29

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018)........................................................................................33

*Davis-Miller v. Auto. Club of S. Cal.*,
  201 Cal. App. 4th 106 (2011)......................................................................................22

*Delarosa v. Boiron, Inc.*,
  275 F.R.D. 582 (C.D. Cal. 2011) .................................................................................31

*Doe v. Xytex Corp.*,
  No. 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) ............................21

*Doninger v. Pac. Nw. Bell, Inc.*,
  564 F.2d 1304 (9th Cir. 1977).....................................................................................13

*Downey v. Public Storage, Inc.*,
  44 Cal. App. 5th 1103 (2020)..................................................................................19, 21

*Ebner v. Fresh, Inc.*,
  838 F.3d 958 (9th Cir. 2016).......................................................................................19

*Ehret v. Uber Techs., Inc.*,
  148 F. Supp. 3d 884 (N.D. Cal. 2015) .................................................................21, 22, 26

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011)..............................................................................14, 17, 34

*Endres v. Wells Fargo Bank*,
  No. 06-7019 PJH, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008).........................15, 27, 28

*English v. Apple Inc.*,
  No. 14-01619 WHO, 2016 WL 1188200 (N.D. Cal. Jan. 5, 2016) ...............................34

*Erica P. John Fund., Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).....................................................................................................14

*In re Facebook, Inc., PPC Advertising Litig.*,
  282 F.R.D. 446 (N.D. Cal. 2012)...................................................2, 16, 17, 24, 29, 32

*In re First Alliance Mortgage*,
  471 F.3d 977 (9th Cir. 2006)........................................................................................23

Gibson, Dunn &
Crutcher LLP

1

**TABLE OF AUTHORITIES**
*(continued)*

2

3

Page(s)

4

*In re First Am. Home Buyers Prot. Corp. Class Action Litig.*,
  313 F.R.D. 578 (S.D. Cal. 2016)..................................................................................23

5

*Fraley v. Batman*,
  638 F. App'x 594 (9th Cir. 2016) ................................................................................31

6

7

*Gilbert v. MoneyMutual LLC*,
  318 F.R.D. 614 (N.D. Cal. 2016) ................................................................................21

8

*Gonzalez-Tzita v. City of L.A.*,
  No. 16-0194, 2019 WL 7790440 (C.D. Cal. Dec. 9, 2019) ..........................................32

9

10

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992)........................................................................................17

11

12

*Hodgers-Durgin v. de la Vina*,
  199 F.3d 1037 (9th Cir. 1999).....................................................................................34

13

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  527 F. Supp. 2d 1084 (N.D. Cal. 2007) .....................................................................30

14

*In re Hyundai & Kia Fuel Economy Litig.*,
  926 F.3d 539 (9th Cir. 2019).......................................................................................22

15

16

*I.M.A.G.E. v. Bailar*,
  78 F.R.D. 549 (N.D. Cal. 1978) ..................................................................................15

17

18

*Jenson v. Fiserv Tr. Co.*,
  256 F. App'x 924 (9th Cir. 2007) ...............................................................................20

19

20

*Jones v ConAgra Foods, Inc.*,
  No. 12-01633 CRB, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ......................20, 23, 24, 25, 34

21

*Joseph v. Koh*,
  No. 20-03782 VKD, 2020 WL 5408042 (N.D. Cal. Sept. 9, 2020)...............................20

22

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*,
  178 Cal. App. 4th 830 (2009)................................................................................19, 22

23

24

*Lanovaz v. Twinings N. Am., Inc.*,
  726 F. App'x 590 (9th Cir. 2018) ...............................................................................33

25

26

*Lavie v. Procter & Gamble Co.*,
  105 Cal. App. 4th 496 (2003)..................................................................................19, 20

27

28

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Lazar v. Sup. Ct.*,
   12 Cal. 4th 631 (1996) ...................................................................................18, 26, 27

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)...........................................................................................34

*Major v. Ocean Spray Cranberries, Inc.*,
   No. 12-03067 EJD, 2013 WL 2558125 (N.D. Cal. June 10, 2013) ...............................16

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012)...........................................................................23, 27

*Mirkin v. Wasserman*,
   5 Cal. 4th 1082 (1993) ....................................................................................20

*Moheb v. Nutramax Labs., Inc.*,
   No. 12-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ...............................17, 24, 28

*Moore v. Apple, Inc.*,
   309 F.R.D. 532 (N.D. Cal. 2015) ...........................................................................28

*Murray Dental Corp. v. Dentsply Int'l, Inc.*,
   19 Cal. App. 5th 258 (2018)...........................................................................18, 20

*Navellier v. Sletten*,
   262 F.3d 923 (9th Cir. 2001)...........................................................................14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001)...........................................................................32

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014)...........................................................................21

*Nguyen v. BDO Seidman, LLP*,
   No. 07-01352, 2009 WL 7742532 (C.D. Cal. July 6, 2009)........................................32

*Nguyen v. Nissan N. Am., Inc.*,
   932 F.3d 811 (9th Cir. 2014)...........................................................................28

*Otyang v. City & Cty. of S.F.*,
   No. 12-00577 MEJ, 2013 WL 843565 (N.D. Cal. Mar. 6, 2013) ...............................33

*Philips v. Ford Motor Co.*,
   No. 14-02989 LHK, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016)............................19

1

**TABLE OF AUTHORITIES**
*(continued)*

2

Page(s)

3

*In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*,
    No. 10-02199, 2012 WL 4490860 (C.D. Cal. Sept. 28, 2012) ......................................................26

4

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015)........................................................................................................29

5

6

*Quezada v. Con-Way Freight, Inc.*,
    No. 09-03670-JSW, 2012 WL 4901423 (N.D. Cal. Oct. 15, 2012)...............................................33

7

8

*R.D. Reeder Lathing Co. v. Cypress Ins. Co.*,
    3 Cal. App. 3d 995 (1970)...........................................................................................................27

9

*Ramirez v. TransUnion LLC*,
    951 F.3d 1008 (9th Cir. 2020).................................................................................................27, 34

10

11

*Rodriguez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010).................................................................................................16, 34

12

13

*Roley v. Google LLC*,
    No. 18-07537 BLF, 2020 WL 8675968 (N.D. Cal. July 20, 2020) ...............................................22

14

*S. Bay Chevrolet v. GMAC*,
    72 Cal. App. 4th 861 (1999).........................................................................................................20

15

16

*S. Ferry LP No. 2. v. Killinger*,
    271 F.R.D. 653 (W.D. Wash. 2011) ..............................................................................................34

17

18

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018).........................................................................................................14

19

*Schulken v. Wash. Mut. Bank*,
    No. 09-02708 LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012).....................................................35

20

21

*Silver v. Penn. Higher Educ. Assistance Agency*,
    No. 14-00652 PJH, 2020 WL 607054 (N.D. Cal. Feb. 7, 2020)....................................................35

22

23

*Snake River Farmers' Ass'n, Inc. v. Dep't of Labor*,
    9 F.3d 792 (9th Cir. 1993)............................................................................................................34

24

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003)......................................................................................................................31

25

26

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011).......................................................................................................22

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016).............................................................................................23

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ....................................................................................17, 18, 29

*Van Asdale v. Int'l Game Tech.*,
    577 F.3d 989 (9th Cir. 2009).............................................................................................33

*Vasquez v. Sup. Ct.*,
    4 Cal. 3d 800 (1971) .................................................................................................18, 20

*In re Vioxx Cases*,
    180 Cal. App. 4th 116 (2009)......................................................................................23, 24

*Wal-Mart Stores Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................13, 17, 18, 20, 31, 35

*Wellin v. Alexy*,
    155 F.R.D. 654 (N.D. Cal. 1994) .....................................................................................16

*William H. Morris Co. v. Grp. W, Inc.*,
    66 F.3d 255 (9th Cir. 1995)..............................................................................................19

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008)............................................................................................19

*Yassin v. Crosland*,
    613 F.2d 219 (9th Cir. 1980)............................................................................................35

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)..........................................................................................32

**Statutes**

Cal. Bus. & Prof. Code § 17204 .........................................................................................27

Cal. Civ. Code § 1709 ........................................................................................................26

**Other Authorities**

Facebook Bus. Help Ctr., *About Audiences for Credit, Employment or Housing*,
    https://www.facebook.com/business/help/2220749868045706........................................8

*Witkin's Cal. Proc.* (5th ed. 2020) .....................................................................................27

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

**Rules**

Fed. R. Civ. P. 23(a)................................................................................................14

Fed. R. Civ. P. 23(b)(2)...........................................................................................33

Fed. R. Civ. P. 23(b)(3)...........................................................................................31

Gibson, Dunn &
Crutcher LLP

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff IntegrityMessageBoards.com, LLC ("IMB") is the sole class representative seeking to represent a sprawling class of Facebook advertisers who vary widely in size, sophistication, and reasons for advertising.  Plaintiff operates an online investment discussion forum.  Five years ago, it ran a handful of ad campaigns that targeted specific categories of individuals it thought would be interested in its Facebook pages.  These campaigns resulted in more than a thousand page "Likes," but Plaintiff was unhappy with the results.  Based on its limited experience, Plaintiff contends that *all* of Facebook's varied advertisers were defrauded because Facebook either (1) omitted material information about certain targeting criteria, or (2) impliedly promised that it could deliver the impossible—perfection in its targeting abilities, such that every ad would be shown only to individuals who actually possessed the interests or other attributes that Facebook inferred and that advertisers targeted.

But *Plaintiff* faces an impossible task because the members of the proposed class are so diverse, and their claims are so individualized, that class certification will inevitably violate Rule 23.  Plaintiff cannot possibly show that all the advertisers in the proposed class—no matter how large or sophisticated—shared the same expectations, were deceived at all (let alone in the same way), or were harmed or damaged in a similar manner by the challenged conduct.

Instead of addressing Rule 23's requirements, Plaintiff devotes much of its Motion to distorting the evidentiary record on matters that are irrelevant to class certification.  Attempting to paint an incomplete picture of the value of Facebook's targeted advertising, Plaintiff relies heavily on a handful of internal, non-scientific analyses about areas for improvement in certain targeting categories.  Casting these internal documents as "proof" of wrongdoing, Plaintiff ignores the testimony of the witnesses who authored them—all of whom explained that these discussions were part of ongoing product-improvement efforts designed to ensure that Facebook was delivering optimal value to advertisers.  There can be no dispute that businesses of all types realize value from Facebook's advertising tools.  And those businesses that do not find Facebook's tools valuable can (and do) spend their advertising dollars elsewhere—or cease advertising altogether (as IMB did).

Plaintiff cannot satisfy its evidentiary burden to meet Rule 23's requirements through a one-sided picture of the factual record in this case, and the Court should deny the Motion for several reasons:

Gibson, Dunn &
Crutcher LLP

1. **Plaintiff is an atypical and inadequate class representative under Rule 23(a).** IMB seeks to represent a sprawling class of advertisers that vary in terms of their size, sophistication, experience, objectives, and the sources upon which they relied. Given this variability, there is no "typical" advertiser in this class. But even if there could be one, it is certainly not Plaintiff: it briefly placed a handful of ad campaigns on Facebook many years ago, and it engaged in a multi-year effort to publicize its claims in the hopes of persuading hedge funds to join a baseless scheme to earn billions of dollars by "shorting" Facebook stock. IMB also cannot adequately represent the proposed class's interests. Its founder testified ███████████████████████████████████████████████████ ████████████ (*Infra* p. 16.) Yet that is exactly what Plaintiff proposes here, rendering this case analogous to another advertising class action against Facebook that this Court refused to certify on adequacy grounds. *In re Facebook, Inc., PPC Advertising Litig.*, 282 F.R.D. 446, 454 (N.D. Cal. 2012).

2. **Plaintiff also cannot show Rule 23(a)(2) commonality and Rule 23(b)(3) predominance.** Plaintiff's UCL and common-law fraud claims allege that Facebook made misleading representations and omissions. To prevail on these claims, Plaintiff would need to show classwide exposure, deception/ falsity, intent, justifiable reliance, materiality, injury, and damages. It has not done so. Among other problems, there is no "common," unifying statement to which the class was exposed; no classwide method to adjudicate whether the disclosed (or allegedly omitted) information was "material" to every advertiser; and no evidence that all advertisers relied on the same information in deciding to advertise on Facebook. To the contrary, as explained below and in the expert survey of Dr. Dominique Hanssens, advertisers were exposed to, knew about, and relied upon many different sources of information before placing their ads. This survey reveals that the only conceivable "glue" holding the putative class together is their overwhelming satisfaction with advertising on Facebook.

Throughout this case, Plaintiff has been unable to identify a "common," uniform "misrepresentation," as evidenced by its shifting citation to an assortment of alleged statements in its initial complaint, amended complaint, and Motion for Class Certification. Now, Plaintiff appears to focus on an "implied" promise of precision that Facebook's self-serve ad interfaces supposedly suggested. This latest strategy fails as a matter of law and fact: Plaintiff cites *no* legal authority to support such sweeping fraud liability based on an *implied* suggestion; and it ignores that the ad

interfaces still implicate too much variability to prove the elements of its claims on a classwide basis.

**3.  Plaintiff also cannot meet its burden to establish classwide injury or damages.**  Each of Plaintiff's claims (and Article III) also requires proof of injury.  An advertiser is not injured or damaged if it received the value it expected and paid for, even if the ad was shown to people who, despite Facebook's best predictive efforts, did not actually possess all of the interests or behaviors that placed them in the advertiser's intended target audience.  By way of example, an advertiser that had the objective of attracting 100 new customers and achieved that objective is not "injured" (much less in a way that is susceptible to common proof) if its ads generated purchasers who may have fallen outside its desired targeting criteria.  Thus, even before reaching the question of *quantifying* damages, deciding the threshold question of *injury* will require proof of each advertiser's expectations, objectives, and particular experience.  Plaintiff does not account for *any* of this variation, as explained in the expert report of Dr. Catherine Tucker.  Instead, Plaintiff simply cites a handful of internal analyses (performed on a very limited subset of targeting data), and assumes that all advertisers expect a uniform (but unspecified) level of precision.  But Plaintiff (and its expert) provide no way to account for the varying expectations of the proposed class, the results of their campaigns, or other potential causes of alleged injury.  In particular, there are multiple reasons why an ad could be delivered to someone falling outside the target audience that have nothing to do with the underlying accuracy of the targeting data.

But even if Plaintiff overcame these hurdles, it has not offered a viable damages methodology.  If anything, Plaintiff's expert compounds these problems; he conceded that his damages model does not account for the many other reasons that a particular campaign may have been unsuccessful.  For example, his model would capture IMB's initial Facebook ad campaign, even though Plaintiff admits that it yields no liability for Facebook.  Plaintiff's expert offers no classwide method of differentiating between these campaigns or resolving these fundamental,  yet inherently individualized, issues.

**4.  A class action is not "superior" or "manageable" under Rule 23(b)(3).**  Plaintiff's damages model also relies upon data that in many cases do not exist, and in other cases would take years to generate, rendering a Rule 23(b)(3) class unmanageable.  Similarly, the potential recovery for class members—especially frequent advertisers—provides ample incentive for them to pursue their claims individually, so the "exception" of class litigation is not "superior" here.

Gibson, Dunn & Crutcher LLP

1    **5.   Plaintiff has not satisfied the requirements for Rule 23(b)(2) certification.**   Finally,

2 Plaintiff lacks Article III standing to seek injunctive relief on behalf of the class because it has not

3 identified any concrete intent to purchase ads on Facebook in the future.  This lack of standing also

4 renders Plaintiff an "inadequate" representative to pursue classwide injunctive relief.  This Court also

5 should reject Rule 23(b)(2) certification because:  (i) Facebook's alleged misconduct did not affect

6 putative class members in a uniform way, given the inherent variability in advertisers on the platform;

7 and (ii) the requested injunction would not provide relief to all advertisers, because the proposed class

8 is full of businesses (like IMB) that no longer advertise on Facebook, and because one of the targeting

9 options at issue (Partner Categories) has ceased since this suit was filed.

10    In sum, Facebook is committed to maximizing advertiser value and has always made clear that

11 the tools it provides are designed to do exactly that.  But there is no way to perfectly infer or predict

12 the interests, behaviors, or other data about every person who will see an ad (online or otherwise).  This

13 is not one of those "rare" cases in which the Court may adjudicate all of the claims in one lawsuit, and

14 Facebook respectfully requests that the Court deny Plaintiff's Motion.

15    **II.    FACTUAL AND PROCEDURAL BACKGROUND**

16 **A.    Background On Digital Advertising And Facebook Advertising**

17    Before the digital age, advertising was expensive, imprecise, and inaccessible to many

18 businesses.  Upstart companies hoping to grow, reach a new audience, and sell a new product or service

19 would advertise on TV or radio, send "junk" mail, or purchase space in a newspaper or magazine.

20 Although these ads may have reached some of the intended audience, advertisers could not be sure,

21 and they had few tools to gauge the results of their campaigns.  (Tucker Rpt. ¶¶ 21–28.)

22    The advent of the Internet transformed advertising by providing advertisers with more

23 information about potential customers and more ways to reach them.  But more information does not

24 mean that all inferences obtained through online activity are correct.  Instead, advertisers can now make

25 more informed predictions and educated assumptions about who *might* be interested in their products/

26 services.  And perhaps most importantly, advertisers can now *measure* the effectiveness of a campaign

27 to decide whether their targeted audience is in fact producing the desired results.  (*Id.*)

28    Facebook's tools allow advertisers to realize these benefits.  People who use Facebook can

Gibson, Dunn &
Crutcher LLP

report information about themselves—such as their age, whether and where they went to college, their relationship status, and other details—by creating Facebook profiles. (App. 1344.)[1] People also engage on Facebook—by "liking" pages or articles, purchasing products, clicking links, or viewing content—in ways that allow insights into their possible interests. (*Id.*) Similar to other companies (Dkt. 120-2 at 11)—and in response to advertiser demand—Facebook also purchased third-party data from 2013 to 2018 to give advertisers access to other targeting criteria like home ownership, household income, and whether someone was looking to buy a new car. (App. 1277; *see also* Tucker Rpt. ¶¶ 30–34.)

These data inform the "interest," "behavior," and "Partner Category" targeting options that permit advertisers to serve targeted ads on Facebook. (App. 883–84.) Of course, Facebook cannot be 100% certain that someone is within a particular targeting category based on its data. Interests often change, and Facebook does not verify whether someone who says she graduated from UC Berkeley actually did. Nor can it be certain that someone who "liked" a page about *American Idol* would engage with ads that target people interested in "singing." But Facebook can make more informed predictions about the advertisements that the billions of individuals using Facebook might find interesting or engaging. (App. 883–84.) That is why Facebook notifies advertisers—not as a disclaimer of quality, but as a recognition of ad targeting limitations—that it "cannot guarantee in every instance that your ad will reach its intended target or achieve the outcome you select." (App. 892–909.)

These offerings—despite their imperfections—attract advertisers of all types and sizes. This group contains Fortune 500 companies, small businesses, sole-proprietors, ad agencies, non-profits, and many others. (App. 1346.) Advertisers in each group possess different levels of sophistication and have different goals and expectations for their ad campaigns. (App. 1346–48; Hanssens Rpt. ¶ 36.) Although Plaintiff paints a very negative picture, its own very limited experience with Facebook advertising is not at all representative of advertisers that were able to revitalize their marketing:

- After an Arkansas-based catering company received no leads after spending $1,700 on television and radio ads, it turned to Facebook to target those living within 30 miles of its location with interests in "food" and "parties." (App. 1122–23.) The Facebook campaign generated immediate inquiries and a **57%** increase in sales. (*Id.*)
- An online fitness coach who "didn't have a massive budget" launched a Facebook campaign

---

[1] "App." refers to the consecutively-numbered exhibits in Facebook's Evidentiary Appendix. For convenience, Facebook's numbering resumes where Plaintiff ended, starting with Exhibit 88.

Gibson, Dunn &
Crutcher LLP

"with $20/day" and obtained 1,892 new email subscribers and **11,850** unique website visitors in one month. (App. 396.)

- A Los Angeles-based natural foods market that wanted to "attract[] a very particular culture" to purchase juice cleanses targeted profiles of women aged 18-40 with an interest in organic food and holistic nutrition who lived within 10 miles of their stores and "**doubl[ed]** [its] results in just a few weeks." (App. 1271.)

These are only some of the millions of small businesses that have realized value through advertising on Facebook. (App. 70–80, 332–410.)

In addition, advertisers, ad agencies, and digital marketing consultants submitted declarations to oppose the Motion. (App. 1369–1405.) These businesses (and their clients) know that Facebook's ad targeting is based on "inferences" and "predictions," and that "the audience selected and the people who ultimately see the ads may not always be a perfect match." (App. 1374, 1392.) Nevertheless, these companies realized value through Facebook's tools and were able to achieve substantial growth in ways that were beyond their reach only a few years ago. Dr. Hanssens' survey confirms overwhelming satisfaction with Facebook: "We were able to reach our targeting audience much more effectively"; "[t]he campaign was worth every penny" and "reach[ed] the people we wanted"; and "I was able to reach a large portion of my target audience." (Hanssens Rpt., Ex. AA.)

**B.    Advertisers Come To Facebook Through Various Channels, Place Ads on Facebook In Different Ways, And Create Campaigns Using Varying Objectives**

Many advertisers value the ability to customize their ad campaigns on Facebook (as compared to other media). (App. 1369–1405.) But advertisers are not exposed to uniform information when they place ads on Facebook. Advertisers that Facebook classifies as "managed"—i.e., they have a dedicated Facebook contact—can and do speak with those contacts on an ad hoc basis about their campaigns and options *before* placing their ads. (App. 1347.) Other advertisers communicate with consultants, ad agencies, Facebook Marketing Partners, and/or Facebook Marketing Experts[2] about the best approach for their ad campaigns. (App. 1284, 1346.) The actual process of placing ads differs from advertiser to advertiser because there are multiple "self-serve ad interfaces," and not just one. (Mot. at 12.) Some advertisers place ads from their Business Page, others use the recently-released Facebook Business

---

[2]  A "Marketing Partner" is a company or agency with an official relationship with Facebook that allows expanded access to Facebook's tools and support. (App. 1286–87.) A "Marketing Expert" is a Facebook employee who assists managed and unmanaged advertisers. (App. 1347.)

6

Suite, many used the Ads Manager App, and some use Facebook's streamlined "Automated Ads" system.  (App. 1345–46; Tucker Rpt. ¶ 71.)  Many advertisers (or their delegates) use the Ads Manager web interface, which is the focus of the description that follows, because it has been the focus of the litigation to date.  But the process differs depending on the tool used.  (App. 19–58.)

The first step in creating a new campaign is to select a "campaign objective."  There are three main categories of objectives, and several types within each category (App. 24–27):  (1) **Awareness**" objectives, for those advertisers that want to increase "brand awareness" or want their ad to "reach" as many people as possible—such as a message on where to vote in an upcoming election; (2) "**Consideration**" objectives, which focus on driving website "traffic," "engagement," "app installs," "video views," "lead generation," and "messages"; and (3) "**Conversion**" objectives, which focus on purchases, "catalog sales," or "store traffic."

Choosing the "ad objective" is the first step for a reason:  it affects how the algorithms deliver the ads and the value the advertiser attaches to certain features (including targeting).  (App. 1349.)  For example, if an advertiser focuses on "conversions," Facebook's system optimizes the campaign and shows ads to people more likely to take the desired action.  (App. 774, Tucker Rpt. ¶¶ 51–52.)  As Sean Gahagan (a Product Marketing Manager), testified, varying objectives also make it impossible to "put in general terms why targeting is valuable to advertisers," because "interpretations of value are going to vary quite a bit across advertisers" based on their "different objectives."  (App. 787–88, 793–94.)  Advertisers focused on "conversions" may prioritize reaching as many potential purchasers instead of targeting a specific population.  (App. 1348–49.)  And some advertisers use Facebook to test different criteria and "learn" more about their target audience "from the campaign," in order to "do their own analysis and measurement and studies."  (App. 805; Tucker Rpt. ¶¶ 57–59.)

**C.    Advertisers Select Their Desired Target Audience By Choosing Among Thousands Of Targeting Categories And Features And Reading A Variety Of Content**

Once the advertiser has selected an objective, it can select the audience to target.  (App. 29–37.)  Advertisers may select demographic criteria (e.g., location, age, and gender).  (App. 30.)  They also can create audiences using their own customer lists ("Custom Audiences"); audiences who share likes, interests, or characteristics similar to a source audience, such as to existing customers ("Lookalike

Audiences"); or individuals who have already seen their ads ("dynamic retargeting"). (*Id.*) Advertisers also may use "detailed targeting," which includes—but is not limited to—the interest, behavior, and Partner Category-based targeting primarily at issue here. (App. 31; *see also* Tucker Rpt. ¶¶ 38–47.)[3]

The interface includes information about the "Audience." (App. 29–37.) When searching for and choosing from these options, the advertiser may "hover" over the category for a "hovercard" that describes the audience. An example for "gardening" clarifies that it is based on inferences:



These "descriptions" vary in what they say about a particular audience, and they include qualified statements like the following:

- Those who "***expressed an interest*** in or like pages related to" the category (as in the "gardening" example), or "***indicated***" they are part of a group (Pl.'s Ex. 44; App. 1039);

- Those "***likely***" to be in a particular group (App. 84);

- Those in a group based on "***estimated***" or "***self-reported***" data (Pl.'s Ex. 56);

- Those whose activity on Facebook "***suggests***" that they are in a particular group (App. 86);

- Those in a particular group based on ***device usage***, such as "[p]eople who primarily access Facebook using a tablet," or who "clicked" on a button at a certain time (App. 88, 1035).

The "Audience" page also includes an audience meter stating that the defined audience is "fairly broad," "defined," or "too specific"; a "detailed targeting" description; "search," and "browse" functions; and buttons for "narrow[ing]" or "exclud[ing]" the audience—by, for example, targeting fans of rock music who are not also fans of classical music. (App. 29–38.) Most of these features

---

[3] Some of these options are not available to advertisers placing ads about housing, employment, and credit. For example, these advertisers cannot target based on age, gender, or zip code, and some detailed targeting categories are unavailable. *See* Facebook Bus. Help Ctr., *About Audiences for Credit, Employment or Housing*, https://www.facebook.com/business/help/2220749868045706.

include an information ("(i)") button that allows the person placing the ad to learn more about the feature via a popup window that appears if hovered over. (*Id.*)  Some of the popups include "Learn More" links with additional information about the feature. (*Id.*)  And some of these features—which Plaintiff appears to challenge as an implied representation of accuracy (Mot. at 3–5)—are not available on the other self-serve targeting interfaces that Plaintiff ignores. (App. 20–21, 40–58.)

Finally, the advertiser proceeds to the last screen required to create an ad campaign. (App. 38.) This page allows advertisers to choose the method by which they will be charged (which implicates one of the carve-outs introduced by Plaintiff's revised class definition). (App. 38, 1350.)  After that step is the "Publish" button, which includes a link to the Self-Serve Ad Terms. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**D.  Facebook Serves Ads To Individuals Within The Proposed Target Audience, But There Are Many Reasons Why Those Individuals May Not Match Each Targeting Option In Every Instance**

Once a campaign is published, there is a bidding process in which ads "compete" to be shown to a given individual. (App. 141–42, 1349–50.)  Although Facebook uses its "best efforts to deliver the ads to the audience" selected, there are many reasons why an ad may be shown to a person who does not match all of the targeting options selected by the advertiser.  In some cases, this is deliberate: as stated in the Self-Serve Ad Terms, ads are occasionally served outside the target audience as part of "back-end experiments," which Facebook runs to improve the system and deliver greater value to all advertisers. (App. 750, 755, 892–909, 1345.)  Or the targeting options might be chosen by "mistake," as was the case for IMB's first campaign. (*See infra* at p. 12; App. 1345.)  Ads may also reach a person outside of the selected targeting options due to unintentional "bugs" in the code. (App. 749, 1345.)[5]

Ads may be shown to people who do not match the targeting options for other reasons.  Self-



Gibson, Dunn & Crutcher LLP

reported data—such as whether someone works for a specific company—may not be accurate because the person may not have updated his/her profile when a job began or ended.  (App. 748–50, 759–60.)  Some data also lend themselves to reasonable, but inaccurate, inferences:  For example, Facebook may infer that Mary is interested in "dogs" based on her purchase of a gift for a neighbor who adopted a puppy, even though Mary has no personal interest in dogs.  (Still, because of her neighbor, Mary may nevertheless be an attractive target for ads selling pet supplies.)

In an effort to better understand what these inferences captured, from 2014 to 2018, Facebook contacted a subset of people using Facebook about their "interests."  (App. 858–60.)  These analyses were designed to help Facebook refine its interest targeting, but Facebook did not measure *all* of its thousands of interest categories.  (App. 1363–68.)  Rather, the analyses measured a very small fraction of them.  (*Id.*)  People were selected at random and asked approximately 15 questions about whether they were interested in topics relating to a small subset of those thousands of categories.  (App. 858.)

Facebook knew that these analyses could only tell it so much.  (App. 857.)  Such analyses are inherently subjective; respondents may misunderstand the prompt, not wish to declare a particular interest, or may not consider themselves to be "interested" in a particular topic even though their Facebook activity suggests otherwise.  (App. 1365–66.)  There is also an unavoidable timing issue with "interests":  if a grandfather shops for "American Girl" dolls for his granddaughter around the holidays, he may be associated with an interest in "dolls."  Although he may not self-select this interest if he were surveyed months later, the grandfather still may very well engage with such an ad.

Further, the analyses revealed nothing about the individual accuracy rate of a given category because they determined only the *average* accuracy rate across selected categories.  (App. 1366.)  But there was no "better alternative" (App. 853), and the analyses served the objective of allowing Facebook to estimate the ███████████████████████████████████ to facilitate business judgments about refinements to its targeting offerings.  (App. 860–61)[6]

The limited attempts at measuring accuracy of *individual* categories show far greater variability

---

[6] Plaintiff argues that Facebook wrongfully withheld results from these analyses.  (Mot. at 6 n.6.)  But Facebook completed a thorough investigation (Dkt. 88-1, 130-2) and produced all responsive analyses on the agreed topics during the agreed timeframe.  (Pl.'s Ex. 85.)  Plaintiff's misplaced assumption that additional analyses "must" exist cannot satisfy its evidentiary burden.

10

Gibson, Dunn &
Crutcher LLP

than what Plaintiff represents.  For example, although "surveys" of some Partner Categories had reported accuracy rates of 4% to 20%, others were as high as 72% or 82%.  (App. 911–19; *id.* 1278–79 (wide variability in accuracy rates).)  Similar variability exists with Facebook's native data, with the limited results showing 72%, 79%, and 85% accuracy rates for certain categories at that time.  (App. 921, 931, 933.)  The predictive accuracy depends on, among other factors, how specific the interest is and what data informs the inference.  (App. 1366–67.)  That is why there is wide variability across categories.  (App. 1026, 1367; *see also id.* 868 (accuracy "varies a lot from behavior to behavior").)[7]

"Accuracy" is only one part of the value of Facebook advertising, and advertisers have a number of ways to assess this value.  For example, advertisers can see real-time reports on ad performance, compare results of different campaigns, run tests to determine whether an ad was engaging to a particular audience, and use "Facebook Pixel" to analyze whether activity on their websites resulted from the Facebook ad campaign.  (Tucker Rpt. ¶¶ 36–37, 53–59.)  Advertisers also have access to other tools that provide similar insights.  (App. 1349.)  All of these tools allow advertisers to track what they care most about—*results* for their ad dollars.  And to the extent advertisers or agencies have questions, they can communicate with Facebook representatives.  (App. 1346.)  In the end, actions speak louder than words, and a significant portion of advertisers who fall within the class definition repeatedly advertised on Facebook during the class period (Tucker Rpt. ¶¶ 90–94), and nearly **90%** of advertisers surveyed by Dr. Hanssens plan to advertise on Facebook again (Hanssens Rpt. ¶ 59).

**E.    IMB's And Retour's Short—And Unrepresentative—Facebook Ad Campaigns**

Plaintiff IMB operates "Investor Village," a website that hosts an online forum for investors to discuss stocks and investments.  (Dkt. 148 ¶ 44.)  In June 2015, IMB surveyed its membership and concluded that a large portion of its user base were home-owning, college-educated, six-figure earners with hefty investment portfolios.  (*Id.* ¶ 45.)  After the survey, IMB was induced to place an ad on Facebook not because of any statement or promise that Facebook made, or any suggestions about which targeting categories to use, but because of an impressive sample ad for Investor Village that its owner

---

[7]  Independent studies conducted by third parties confirm the variability of these results.  (*See, e.g.*, App. 179–82 (91% match between respondents and their predicted category for some categories; 29% match for others); Dkt. 120-2 at 10 (Facebook inferences about characteristics were "somewhat accurate," across categories, 73% of the time).)

Gibson, Dunn &
Crutcher LLP

and founder (Ralph Kidd) saw on his personal Facebook account.   (Dkt. 148 ¶ 46; App. 526–28.)

Based on this professional sample and the "ease" of the ad interface (*id.*), IMB ran its first Facebook

ad, targeting individuals over 44 years old who had an "interest in at least one of a number of different

approaches to investing" (Dkt. 1 ¶ 55).  Even though IMB used "interest" targeting, which would place

this campaign in the class definition (App. 1354), Plaintiff "does not allege that this campaign gives

rise to liability on Facebook's part," because ███████████████████████████████████

████████████████████████████████████████████ (App. 529–33; Dkt. 148 ¶ 48).  As

a result of these mistakes, IMB's initial campaign was unsuccessful.  (Dkt. 148 ¶ 48.)

In the ensuing months, IMB launched two more Facebook ads that used interest targeting and

Partner Categories (but not "behavior" targeting), and were designed to generate "Likes" for IMB's

Facebook pages.  (*Id.* ¶¶ 49–69; App. 1354–55.)  Ultimately, that is what Plaintiff received:  in total,

1,692 "Likes" for its Facebook pages.  (App. 977–1023.)

Although the ads generated more "Likes," IMB suspected that not all of these "Likes" came

from people within its intended audience, which included home-owning, college graduates with a

household income over six figures.  (Dkt. 148 ¶¶ 49–69.)  Based on its suspicion, Plaintiff theorized

that Facebook intentionally diverted ads to people outside of the target audience.  (*Id.*)  To test its

theory, Plaintiff ran contrived ad campaigns for fake entities such as "People for the Ethical Treatment

of Gummy Bears," "The Unicorn Whisperer," and others.  (App. 507–08, 554–55, 558–59, 600.)

Plaintiff's goal was not to learn information to refine its ad targeting, complain to Facebook, or

get a refund, but instead to "monetize" this supposed discovery.  (App. 534.)  Plaintiff's initial plan—

which it ranked as **the highest potential monetization strategy**" worth "**hundreds of millions, if not**

**billions of dollars**"—was a "hedge fund play" that involved "tak[ing] a short position in Facebook,"

"leaking" information about Facebook's alleged "fraud" that would supposedly deflate Facebook's

stock price, and then profiting handsomely.  (App. 535–36, 542–43, 548–549, 581, 601 (emphases

added); *see also* App 447–61.)  IMB prepared an "investment thesis" and met with several hedge funds

at the *same time* he was running one of his Facebook ad campaigns.  (App. 589.)  After the hedge funds

rejected its stock-shorting scheme (App. 539–47), Plaintiff prepared a book manuscript that it hoped

would become a "bestseller" (App. 601).  At this time, Mr. Kidd had no interest in a lawsuit: "Class

1    action?  No thanks.  I'll just take it to the court of public opinion and let you the reader decide."  (App.

2    601; *see also id.* 462–70.)  He changed his mind several years later, "reached out to several different

3    firms" (App. 495–96), and eventually filed this lawsuit (Dkt. 1).

4         Before advertising on Facebook, IMB never conducted any "non-web-based"—i.e., traditional

5    print or direct mail—advertising; never advertised on Twitter, YouTube, LinkedIn, or Snapchat; and

6    never advertised *at all* aside from the Facebook ads and two small Google campaigns in 2006.  (App.

7    511–19.)  It has not paid for any advertising at all since 2016.  (*Id.*)  During its deposition, Mr. Kidd

8    (IMB's corporate designee) testified that IMB does not intend to purchase ads on Facebook again:

9              Q:    Would you run advertisements on Facebook again?

10             A:    At this time, no.

11             Q:    Why not?

12             A:    Because I have [*sic*] bad experience with them.

13   (App. 592.)

14        Retour, which was added as a plaintiff in the amended complaint (Dkt. 148) advertised its out-

15   of-office messaging app ("While You Were Out") on Facebook for one week in January 2018.  It used,

16   among other categories, interest and behavior targeting and people employed by "The Financial

17   Times."  (*Id.* ¶¶ 70–74.)  Retour ultimately paid $20 for its ad campaign.  (*Id.* ¶¶ 70–77.)  During the

18   one-week campaign, Retour changed its targeting options at least twice.  (App. 1355.)  Only a few

19   business days after the deposition of its corporate designee (David Pollack), Retour voluntarily

20   dismissed its claims, presumably because of ████████████████████  (Dkt. 144;

21   App. 626–41.)  But Retour participated in discovery and reserved its right to remain a member of the

22   putative class (Dkt. 144), so Facebook discusses its experience in this brief.

23   **III.    THE LEGAL STANDARDS GOVERNING THIS MOTION**

24        A "class action is an exception to the usual rule that litigation is conducted by and on behalf of

25   individual named parties only."  *Wal-Mart Stores Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Rule 23

26   "imposes stringent requirements for certification that in practice exclude most claims."  *Am. Express*

27   *Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).  "Mere invocation of the language of

28   Rule 23 . . . is no mystical legal talisman guaranteeing class treatment."  *Doninger v. Pac. Nw. Bell,*

Gibson, Dunn &
Crutcher LLP

*Inc.*, 564 F.2d 1304, 1312 (9th Cir. 1977).  Instead, plaintiff "must affirmatively demonstrate his compliance with the Rule," *Dukes*, 564 U.S. at 350, by reference to the elements of the "underlying cause[s] of action," *Erica P. John Fund., Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis"—based on "evidence," and not pleadings or speculation—that plaintiff met its "evidentiary burden." *Dukes*, 564 U.S. at 351.  In its evidentiary analysis, the Court also considers defendant's due process "entitle[ment] to litigate" defenses to "individual claims" through individual proof.  *Id*. at 367.  These rigorous requirements are essential, given the enormous pressure on defendants to settle even "questionable claims" after a class is certified.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2012).

## IV.   STATEMENT OF ISSUE TO BE DECIDED UNDER RULE 7-4(a)(3)

Has Plaintiff met its evidentiary burden to affirmatively demonstrate, through a "rigorous analysis," that it has established each of the Rule 23(a), (b)(2), and (b)(3) requirements necessary to certify its proposed class?

## V.   PLAINTIFF IS AN ATYPICAL AND INADEQUATE CLASS REPRESENTATIVE

In every class action, the plaintiff must establish that it is "typical" of the proposed class and that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)–(4).  "The test for typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether the other class members have been injured by the same course of conduct."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).  And a class representative is "adequate" only if it can "prosecute the action vigorously on behalf of the class" without "conflicts of interest with other class members."  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018).  Lack of "typicality" or "adequacy" are "independently sufficient [grounds] to support the denial of certification," *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001), that "tend[] to merge," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).  Plaintiff has not carried its evidentiary burden to establish either requirement:

*First*, Plaintiff is an *a*typical and *in*adequate representative of the sprawling class that it seeks to represent.  As to "typicality," there is no "same course of conduct" that led to "the same or similar injury" here, and therefore no "typical" advertiser. *Ellis*, 657 F.3d at 984.  As explained above (*supra*

pp. 4–11), advertisers differ substantially in the "who," "what," "when," "where," and "why" of their interactions with Facebook:  Advertisers are a varied group—some are long-time marketers that are also extremely experienced with Facebook advertising, while others (like IMB) have advertised only a handful of times.  Some advertisers (like IMB) only used Ads Manager, while others used Facebook's other interfaces.  Some advertisers placed their own ads, while others hired third parties to place ads on their behalf.  Some communicated with Facebook before, during, or after their campaigns; others did not.  Some engaged with "hovercards" and other disclosures; others did not.  Advertisers saw different audience metrics and used different combinations of hundreds of thousands of targeting categories.  Some have never advertised before or only rarely (like IMB); others spend thousands of dollars on advertising on Facebook (or elsewhere) every month.  Some relied on third-party advice before advertising on Facebook; others did not.  Some have marketing departments; others do not.  (App. 22–69; Hanssens Rpt., Exs. N–S.)  These differences are relevant to deception, exposure, materiality, reliance, and injury and preclude a finding of Rule 23(a)(3) typicality.  *See, e.g.*, *I.M.A.G.E. v. Bailar*, 78 F.R.D. 549, 555 (N.D. Cal. 1978) (plaintiff was atypical in part because of a "heterogeneous" "proposed class"); *Endres v. Wells Fargo Bank*, No. 06-7019 PJH, 2008 WL 344204, at *11–13 (N.D. Cal. Feb. 6, 2008) (plaintiff was atypical due to "wide variety of individual issues").

Even if there were a "typical" advertiser for this vast and varied class (or any subclass Plaintiff might try to define), Plaintiff IMB would not be it for several reasons:

- Plaintiff relied on a sample ad and (alleged) "implied" representations on the Ads Manager interface in deciding to place an ad.  (App. 526–27, 583.)  Many advertisers did not.  (Hanssens Rpt. ¶¶ 39–40.)

- Plaintiff did not rely on any advice before advertising on Facebook.  (App. 526–27, 583.)  Many did.  (Hanssens Rpt., Exs. P–S; App. 1285-86, 1346–47.)

- Plaintiff had one objective—obtaining "Likes" for its Facebook pages.  (Dkt. 148 ¶¶ 50, 63.)  ████████████████████████████████████████████████████████████████████████

- Plaintiff seeks to represent advertisers that used "behavior" targeting (Mot. at 12) and would have been exposed to those hovercards, but it never used "behavior" targeting itself (Dkt. 148 ¶¶ 50, 64; App. 1355).  By contrast, ████████████████████████████████████████ (Tucker Rpt. ¶ 65), exposing many advertisers to materially different hovercards.  *Major v. Ocean Spray Cranberries, Inc.*, No. 12-03067 EJD, 2013 WL 2558125, at *3 (N.D. Cal. June 10, 2013) (plaintiff not typical because the class definition "encompass[ed] products that she herself did not purchase").

15

1

- Plaintiff spent two years trying to monetize its theory via a hedge fund play or bestselling book before filing this lawsuit. (*Supra* pp. 11–13.)

2

3      Though its lawyers now contend otherwise, Plaintiff essentially admitted it was atypical (or inadequate) ███████████████████████████████████████████████████████████████

4      ████████████████████████████████████████████████████████████████████████████████

5      ██████████████████████████████████████████████████████████ (App. 501–02, 504.)

6      This mismatch between Plaintiff's narrower view and the broad class its counsel seeks to certify raises

7      questions about Plaintiff's "interest in supervising the attorneys in this case." *Wellin v. Alexy*, 155

8      F.R.D. 654, 659 (N.D. Cal. 1994) (class representative inadequate in part for this reason). ████████

9      ████████████████████████████████████████████████████████████████████████████████

10     ████████████████████    It was right, and its claims are not "reasonably co-extensive with the

11     claims of the class" for that reason. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

12         These differences also render IMB an inadequate class representative under Rule 23(a)(4).  This

13     Court held in the *PPC Advertising Litigation* that a mismatch between the class representative and the

14     proposed class can be grounds to reject certification on adequacy grounds.  In that case, two small

15     advertisers sought to represent a proposed class of Facebook advertisers that "include[d] large

16     sophisticated corporations" that contracted with Facebook "on different terms" and "use[d] different

17     channels to manage their ongoing advertising campaigns with Facebook." *In re Facebook PPC*, 282

18     F.R.D. at 454. The Court concluded that the class representatives had "interests . . . different than those

19     of other class members" that rendered them inadequate. *Id.*  Plaintiff ignores this decision in its Motion.

20         This case presents even more pronounced differences between Plaintiff and the proposed class.

21     The same variability across advertisers that precluded certification in the *PPC Advertising Litigation*

22     exists here, as do the differences in communication channels and ███████████ (App. 1285–87, 1346–

23     48; *supra* n. 4.)  In addition, the putative class members here also regularly communicated with (and

24     relied on) third parties before, during, and in between their ad campaigns, and they vary dramatically

25     as to their business objectives and how frequently they advertise. (App. 176–312, 1346–48; Hanssens

26     Rpt., Ex. Q.)  IMB's "interests" as a smaller, less sophisticated advertiser that advertised for a short

27     period of time using a rarely-employed objective and relied on the Ads Manager interface alone are

28     worlds away from other advertisers that relied on different information in placing their ads on Facebook

or that have continued to advertise on Facebook for years.  *In re Facebook PPC*, 282 F.R.D. at 454.

*Second*, apart from the mismatch between Plaintiff and the class, Plaintiff is atypical and inadequate because its interactions with Facebook were very limited, it has not advertised in years, and it does not intend to advertise on Facebook in the future.  *Moheb v. Nutramax Labs., Inc.*, No. 12-3633, 2012 WL 6951904, at *5 (C.D. Cal. Sept. 4, 2012) (finding plaintiff inadequate because she only "used one bottle of the product" while "many members" of the class used the product "for an extended period of time").  According to Dr. Tucker, during the class period, a significant portion of the proposed class advertised regularly on Facebook.  (Tucker Rpt. ¶¶ 90–94.)  And Dr. Hanssens' survey determined that 90% of the putative class would advertise on Facebook again.  (Hanssens Rpt. ¶ 59.)  Plaintiff, by contrast, advertised three times over a few months (Dkt. 148 ¶¶ 49–69)—excluding its "test" ads using inactive Facebook pages for phony entities—and would not advertise again (App. 592).  Accordingly, IMB did not have the same opportunity to learn more about advertising on Facebook by placing multiple ads, using measurement tools, or talking to Facebook representatives or third parties.  *Ellis*, 657 F.3d at 984.  Further, because Plaintiff has not advertised at all in five years and has no intention to advertise on Facebook again, it is likely to be "preoccupied with defenses unique to it" such as a lack of Article III standing to seek forward-looking relief.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  (*Infra* pp. 33–34.)

## VI.     PLAINTIFF HAS NOT MET ITS BURDEN TO SHOW COMMONALITY OR PREDOMINANCE WITH "EVIDENTIARY" PROOF

For purposes of Rule 23(a)(2)'s "commonality requirement," reciting purported common "questions is not sufficient to obtain class certification."  *Dukes*, 564 U.S. at 349.  Instead, "[w]hat matters to class certification is . . . the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.* at 350 (internal alterations omitted).  Rule 23(b)(3)'s predominance requirement, by contrast, "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  "This calls upon courts to give careful scrutiny to the relation between common and individual questions in the case," *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016), which imposes a "far more demanding" standard than commonality under Rule 23(a)(2), *Amchem*, 521 U.S. at 623.

1    Neither test is met here.  To establish its UCL and common-law fraud claims on a classwide

2    basis, Plaintiff would need to show (1) classwide exposure (common-law fraud and UCL) to

3    (2) knowingly "false" (common-law fraud) or "likely to deceive" (UCL) representations or omissions;

4    (3) that were "material"; (4) an intent by Facebook to induce reliance (common-law fraud);

5    (5) justifiable reliance (common-law fraud); and (6) resulting damage.  *Cohen v. DIRECTV, Inc.*, 178

6    Cal. App. 4th 966, 980 (2009); *Lazar v. Sup. Ct.*, 12 Cal. 4th 631, 638 (1996); *Vasquez v. Sup. Ct.*, 4

7    Cal. 3d 800, 814 (1971).  But there is no common proof of these elements that would "generate common

8    answers apt to drive the resolution of the litigation," *Dukes*, 564 U.S. at 350, and individualized issues

9    would predominate under Rule 23(b)(3), such that members of the proposed class would "need to

10   present evidence that varies from member to member," *Tyson Foods*, 136 S. Ct. at 1045.

11   **A.     There Is No "Common" Way To Assess Whether The Targeting Interface Was Misleading**

12         Plaintiff's first proposed "common" question—and the only one related to its claim for

13   equitable relief—is "[w]hether the targeting interface used by all class members was misleading."

14   (Mot. at 14.)  But this question cannot be resolved in "one stroke," *Dukes*, 564 U.S. at 350, and, in any

15   event, individual issues would predominate over allegedly "common" ones for several reasons:

16         *First*, because advertisers can select ads using one or more self-serve interfaces and thousands

17   of targeting categories (and associated hovercards, audience sizes, and accuracy rates), determining

18   whether the representations on any given targeting interface are false or deceptive would require an

19   "independent legal analysis" of the "language" of each representation on each interface.  *Berger v.*

20   *Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014); *Murray Dental Corp. v. Dentsply Int'l,*

21   *Inc.*, 19 Cal. App. 5th 258, 272–73 (2018) ("the primary evidence in a false advertising case is the

22   advertising itself").  There are many questions that would need to be resolved individually, including:

23   - Which self-serve interface did the advertiser use?  (App. 19–58.)

24   - Which targeting categories did the advertiser use?  Did the hovercards associated with those
25     categories include caveats such as "likely," "estimated," or "suggests"?  Are any of these
     categories "nonactionable" predictions as opposed to statements of "fact" (*Apollo Capital*
26     *Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 241 (2007))?  If they are
     statements of "fact," were they false or misleading?

27   - How did the advertiser select its targeting categories?  Did it "search" for keywords within
28     the Detailed Targeting selection screen, such that it saw the "granular" categories that
     allegedly implied a high degree of precision (Mot. at 4), or did it use the "browse" function

18

which shows more general categories?  Did it click on any of the "Learn More" links or "information" / "(i)" buttons?  (*Supra* pp. 8–9.)

- Did the self-serve interface the advertiser used have the "audience definition" meter graphic—or just words?  Did the meter on the website interface indicate that audience selection was "fairly broad," "too narrow," or "defined"?  Was the "potential reach" number (i.e., an estimate of audience size) very large or very small?

- What terms and conditions were the advertisers exposed to?  (*Supra* pp. 5, 9.)  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (product disclosures established that the representations were not "false or misleading" under the UCL).  ███████████████████ ███████████████████   *Supra* n. 4; *Berger*, 741 F.3d at 1069 (varying contract terms precludes false advertising class action).

Without common evidence of *what*, specifically, the advertiser saw, and what was supposedly misleading, there can be no "uniform conduct likely to mislead the entire class," *Kaldenbach v. Mut. Of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (2009), and thus, no "commonality," *Darisse v. Nest Labs, Inc.*, No. 14-01363 BLF, 2016 WL 4385849, at *6 (N.D. Cal. Aug. 15, 2016) (no commonality if "the representations were not uniform, and not all of them were misrepresentations").  At a minimum, though, there is no predominance.  *Philips v. Ford Motor Co.*, No. 14-02989 LHK, 2016 WL 7428810, at *16 (N.D. Cal. Dec. 22, 2016) (noting the "extensive individualized inquiries" necessary to determine whether class members read the relevant disclosure); *Downey v. Public Storage, Inc.*, 44 Cal. App. 5th 1103, 1118 (2020) (no predominance because some of the allegedly deceptive advertisements contained disclaimers and not all contained all of the "falsities and omissions that plaintiffs claim render those ads deceptive").

*Second*, as noted, the putative class includes sophisticated businesses such as Procter & Gamble and Disney that advertise regularly, ad agencies, and first-time small business advertisers, rendering it impossible to analyze "deception" on a classwide basis.  The UCL considers whether a "reasonable" advertiser would be deceived.  *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).  This "reasonable" advertiser analysis—which is "critical" in a case involving implied representations, *William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995)—turns on whether "it is probable that a *significant portion* of the . . . targeted [group], acting reasonably in the circumstances, could be misled," *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003) (emphasis added),

1    based on the group's "knowledge" and experience, *Dentsply*, 19 Cal. App. 5th at 272.

2        Plaintiff cannot make that showing "in one stroke," because the proposed class is too varied.

3    *Dukes*, 564 U.S. at 350; App. 1346.  This is not a case in which each class member has similar levels

4    of experience, such that it would be possible to show that a reasonable advertiser in a "significant

5    portion" of the class would be misled.  *Compare Dentsply*, 19 Cal. App. 5th at 272–73 ("licensed

6    dentists"); *S. Bay Chevrolet v. GMAC*, 72 Cal. App. 4th 861, 889 (1999) ("sophisticated business

7    entities" with an "ongoing relationship" with defendant); *see also* App. 1374, 1385.  Thus, "even if the

8    challenged statements were facially uniform" (they are not), the advertisers' reasonable "understanding

9    of those representations would not be."  *Jones v ConAgra Foods, Inc.*, No. 12-01633 CRB, 2014 WL

10   2702726, at \*14 (N.D. Cal. June 13, 2014).  For example, ███████████████████

11   ████████████████████████████████████████████

12   ███████ (App. 620–22.)  IMB apparently takes a different view, but its "undefined personal

13   assumption and expectations" about target audiences on Facebook cannot substitute for what a

14   "reasonable" advertiser in this varied class would understand.  *Clemens v. DaimlerChrysler Corp.*, 534

15   F.3d 1017, 1026 (9th Cir. 2008).  There can be no "common" proof of deception—and certainly no

16   Rule 23(b)(3) "predominance"—for such a class.  *See Lavie*, 105 Cal. App. 4th at 508.[8]

17   **B.**     **The Class Is Not Entitled To A Classwide Inference Of Reliance, And The Need For**
18         **Individualized Proof Of Reliance Precludes A Finding Of Predominance**

19        Under California law, a classwide inference of reliance does not arise unless "the same material

20   misrepresentations have actually been communicated to each member of a class."  *Mirkin v.*

21   *Wasserman*, 5 Cal. 4th 1082, 1095 (1993); *Jenson v. Fiserv Tr. Co.*, 256 F. App'x 924, 926 (9th Cir.

22   2007) (omission-based theory).  Here, there is no such classwide evidence, because there was no

23   uniform exposure and, even if there were, the materiality of the alleged misrepresentations or omissions

24   varies by advertiser.  Plaintiff cannot use an "inference" to satisfy its evidentiary burden.[9]

---

25   [8]   Because Plaintiff proposed only one "common" question for its UCL claim, which is the basis for
26      its request for injunctive relief, the Court can deny certification under Rule 23(b)(2) if it rules that
      Plaintiff has not met its burden of proving that this question can be resolved on a classwide basis.

27   [9]   Plaintiff does not address whether *justifiable* reliance—an essential element of its claims, *see City*
28      *Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 839 (9th Cir. 2004)—is subject to
      "common" proof.  *Vasquez*, 4 Cal. 3d at 814 n.9.  It is not.  Because "justifiable reliance" focuses
      on an advertiser's "own knowledge and experience," *Joseph v. Koh*, No. 20-03782 VKD, 2020 WL

Gibson, Dunn &
Crutcher LLP

1.      ***There Was No Uniform Exposure, Statement, Or "Centrally-Orchestrated Scheme"***

Plaintiff claims that its class definition "guarantees that every single class member saw and interacted with the misrepresentations and omissions at the heart of this case." (Mot. at 21.)  That is demonstrably false for both the misrepresentation and omission theories:  The class definition merely requires that class members "selected" certain targeting categories and paid "for at least one ad." (*Id.* at 12.)  Many advertisers—including the ad agencies, consultants, and Facebook Marketing Partners that placed ads on their behalf—"paid" Facebook but never directly accessed a Facebook targeting interface.  (App. 1286, 1377, 1380, 1389; Hanssens Rpt., Ex. N.)  So these putative class members could not have been "exposed" to the alleged "implied" representation through any of the interfaces.[10]

Moreover, contrary to Plaintiff's assumption, "[j]ust because the information was available on the website does not necessarily imply that visitors would have seen it, especially when there was a good deal of other information on the website." *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 900–01 (N.D. Cal. 2015).  This is especially true here, because "individuals had various reasons for visiting" one of the interfaces, and each of the alleged "implied" representations appears in different places. *Id.*; *Gilbert v. MoneyMutual LLC*, 318 F.R.D. 614, 625–26 (N.D. Cal. 2016) (no classwide exposure to website statements).  Again, hovercards, the "AND/OR" targeting options, and the menu of targeting categories are visible only if the advertiser clicks certain links, types certain words, or "hovers" over certain portions of the site.  *See Doe v. Xytex Corp.*, No. 16-02935 WHA, 2016 WL 3902577, at *3 (N.D. Cal. July 19, 2016) (website agreement was not conspicuous where it "could only be accessed *after* a user pulled down an additional menu"); App. 22–38.  IMB does not claim that it reviewed *any* hovercards before advertising on Facebook.  (Mot. at 4; App. 583.)  And not all of the representations are available on each of Facebook's self-serve interfaces.  (App. 19–58.)  The Ninth Circuit has rejected Plaintiff's suggestion that every person who visits a webpage is deemed to view all information on that webpage, *see Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014), and Plaintiff has

---

5408042, at *10 (N.D. Cal. Sept. 9, 2020), this inquiry raises a number of individualized issues that would predominate across this diverse class.

[10]   The proposed class is not limited to Ads Manager; it also includes advertisers who accessed other "self-serve interface[s]" with different content.  (App. 1345–46.)  This variability alone defeats Plaintiff's theory of classwide exposure.  *Downey*, 44 Cal. App. 5th at 1117 (upholding denial of certification where class definition included those who paid for a particular rate, but class members could obtain that rate "without ever seeing" the alleged misrepresentations and omissions).

21

not cited any record evidence that it is "highly likely" that each class member was exposed to all of the website content, *Ehret*, 148 F. Supp. at 900. Dr. Hanssens confirmed the lack of classwide exposure. (Hanssens Rpt. ¶¶ 34, 37–40.)[11]

The variability above is alone sufficient to defeat classwide reliance, but there is more: advertisers obtained "disparate information" about targeting—including directly from Facebook employees, the Facebook for Business page, and the Facebook Help Center—before, during, and after placing their ads. (App. 91–175, 766–72, 1347; Hanssens Rpt. ¶¶ 39–42.) *E.g.*, *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (such "disparate information" defeats predominance), *abrogated on other grounds by Comcast*, 569 U.S. 27; *Roley v. Google LLC*, No. 18-07537 BLF, 2020 WL 8675968, at *7–9 (N.D. Cal. July 20, 2020) (no inference of reliance because some class members read disclosures, while others did not). Many advertisers know—based on these interactions, prior experience, common sense, or the information they read—the limitations of ad targeting, and yet they are satisfied with the value they received. (Hanssens Rpt. ¶¶ 54–61; App. 1369–1405.)

Facebook representatives discuss ad targeting with advertisers on an ad hoc basis in some cases before advertisers (or their representatives) ever access a self-serve interface. (App. 1347.) For example, Facebook employees have explained to advertisers that ad targeting is "not perfect," but "that's ok because other mediums like TV don't even allow you to target your audience." (App. 975, 1346.) ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████ The same variability forecloses Plaintiff's "omissions"

---

[11] The key representations in this case are therefore different from allegedly false representation about the price of a product, which is something that all purchasers necessarily see. (Mot. at 21 (citing *Brazil v. Dell Inc.*, No. 07-1700 RMW, 2010 WL 5387831, at *5 (N.D. Cal. Dec. 21, 2010)).) Instead, "individual evidence will be required to determine whether the representations were actually made to each member of the class." *Davis-Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 134 (2011) (upholding denial of certification for lack of commonality based on lack of classwide exposure); *Kaldenbach*, 178 Cal. App. 4th at 851 (same).

Nor were the statements simply presented in different "guises," as Plaintiff claims. (Mot. at 22 (quoting *In re Hyundai & Kia Fuel Economy Litig.*, 926 F.3d 539, 560 (9th Cir. 2019)).) To the contrary, the representations varied substantially. (*Supra* pp. 7–9; *Berger*, 741 F.3d at 1069; *see also Cabral v. Supple LLC*, 608 F. App'x 482, 483 (9th Cir. 2015) (reversing grant of certification because of differences in "wording in the language of advertisements or representations")).

Gibson, Dunn &
Crutcher LLP

theory.  After all, the Ninth Circuit has held that a class definition based on alleged omissions "must also exclude those members who learned of the . . . allegedly omitted limitations before they purchased" the product.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012).

The experiences of IMB and Retour confirms this variability.  They initially based their claims on several representations (Dkt. 1 ¶¶ 18–49; Dkt. 148 ¶¶ 19–43), but have now limited them to a select subset (Mot. at 3–5).  They admitted in discovery that they were exposed to and relied upon very different representations in deciding to advertise on Facebook.  Exhibit 88 charts this varying exposure and reliance for IMB and Retour.  Dr. Hanssens' survey confirmed that advertisers saw different statements.  (Hanssens Rpt., Exs. Q, T.)  As a result, putative class members were exposed to "disparate information from various representatives of the defendant" in a way that "creat[ed] materially different impressions about" the allegedly misleading statements and omissions—unlike in *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1137–38 (9th Cir. 2016) (Mot. at 22).  And unlike *In re First Alliance Mortgage*, 471 F.3d 977, 984–85, 990–91 (9th Cir. 2006) (Mot. at 22), which involved a "centrally orchestrated scheme" involving a "standardized sales pitch" based on a training "manual" given to all sales personnel, there were no such common, central representations here.[12]

### 2.     *Materiality Also Is Not Subject To "Common" Proof And Cannot "Predominate"*

Nor is materiality subject to "common" proof, or likely to predominate over individual issues.  Even though "materiality is an objective standard," Plaintiff must still "point to some type of common proof."  *Jones*, 2014 WL 2702726, at *16.  There is no "common proof" because the importance that advertisers attach to the alleged misrepresentations and omissions about targeting accuracy "would vary" from advertiser to advertiser, *In re Vioxx Cases*, 180 Cal. App. 4th 116, 129 (2009), in large part because the "disparate categories" of advertisers in the proposed class are not at all "similarly situated," *see, e.g.*, *In re First Am. Home Buyers Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 607 (S.D. Cal. 2016) (individualized issues of materiality predominated due to diverse class).

For example, first-time advertisers often rely on advice or other statements from ad agencies,

---

[12]  Plaintiff attempts to argue to the contrary by citing other representations from outside one of the self-serve interfaces.  (Mot. at 22–23.)  But Plaintiff did not even see or rely on many of the representations cited in its brief.  (App. 12–15.)  And Retour (which is still a putative class member) saw other statements altogether.  (*Id.*)

Facebook Marketing Partners, or other third-party consultants/websites before advertising.  (App. 1286; Hanssens Rpt., Exs. P–Q.)  Reliance on a third party as part of the decision making process "likely would override any" advertiser "reliance on [Facebook's] statements" on the targeting interface. *Vioxx*, 180 Cal. App. 4th at 134.  As this Court concluded in another advertising case, advertisers with "direct access to a Facebook representative" and those who relied on "third-party agencies or developers to place advertising on Facebook" "would have no reason to consult" other Facebook representations.  *In re Facebook PPC*, 282 F.R.D. at 458; *see also Vioxx*, 180 Cal. App. 4th at 134 (patients relying on third-party drug approval could not claim reliance on defendant's safety claims); *Akkerman v. Mecta Corp.*, 152 Cal. App. 4th 1094, 1100–01 (2007) (same); *Moheb*, 2012 WL 6951904, at *4 (same).

Those that advertised on Facebook many times, or used tools to measure the effectiveness of their campaigns and chose to advertise again, are likewise situated differently from other class members. (Tucker Rpt. ¶¶ 61–63.)  For those advertisers, any "implied" representations on Facebook's targeting interfaces would not be "material" at all.  (Hanssens Rpt. ¶¶ 54–61.)  Courts acknowledge that classwide proof of materiality faces insurmountable hurdles in such circumstances.  *Chow v. Neutrogena Corp.*, No. 12-04624, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) (rejecting an inference of reliance because "a significant portion of the consumers who purchased the product were repeat purchasers"); *see Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 454, 457 (S.D. Cal. 2014).

The "[advertiser]-specific factors" that are "part of" an advertiser's decision to advertise on Facebook only compound this variability.  *Vioxx*, 180 Cal. App. 4th at 134 ("patient-specific factors" that were "part of the prescribing decision" defeated classwide showing of materiality).  For example, as long as they achieve their objectives, advertisers optimizing for product purchases care far less (if at all) about how often their ad is shown to people who actually possess the interests that Facebook inferred.  (App. 787–88, 793–94, 1348–49; *Jones*, 2014 WL 2702726, at *16 (no classwide materiality because class members might purchase the product for "many different reasons" and for "many different purposes").)  Similarly, those advertisers that only want to sell their product to a particular group—say, an app developer that wants downloads from gamers who are more likely to make in-app purchases—would have different priorities.  And the same is true of advertisers conducting experiments

or "A/B" tests for market research purposes and to learn more about their customers in advance of a broader campaign.  (App. 1349.)  Ultimately, advertising is a "high involvement" activity in which many different factors and objectives influence decisions.  (Hanssens Rpt. ¶¶ 14–28.)

Despite its burden, Plaintiff submitted *no evidence* from any other advertisers showing that "the challenged statements were in fact material" to their decision to advertise on Facebook, "as opposed to, or in addition to" other factors.  *Jones*, 2014 WL 2702726, at *15; *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. 13-02438, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017).  Instead, Plaintiff relies on a handful of internal documents that purport to discuss advertisers' general expectations for accuracy in the aggregate, along with an email discussing a "survey" about interest accuracy.  (Mot. at 24.)  These documents cannot possibly meet Plaintiff's evidentiary burden of showing classwide materiality.  Further, the "survey" Plaintiff references (*id.*) was not a "survey" or scientific study at all.  (App. 1367.)  It involved a subset of advertisers (App. 1367; Pl.'s Ex. 3)—roughly 10 or 20—that were not representative of advertisers on Facebook (App. 1367).  And perhaps most importantly, the internal documents only discuss, in a general way, one feature that advertisers value about Facebook (*id.*)—not what information might make a difference in their "choice of action in the transaction in question," which is what is relevant to materiality.  *Block v. eBay, Inc.*, 747 F.3d 1135, 1140 (9th Cir. 2014).

Even if Plaintiff's exhibits supported such a connection, they would still be insufficient because they address only one of the three targeting categories at issue—interests.  (Pl.'s Ex. 3.)  And even if they addressed all three categories, at best, there would be a "conflict" in the evidence on materiality, and thus, a failure of common proof.  *In re ConAgra Foods*, 302 F.R.D. 537, 577 (C.D. Cal. 2014).  Again, although it is *Plaintiff's* evidentiary burden, it is *Facebook* that has shown the lack of classwide materiality.  Dr. Hanssens, a UCLA professor of marketing and one of the country's leading survey experts, conducted an actual, scientific survey demonstrating that advertisers choose to advertise on Facebook for many reasons, including their desire to target, and that the type of targeting precision IMB demands was not important, because advertisers were overwhelmingly satisfied with the performance of their Facebook campaigns and 90% of the respondents plan to advertise on Facebook again.  (Hanssens Rpt. ¶¶ 45–61; *see also* App. 953 (internal Facebook study indicating high levels of satisfaction with Facebook's "targeting" across all advertisers); *id.* 1369–1405 (advertiser

25

Gibson, Dunn &
Crutcher LLP

declarations).)  This evidence makes this case nothing like the lone decision Plaintiff cites to argue that materiality can be shown via a "defendant's own customer survey data." (Mot. at 24 (citing *In re POM Wonderful LLC Mktg. & Sales Pracs. Litig.*, 2012 WL 4490860, at *5 (C.D. Cal. 2012) (finding materiality based on survey data about reasons for product purchase but not product satisfaction).)

### C.   Whether Facebook Intended To Induce Reliance Cannot Be Established Via Common Proof And Will Lead To Individual Questions

Plaintiff's next allegedly "common" question is "[w]hether Facebook acted with fraudulent intent" (Mot. at 14)—that is, whether it intended to induce reliance by advertisers, *Lazar*, 12 Cal. 4th at 638; Cal. Civ. Code § 1709.  But there is no common evidence that Facebook "kn[e]w[] with substantial certainty" that every member of the class would "rely on the representation[s] in the course of the transaction." *Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1477 (1997).  And, at any rate, individualized issues would preclude a finding of predominance under Rule 23(b)(3).

In assessing whether Facebook intended to induce a particular advertiser to "alter [its] position," Cal. Civ. Code § 1709—*i.e.*, to purchase an ad—Plaintiff cannot ignore *what else* an advertiser knew about ad targeting "prior to the transaction," *Ehret*, 148 F. Supp. 3d at 900, as well as *what else* Facebook knew about what *others* were telling advertisers about ad targeting *before* logging on to Facebook to place an ad.  There is no classwide proof of either.  Plaintiff asks this Court to assume that advertisers accessed Facebook on a blank slate, without any prior context.  But that is obviously not true: ███████████████████████████ (*supra* n.4), different oral and written conversations *before* and *after* advertisers accessed a Facebook self-serve interface (*supra* pp. 6–7, 22–23), and different levels of knowledge about and engagement with advertising *before* placing ads (*supra* pp. 5–6).  Similarly, Facebook knew that some advertisers communicated with ad agencies, consultants, Facebook Marketing Partners, and Facebook Marketing Experts *before* their campaigns as well. (*Supra* pp. 5-6, 11.)  Facebook likewise could not have intended to induce reliance for advertisers that (i) *did not even access* a self-serve interface themselves; (ii) accessed interfaces that did not have the challenged representations; (iii) advertised on Facebook many times before, or (iv) had already measured their campaigns and knew what criteria they wanted to use. (*Supra* pp. 6–9; App. 1285–86; 1346–49; Hanssens Rpt. ¶¶ 34–36.)  Plaintiff's citation to two internal documents discussing advertiser

Gibson, Dunn &
Crutcher LLP

expectations for targeting accuracy generally (Mot. at 20) does not account for any of this variability.

**D.    Injury And Damages Are Not Susceptible To "Common" Proof And Would Lead To Multiple Individualized Issues**

**1.    *There Are No "Common" Issues Relating to Injury***

Plaintiff's injury and damages analysis focuses exclusively on whether there is a valid method for calculating class members' damages.  But this analysis skips a step:  before reaching damages, the trier of fact must determine *whether* class members suffered injury, and if so, whether Facebook's conduct *caused* that injury.  *R.D. Reeder Lathing Co. v. Cypress Ins. Co.*, 3 Cal. App. 3d 995, 999 (1970).  This is an essential requirement of both Article III and the elements of Plaintiff's claims. *Witkin's Cal. Proc.* § 731 (5th ed. 2020); *Lazar*, 12 Cal. 4th at 638; Cal. Bus. & Prof. Code § 17204.

Here, determining the fact of injury—which is essentially a threshold question of causation and injury—would require a campaign-by-campaign analysis that precludes a finding of commonality or predominance.  *Mazza*, 666 F.3d at 595–96 (no predominance because many class members were uninjured); *Endres*, 2008 WL 344204, at *12 (denying class certification in part because a "highly individualized analysis" would have been required for "questions of actual injury").  The same is true as to whether each class member can satisfy Article III's injury-in-fact requirement given that neither of Plaintiff's experts has proposed a "mechanism for identifying class members who lack standing"— either now (*Mazza*, 666 F.3d at 594 ("No class may be certified that contains members lacking Article III standing.")), or "at the damages phase," *Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020), *cert. granted*, -- S. Ct. --, 2020 WL 7366280.  Among other things, the Court would have to consider:

- Whether the advertiser erred in selecting targeting options (as with IMB's first campaign);

- What value the advertiser—each of which varies as to its sophistication, as Plaintiff's expert (Gregory Pinsonneault) recognizes (App. 657–58)—assigned to targeting accuracy, which may change depending on the advertiser's objective (*supra* p. 7; Tucker Rpt. ¶¶ 102–04);

- Whether the advertiser sought to create an audience where every member satisfied every criteria ("AND" audiences), or whether it sought to create one where every member satisfied at least one criterion ("OR" audiences) (*see* Tucker Rpt. ¶ 118);

- The advertiser's own expectations about targeting accuracy, as compared to the actual accuracy of the options it used, which varied widely across options (App. 1279–80, 1367);

- The motivation the advertiser had for choosing the particular targeting option (Tucker Rpt. ¶ 119), the outcome of the advertiser's campaign, and how it elected to be charged (by impression or by action) (Mot. at 12);

- Whether the advertiser continued advertising on Facebook based on being satisfied with its

27

prior campaign (Hanssens Rpt. ¶¶ 54–61; Tucker Rpt. ¶¶ 92–93);

- Whether the advertiser was uninjured because it allowed "target expansion," which cannot be readily determined (App. 752–53, 1357; Tucker Rpt. ¶¶ 110–15) even though Plaintiff recognizes such consent as evidence of lack of injury by seeking to exclude these advertisers (Mot. at 12); and

- Whether a back-end experiment was conducted on the campaign.  (App. 750, 1345.)

These issues would require the Court "to evaluate each" advertiser's campaign "to determine the fact of injury," *Moore v. Apple, Inc.*, 309 F.R.D. 532, 545 (N.D. Cal. 2015), which cannot be avoided by using proxies or estimates, *e.g.*, *Endres*, 2008 WL 344204, at *12.  The many advertisers that have had success on Facebook (App. 70–80, 332–410, 1040–1274, 1369–1405) and that are satisfied (App. 953; Hanssens Rpt. ¶ 59) are just two examples of just how complicated Plaintiff's proposed exercise would be.  *E.g.*, *Moheb*, 2012 WL 6951904, at *4 ("injury" was "not a common question, because many purchasers are satisfied").

██████████████████████████████████████████████████

██████████████████████████████████████████████████ and it does nothing to simplify

the inherently complex process of determining whether there was any injury in the first instance (Tucker Rpt. ¶¶ 154–58).  Ultimately, the "value" an advertiser received from a particular campaign is an inherently individualized question that can only be decided based on the causes of misdelivery and what expectations and goals the advertiser had for the campaign.

    **2.**    ***Plaintiff's Damages Model Does Not Measure Only Those Damages Attributable To Its Theory Of Liability***

Under binding Supreme Court precedent, a classwide damages model must be "consistent with [the plaintiff's] theory of liability."  *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 814 (9th Cir. 2014) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)).  But Plaintiff does not propose a methodology that would measure only those damages that align with the alleged liability.  Plaintiff acknowledges that there is a subset of ad campaigns—including one of its own—that do not "give[] rise to liability on Facebook's part," because the advertiser made "mistakes" in "select[ing] the targeting criteria." (Dkt. 148 ¶ 48.)  Yet Plaintiff's damages model assumes that *every campaign* that used "interest," "behavior," or "Partner Categories" targeting resulted in liability for Facebook.  In his

deposition, Mr. Pinsonneault admitted that his model does *not* account for advertisers, like IMB, that made mistakes in their ad campaigns.  (Dkt. 156-2 ¶¶ 91–144; App. 687–88.)  Nor does his model account for other reasons for apparent inaccuracies that have nothing to do with the underlying data, such as bugs, organic activity, and experimentation.  (App. 683–73, 1345; Tucker Rpt. ¶¶ 154–55.)  Without a means of accounting for these issues, Plaintiff's model does not "measure only those damages attributable to" its "theory of liability" under *Comcast*.  *Davidson v. Apple Inc.*, No. 16-04942 LHK, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (damages model "fatally flawed" because it "assume[d]" that the alleged defect would "manifest in all" cases even though that was not the plaintiffs' "theory of liability").  Instead, the model "indiscriminately award[s] recovery" for actions "not linked to any wrongdoing [that] must be excluded from the case as a matter of law"—but that cannot be excluded without individualized analyses.  *In re Facebook PPC*, 282 F.R.D. at 456, 461.

Plaintiff's proposal to use "average" accuracy rates for its damages calculations suffers from the same flaw.  *Comcast*, 569 U.S. at 35; Dkt. 156-2 ¶¶ 112, 126–128, 164.  This approach is not even an "approximation" of damages.  *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).  Instead, "[b]y lumping [these categories] together and using an average for the group, these distinctions among [categories] are ignored in a way that prejudices some class members by reducing their award of damages and unjustly enriches others."  *Adams v. Target Corp.*, No. 13-5944, 2014 WL 12558858, at *3 (C.D. Cal. Nov. 25, 2014) (rejecting damages model on this basis).  Plaintiff's methodology also contravenes the Supreme Court's decision in *Tyson Foods*, which held that "[r]epresentative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of [damages]."  136 S. Ct. at 1048.

Next, Mr. Pinsonneault also fails to account for several other independent variables.  His model assumes that only 10% of the revenue Facebook derived from ads placed on its website is attributable to "factors beyond targeting accuracy."  (Dkt. 156-2 ¶ 108; App. 673.)  But this assumption is entirely arbitrary and not grounded in reality, and it dramatically understates the value many advertisers place on factors other than ad targeting (Dkt. 156-2 ¶ 114, n.178; Tucker Rpt. ¶¶ 53–59 (discussing such features)) and ignores what advertisers have actually said about what they value (App. 951–68, 1369–1405; Hanssens Rpt. ¶¶ 45–51).  In doing so, Mr. Pinsonneault would award damages that are not truly

1   "attributable to" allegedly inaccurate data.  *Comcast*, 569 U.S. at 35.  Ad targeting is simply one of

2   *many* features that appeal to advertisers.  (Hanssens Rpt. ¶¶ 45–51.)  Without a non-arbitrary method

3   for accounting for those features, Plaintiff's model fails under *Comcast*.  *See, e.g.*, *Bruton v. Gerber*

4   *Prods. Co.*, No. 12-02412-LHK, 2018 WL 1009257, at *9–11 (N.D. Cal. Feb. 13, 2018) (damages

5   model flawed under *Comcast* because it did not account for "independent variables that might affect"

6   customer value); *Brazil v. Dole Packaged Foods, LLC*, No. 12-01831-LHK, 2014 WL 5794873, at *11

7   (N.D. Cal. Nov. 6, 2014) (same), *aff'd*, 660 F. App'x 531, 535 (9th Cir. 2016).

8          Plaintiff compounds these problems by assuming that *every* advertiser in the class expects 100%

9   accuracy for *every* targeting option in *every* campaign they run, regardless of any of the campaign's

10  other details or objectives.  (*E.g.*, Dkt. 156-2 ¶ 120.)  Mr. Pinsonneault acknowledges that this

11  assumption is unrealistic,[13] but promises to account for advertisers' differing expectations by

12  downwardly adjusting the accuracy rate.  (*Id.* ¶ 137.)  Yet nowhere does he explain *where* he would

13  obtain the information necessary to make these adjustments (for millions of ad campaigns), or how he

14  would ensure the information is reliable.  (*Id.*; App. 720–21; Tucker Rpt. ¶¶ 181–85.)  Nor does he

15  explain *how* he will account for Facebook's different descriptions about what the targeting options are

16  meant to capture—such as that data "suggests" someone is interested in, say, kitesurfing, or that

17  someone was "likely" or "highly likely" to purchase a Subaru—and whether those varying descriptions

18  affected advertisers' expectations about accuracy.  (App. 713–14, 718–19; Tucker Rpt. ¶¶ 181–85.)

19  **E.     Plaintiff Cannot Establish Classwide Punitive Damages, Nor Is That Issue A "Common"
20          Question "Apt To Drive The Resolution" Of This Action**

21         Alternatively, Plaintiff argues that even if the Court concludes that damages cannot be

22  calculated on a classwide basis, it can nonetheless "certify a (b)(3) class seeking nominal and punitive

23  damages."  (Mot. at 27.)  But as Plaintiff recognizes, it still must show that "actual damage occurred"

24  on a classwide basis.  (*Id.* citing *Hynix Semiconductor Inc. v. Rambus Inc.*, 527 F. Supp. 2d 1084, 1100

25  (N.D. Cal. 2007)).)  Plaintiff cannot show that with common proof that "actual damage occurred"—

26  and therefore cannot show entitlement to nominal damages on a classwide basis.  *Caitlin v. Wash.*

27  *Energy Co.*, 791 F.2d 1343, 1350 (9th Cir. 1986) (the failure to show "the fact of damage" "precludes

28  _____
[13]  The assumption does not account for advertiser variability, nor does it address how expectations
      for accuracy might change depending on the difficulty of inferring a particular interest or behavior.

Gibson, Dunn &
Crutcher LLP

an award of nominal damages").

Even if Plaintiff could make a showing of actual damages, however, its request would remain improper:  Rule 23 and due process require an opportunity for Facebook to litigate individual defenses to any punitive damages—including to ensure that damages are not awarded to any advertiser that was unharmed.  U.S. Const. amend. V; *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *see also Fraley v. Batman*, 638 F. App'x 594, 597 (9th Cir. 2016) (large amount of statutory penalties for each class member "could implicate due process concerns").  Here, deciding which proposed class members were actually harmed—and what amount of punitive damages (if any) would be appropriate and within the ratio limits of due process, *State Farm*, 538 U.S. at 425—would require individualized inquiries, as discussed above.  *Beck v. Boeing Co.*, 60 F. App'x 38, 39–40 (9th Cir. 2003) (vacating certification order on punitive damages because it would have included uninjured class members); *accord Campbell v. Facebook*, 315 F.R.D. 250, 269 (N.D. Cal. 2016) (rejecting certification of claims for statutory damages based on individualized harm inquiry).  And the lack of a "common" policy or representation would necessitate additional individual inquiries.  *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1241 (1995) (no punitive damages available "in those fraud actions" involving "negligent" misrepresentations); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 592–93 (C.D. Cal. 2011) (fraud cases seeking "punitive damages" often involve "individualized hearings").

Plaintiff also argues that the Court can resolve the question of punitive damages (*i.e.*, whether Facebook's management "ratified" the alleged fraud) on a classwide basis. (Mot. at 14.)  But a question is only "common" under Rule 23(a) if the "determination of its truth or falsity will resolve an issue *that is central to the validity of each one of the claims in one stroke*."  *Dukes*, 564 U.S. at 350 (emphasis added).  And the availability of punitive damages has nothing to do with the "validity" of Plaintiff's claims; instead, it would be resolved only *after* the individualized inquiry into liability and compensatory damages.  *California v. Altus Fin. S.A.*, 540 F.3d 992, 1000 (9th Cir. 2008) (punitive damages available under California law only after determination of liability and actual damages).

## VII.   CLASS LITIGATION IS NOT THE "SUPERIOR" METHOD OF ADJUDICATION

Under Rule 23(b)(3), the Court must also evaluate whether class members have an interest in controlling the prosecution of a separate action, whether other litigation relating to the controversy has

31

Gibson, Dunn &
Crutcher LLP

1   already begun, and the likely difficulty in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).

2   These factors establish that Rule 23(b)(3) certification would be improper for several other reasons:

3       *First*, Plaintiff believes that its "big data" expert, Dr. Riedewald, can simply run "queries" on

4   Facebook's data to calculate damages.  (Mot. at 29; Dkt. 156-3 ¶ 51.)  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

14   (Dkt. 156-3 ¶ 55; Tucker Rpt. ¶¶ 142–46.)  Mr. Pinssoneault's model therefore does not "lend[] itself

15   to a workable, mechanical calculation."  *In re Facebook PPC*, 282 F.R.D. at 459–60 (class action

16   "unmanageable" because of the individualized inquiries necessary to assess "injury").

17       *Second*, there are enough potential damages at stake for class members to have an incentive to

18   litigate their claims individually.  *See, e.g.*, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190

19   (9th Cir. 2001) (amount of "damages suffered by each putative class member" relevant to superiority);

20   *e.g.*, Tucker Rpt. ¶ 108.  This factor "weighs heavily against class certification," because at least some

21   putative class members "have sufficient monetary incentive to pursue their own claims."  *Nguyen v.*

22   *BDO Seidman, LLP*, No. 07-01352, 2009 WL 7742532, at *8 (C.D. Cal. July 6, 2009) (denying

23   certification because the class included "well-paid employees" who were seeking "years' worth of

24   overtime back-pay"); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154,

25   191 (3d Cir. 2001) (denying certification of class with large institutional investors who had "a

26   significant financial stake to raise stand-alone claims").  Some class members therefore "have an

27   interest in controlling their own litigation."  *Gonzalez-Tzita v. City of L.A.*, No. 16-0194, 2019 WL

28   7790440, at *8 (C.D. Cal. Dec. 9, 2019).  At a minimum, there is a substantial risk that advertisers with

larger ad budgets would conclude that IMB could not represent their interests and opt out.

## VIII.   PLAINTIFF ALSO CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)(2)

Rule 23(b)(2) certification is appropriate only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   Fed. R. Civ. P. 23(b)(2).   Plaintiff has not met its evidentiary burden for (b)(2) certification for several reasons:

**1.   *Plaintiff Lacks Article III Standing To Pursue Injunctive Relief.***   The Court's recent Motion to Dismiss ruling limited Plaintiff to forward-looking injunctive and declaratory relief. (Dkt. 147.)   But Plaintiff's deposition testimony establishes that it lacks Article III standing to pursue this relief.   Plaintiff testified that, "[a]t this time," it does not intend to advertise on Facebook again because it had a "bad experience with" Facebook.   (App. 592.)   In addition, IMB has rarely advertised in general and has not run *any* advertising—on Facebook or otherwise—since 2016.   (App. 518–19.) Accordingly, Plaintiff cannot show that it "would like to" purchase ads on Facebook in the future, but cannot rely on Facebook's representations, *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018), and it therefore lacks constitutional standing to seek injunctive relief, *Lanovaz v. Twinings N. Am., Inc.,* 726 F. App'x 590, 591 (9th Cir. 2018) (affirming summary judgment for lack of standing because the plaintiff did not intend to purchase the product in the future).

Plaintiff attempts to avoid its sworn deposition testimony by relying on its class-certification declaration stating that "IMB would resume advertising on Facebook" if it "could rely on Facebook's representations concerning its targeting accuracy."   (Dkt. 156-1.)   But this statement is inconsistent with its deposition testimony and can therefore be disregarded as a "sham."   *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009); *Otyang v. City & Cty. of S.F.*, No. 12-00577 MEJ, 2013 WL 843565, at *6 (N.D. Cal. Mar. 6, 2013); *Quezada v. Con-Way Freight, Inc.*, No. 09-03670-JSW, 2012 WL 4901423, at *1 n.1 (N.D. Cal. Oct. 15, 2012) (applying "sham" affidavit rule at class certification). After all, when directly asked whether IMB would run advertisements on Facebook again, Mr. Kidd testified, "[a]t this time, no" and, when asked the open-ended question "Why not?," he did not provide any of the explanations now offered in his new declaration.   (App. 592; Dkt 156-1.)   Even if the Court were to consider Plaintiff's declaration, neither it (nor IMB's "at this time" qualifier during the

Gibson, Dunn &
Crutcher LLP

deposition) would be sufficient to demonstrate Article III standing, because Plaintiff never identified any "concrete plans" to advertise in the future. *Lujan v. Defs. of Wildlife,*, 504 U.S. 555, 564 (1992); *see also Snake River Farmers' Ass'n, Inc. v. Dep't of Labor*, 9 F.3d 792, 798 (9th Cir. 1993) (declaration that farmworker was "looking" for work and was "still interested in future employment" indicated a mere "'some day' speculative possibility" of future injury). Instead, the evidence demonstrates that IMB was an infrequent advertiser that has not placed any ads in five years, and a large portion of its Facebook ads were "tests" to try to substantiate its "hedge fund play." (App. 601.) For these reasons, the Court should deny Rule 23(b)(2) certification. *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999); *Jones*, 2014 WL 2702726, at *12–13; *see also In re Coca-Cola Prods. Mktg. & Sales Pracs. Litig.*, No. 14-2555 JSW, 2020 WL 759388, at *7–9 (N.D. Cal. Feb. 14, 2020) (granting certification under Rule 23(b)(2) because, *at their depositions*, the class representatives indicated a desire to purchase the product in the future) (cited in Mot. at 18).

At a minimum, however, Plaintiff is inadequate to seek forward-looking equitable relief on behalf of the class. *Ellis*, 657 F.3d at 986 (former employees who lacked standing were inadequate to seek injunctive relief).[14] Even if the Court were to determine that there is a triable issue as to Mr. Kidd's testimony, the adequacy problem would persist beyond class certification because Plaintiff must show standing to seek injunctive relief "even at the final judgment stage." *Ramirez*, 951 F.3d at 1023. Thus, a triable issue of fact as to standing would remain in this Court, as well as any appeal before the Ninth Circuit, which creates "serious questions" regarding IMB's standing and would divert attention to issues specific to IMB. *English v. Apple Inc.*, No. 14-01619 WHO, 2016 WL 1188200, at *8 (N.D. Cal. Jan. 5, 2016). IMB's standing therefore "presents a unique legal issue that could ultimately severely prejudice the class" and "become a major focus of the litigation." *S. Ferry LP No. 2. v. Killinger*, 271 F.R.D. 653, 658–59 (W.D. Wash. 2011).

**2. *No Uniformity.*** Facebook did not act or refuse to act "on grounds that apply generally to the class" because there was no "practice applicable to all [class members]." *Rodriguez*, 591 F.3d at 1125. As discussed, there were no uniform representations, no uniform expectations about targeting

---

[14] That Plaintiff had "no idea" whether the challenged conduct "continues to this day" further underscores its inadequacy to seek equitable relief on behalf of the proposed class. (App. 582.)

accuracy, no uniform exposure, no uniform reliance, no uniform method of obtaining information about ad targeting from Facebook, and no uniform accuracy rates across categories, advertisers, or the class period. (*Supra* pp. 6–11.) This lack of uniformity precludes a finding that Facebook acted in a uniform way. *Yassin v. Crosland*, 613 F.2d 219, 220 (9th Cir. 1980) (reversing grant of certification under Rule 23(b)(2) where the defendant's conduct had "significantly disparate effects").

**3.** ***"A Single Injunction" Would Not "Provide Relief To Each Member Of The Class."***

*Dukes*, 564 U.S. at 360. ███████████████████████████████████████

████████████████, and those advertisers would not benefit from the requested injunction because they no longer advertise on Facebook. (Hanssens Rpt. ¶ 59; Tucker Rpt. ¶¶ 186–87); *Schulken v. Wash. Mut. Bank*, No. 09-02708 LHK, 2012 WL 28099, at *7 (N.D. Cal. Jan. 5, 2012) (denying (b)(2) certification because class members who no longer used the product were "not currently in a position to benefit from a change in Chase's policies and practices"); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (same). Advertisers that used only Partner Categories have nothing to gain from the requested equitable relief, because this option was discontinued in 2018 and is no longer available. *E.g.*, *Silver v. Penn. Higher Educ. Assistance Agency*, No. 14-00652 PJH, 2020 WL 607054, at *18 (N.D. Cal. Feb. 7, 2020) (denying Rule 23(b)(2) certification because of mootness).

## IX.   CONCLUSION

Plaintiff's attempt to represent, as the sole class representative, an incredibly varied class of advertisers—that relied on different sources in deciding to advertise on Facebook, interacted with Facebook in different ways, saw different information, had different expectations and objectives for their ad campaigns, and achieved different results—undermines typicality, adequacy, commonality, and predominance. This case is not suitable for class treatment, and the Court should deny the Motion.

Respectfully submitted,

Dated: March 3, 2021                GIBSON, DUNN & CRUTCHER LLP


By: _____/s/ Christopher Chorba_____
            Christopher Chorba

*Attorneys for Defendant Facebook, Inc.*