# Exhibit A

# (REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED)

**POMERANTZ LLP**
Jordan L. Lurie (SBN 130013)
Ari Y. Basser (SBN 272618)
1100 Glendon Avenue, 15th floor
Los Angeles, CA  90024
Phone: (310) 432-8492
Fax:     (310) 861-8591
Email: jllurie@pomlaw.com
Email: abasser@pomlaw.com


**WOHL & FRUCHTER LLP**
Joshua Elazar Fruchter (*admitted pro hac vice*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY  10952
Phone: (845) 290-6818
Fax:     (718) 504-3773
Email: jfruchter@wohlfruchter.com

**MOLOLAMKEN LLP**
Steven F. Molo (*admitted pro hac vice*)
Lauren F. Dayton (*admitted pro hac vice*)
Leonid Grinberg (*admitted pro hac vice*)
430 Park Avenue
New York, NY  10022
Phone: (212) 607-8160
Fax:     (212) 607-8161
Email: smolo@mololamken.com
Email: ldayton@mololamken.com
Email: lgrinberg@mololamken.com

Megan Cunniff Church (*admitted pro hac vice*)
300 N. LaSalle Street, Suite 5350
Chicago, IL  60654
Phone: (312) 450-6716
Fax:     (847) 440-2692
Email: mchurch@mololamken.com

Caleb Hayes-Deats (*admitted pro hac vice*)
Eugene A. Sokoloff (*admitted pro hac vice*)
600 New Hampshire Avenue, N.W., Suite 500
Washington, D.C.  20037
Phone: (202) 556-2000
Fax:     (202) 556-2001
Email: chayes-deats@mololamken.com
Email: esokoloff@mololamken.com

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| INTEGRITYMESSAGEBOARDS.COM, LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>FACEBOOK, INC.<br><br>                    Defendant. | Case No. 4:18-cv-05286 PJH-JCS<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO CERTIFY CLASS**<br><br>Hon. Phyllis J. Hamilton<br><br>Date: April 29, 2021<br>Time: 9:00 a.m.<br>Courtroom: Courtroom 3, 3rd Floor |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    IMB Satisfies Typicality and Adequacy ............................................................ 2

    A.    IMB's Claims Are Typical of the Class's Claims ................................. 2

    B.    IMB Will Adequately Represent the Class ........................................... 4

II.    Common Questions Predominate Over Individual Issues ................................. 5

    A.    Common Evidence Will Establish Falsity ........................................... 6

        1.    All Class Members Were Exposed to the Same Common Core of Misrepresentations and Omissions ........................................... 6

        2.    Falsity Does Not Turn on Class Members' "Sophistication" or "Experience" .................................................................... 9

    B.    Facebook's Fraudulent Intent Can Be Inferred on a Class-Wide Basis ............... 9

    C.    Materiality Is a Common Question and Gives Rise to a Presumption of Reliance .............................................................................. 10

        1.    Each Class Member Saw Substantially the Same Misleading Representations ..................................................................... 11

        2.    Accuracy Is Obviously and Concededly Material .................... 12

        3.    Facebook's Fatally Flawed "Survey" Cannot Undermine the Obvious Materiality of Its Misrepresentations ....................... 14

    D.    All Class Members Suffered Damages Traceable to Facebook's Accuracy Fraud ................................................................................... 15

        1.    Every Class Member Suffered Injury ...................................... 15

        2.    IMB's Damages Models Isolate the Harm from Facebook's Fraud ....... 16

        3.    The Court Can Certify a Class for Punitive Damages ........................... 17

III.    A Class Action Is Superior ............................................................... 18

IV.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2) ................... 19

i

1.    IMB Has Standing To Seek Injunctive Relief on Behalf of the
Class ............................................................................................................ 19

2.    Facebook's Remaining Objections Are Meritless .................................. 20

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

*Akkerman v. Mecta Corp.*,
  152 Cal. App. 4th 1094 (2007) .......................................................................................... 12

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. 2014) ........................................................................................ 12

*Anderson v. Deloitte & Touche LLP*,
  56 Cal. App. 4th 1468 (1997) ............................................................................................. 10

*Arizona v. ASARCO LLC*,
  773 F.3d 1050 (9th Cir. 2014) ............................................................................................ 17

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir.1975) ................................................................................................. 3

*Bradach v. Pharmavite, LLC*,
  735 F. App'x 251 (9th Cir. 2018) ......................................................................................... 9

*Brazil v. Dell Inc.*,
  No. 07 Civ. 1700 (RMW), 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010)......................... 11

*Broomfield v. Craft Brew All., Inc.*,
  No. 17 Civ. 1027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ................................ 6

*Brown v. Hain Celestial Grp., Inc.*,
  No. 11 Civ. 03082 (LB), 2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .............................. 4

*Chavez v. Blue Sky Nat. Beverage Co.*,
  268 F.R.D. 365 (N.D. Cal. 2010) .......................................................................................... 4

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ........................................................................................ 20

*Chow v. Neutrogena Corp.*,
  No. 12 Civ. 04624, 2013 WL 5629777 (C.D. Cal. Jan. 22, 2013)....................................... 12

*In re Coca-Cola Prod. Mktg. & Sales Pracs. Litig.*,
  No. 14-MD-02555-JSW, 2020 WL 759388 (N.D. Cal. Feb. 14, 2020) ............................... 19

*Collins v. eMachines, Inc.*,
  202 Cal. App. 4th 249 (2011) ............................................................................................ 5, 9

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) .............................................................................................. 19

*Delarosa v. Boiron*,
  275 F.R.D. 582 (C.D. Cal. 2011) ........................................................................................ 17

iii

*Ehret v. Uber Techs., Inc.*,
  148 F. Supp. 3d 884 (N.D. Cal. 2015) ..................................................................... 11

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ................................................................................. 10

*Engalla v. Permanente Med. Grp.*,
  938 P.2d 903 (Cal. 1997) ............................................................................. 9, 10, 13

*In re Facebook, Inc., PPC Advert. Litig.*,
  282 F.R.D. 446 (N.D. Cal. 2012) .............................................................................. 3

*In re First All. Mortg. Co.*,
  471 F.3d 977 (9th Cir. 2006) ....................................................................... 6, 11, 16

*Gonzalez-Tzita v. City of Los Angeles*,
  No. 16 Civ. 0194 FMO, 2019 WL 7790440 (C.D. Cal. Dec. 9, 2019) ........................... 18

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................................................... 6, 9

*Huntsman v. Sw. Airlines Co.*,
  No. 19-CV-00083-PJH, 2021 WL 391300 (N.D. Cal. Feb. 3, 2021) ............................... 4

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) ......................................................................... *passim*

*I.M.A.G.E. v. Bailar*,
  78 F.R.D. 549 (N.D. Cal. 1978) ............................................................................... 3

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020) ............................................................................ 16

*Lehr v. City of Sacramento*,
  259 F.R.D. 479 (E.D. Cal. 2009) ............................................................................ 18

*Meyer v. Bebe Stores, Inc.*,
  No. 14-CV-267-YGR, 2016 WL 8933624 (N.D. Cal. Aug. 22, 2016) ............................. 9

*Mirkin v. Wasserman*,
  858 P.2d 568 (Cal. 1993) ...................................................................................... 10

*Moheb v. Nutramax Lab'ys Inc.*,
  No. CV 12-3633-JFW JCX, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ....................... 4

*Nevarez v. Forty Niners Football Co., LLC*,
  326 F.R.D. 562 (N.D. Cal. 2018) .............................................................................. 4

*Nguyen v. BDO Seidman, LLP*,
  No. 07 Civ. 01352, 2009 WL 7742532 (C.D. Cal. July 6, 2009) ................................... 18

iv

*Nguyen v. Nissan N. Am., Inc.,*
    932 F.3d 811 (9th Cir. 2019) ............................................................... 12

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ............................................................... 20

*Patricia A. Murray Dental Corp. v. Dentsply Int'l, Inc.,*
    19 Cal. App. 5th 258 (2018) ................................................................. 9

*Pulaski & Middleman, LLC v. Google, Inc.,*
    802 F.3d 979 (9th Cir. 2015) ................................................... 15, 16, 17

*Purnell v. Rudolph & Sletten Inc.,*
    No. 18-CV-01402-PJH, 2019 WL 7020217 (N.D. Cal. Dec. 20, 2019).......................... 19

*Ruiz Torres v. Mercer Canyons Inc.,*
    835 F.3d 1125 (9th Cir. 2016) ................................................... 3, 10, 16

*Schulken v. Wash. Mut. Bank,*
    No. 09-CV-02708-LHK, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ........................... 20

*True v. Am. Honda Motor Co.,*
    749 F. Supp. 2d 1052 (C.D. Cal. 2010) ................................................... 10

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S.Ct. 1036 (2016)........................................................... 16, 17

*In re Vioxx Class Cases,*
    180 Cal. App. 4th 116 (2009) ............................................................. 12

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).......................................................................... 5

*Williams v. Gerber Prods. Co.,*
    552 F.3d 934 (9th Cir. 2008) ............................................................... 6

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) ..................................................... 2, 3, 18

## STATUTES AND RULES

Cal Civ. Code § 1710 ........................................................................ 6

Cal. Civ. Code § 3294 ....................................................................... 17

Fed. R. Civ. P. 23(a)(2) ............................................................... 19, 20

Fed. R. Civ. P. 23(b)(2).............................................................. 2, 19

Fed. R. Civ. P. 23(b)(3)...................................................................... 2

Fed. R. Civ. P. 23(b)(3)(B) ........................................................................................................ 17

Fed. R. Civ. P. 23(b)(3)(C) ........................................................................................................ 17

**INTRODUCTION**

In an effort to obfuscate, Facebook dramatically overcomplicates a simple case. In selling ads, it lied about its ability to accurately target audiences—something Facebook and advertisers consider important. Thus, advertisers paid for something they did not receive.

Facebook made billions selling targeted ads. It knew its advertisers expected that those ads would "only" go to their "intended audience." Ex. 30(b) at 3. But Facebook's data showed they went to "someone other than the advertisers' intended audience" "more than half the time." *Id.* The company's top executives were told that the most popular targeting categories were just "40% correct." Ex. 42 at 2-3. Others were "definitely lower," with some dropping as low as 4%. Ex. 47 at 296:17-19; *see* Ex. 46.

Facebook knew these accuracy problems broke a ███████████████████████ Ex. 67 at 1, and that meant ████████████ Ex. 60 at 4. But Facebook also knew ████████ ████████████████ Ex. 3 at 6. Rather than disclose the truth, Facebook chose to profit from deception.

Facebook cannot deny these facts, drawn from its own files. So it tries to put on a happy face, claiming its advertisers are "satisfied." But none of those advertisers were told the truth about Facebook's "abysmal" accuracy. Ex. 48 at 3. And nothing in Facebook's inadmissible "testimonials" or fatally flawed "survey" suggests that advertisers would not "attach importance" to the fact that fewer than half—40% or less—of their ads' viewers would actually meet the targeting criteria they paid for. To the contrary, Facebook's research confirms accuracy is a "foundational" expectation of its advertisers, Ex. 65 at 21, and that inaccuracy has a ████████████████████ Ex. 97 at 3.

Whether—like ████████ of the class—an advertiser spent as much or less than IMB on Facebook's ads, or whether it spent more, every class member has the same interests in this litigation. All were victims of the same course of conduct, a centrally orchestrated strategy to sell advertisers a product Facebook knew fell short of advertisers' "accuracy expectations." Ex. 30(b) at 3. And all "waste[d] money"—in the words of Facebook's damages expert—on ads that Facebook showed "to people who will never be interested in their product or service." Ex. 88 at 681.

That makes IMB both "typical" and adequate under Ninth Circuit precedent. It also means that "predominance is 'readily met.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 559 (9th Cir.

2019).    Nothing  in  the  litany  of  illusory  or  irrelevant  differences  that  fill  Facebook's  opposition undermines the essential commonality of its class-wide misrepresentations and omissions or their class-wide effect.

Nor do these purported differences undermine IMB's proposed damages models, which are based on Facebook's own refund policy and internal methodologies.    After  operating  for  years  on  the understanding that advertisers are entitled to a refund based simply on ███████ ads "served outside [their] target audience," Facebook cannot plausibly claim the same approach is not a fair and reasonable  measure  of  advertisers'  out-of-pocket  losses.    Ex. 67 at 2.   And IMB's data expert has shown—and  Facebook's  damages  expert  confirms—that  Facebook  has  all  the  data  necessary  to implement IMB's models far more efficiently on a class-wide basis than in piecemeal litigation.

This Court should certify the class.

## ARGUMENT

IMB  seeks  to  certify  a  class  under  Federal  Rule  of  Civil  Procedure  23(b)(2)  and  (b)(3) comprising all individuals or entities within the United States who, from August 28, 2014 to the present, targeted Facebook users in one or more "interest," "behavior," or "partner" categories selected using Facebook's self-serve targeting interface, and who paid Facebook for at least one ad for which they neither (a) expressly authorized Facebook to disregard their targeting criteria by opting into "Target Expansion" nor (b) elected to be charged only when a user made a purchase or downloaded an app.

## I.    IMB SATISFIES TYPICALITY AND ADEQUACY

### A.    IMB's Claims Are Typical of the Class's Claims

Facebook argues (at 14) that IMB is not a "'typical' advertiser."  But *Facebook's data* shows that IMB is actually quite typical.  The median class member used Facebook for ███████ ████████ ; ████████ of the class spent less on Facebook than IMB.  Reply Decl. of Mirek Riedewald, Ph.D. ¶¶ 64-65.  Moreover, the question is not whether IMB is a typical "advertiser."  It is whether IMB suffered "'the same or similar injury'" as other class members, and "'whether other class members have been injured by the same course of conduct.'"  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  The answer is "yes."

IMB alleges it was injured when it paid for ads shown to Facebook users who did not meet the targeting criteria it selected using Facebook's self-serve targeting interface. *See* FAC ¶¶161, 169; Ex. 74 (Kidd Dep.) at 209:8-210:13, 211:15-24; 323:23-324:20; Exs. 75, 76. The class definition assures that every class member was "'injured by the same course of conduct.'" *Wolin*, 617 F.3d at 1175.

Facebook posits (at 15-16) a number of ways in which it says advertisers vary. But the "'purpose of the typicality requirement is to assure that the ***interest*** of the named representative aligns with the interests of the class.'" *Wolin*, 617 F.3d at 1175 (emphasis added). That requirement is easily met. Facebook's documents show that targeting accuracy is a "foundational expectation that advertisers have." Ex. 65 at 21. Facebook's damages expert, Dr. Tucker, explains why: Targeting "allows advertisers" to avoid "wast[ing] money showing ads to people who will never be interested in their product or service." Ex. 88 at 681. Nothing in her research suggests that larger advertisers are happy to "waste money" overpaying for targeting that reaches its audience less than half the time. They are not.[1]

Facebook next resorts (at 16) to rewriting this Court's decision *In re Facebook, Inc., PPC Advertising Litigation*, 282 F.R.D. 446 (N.D. Cal. 2012). That case does not support Facebook's position. The "different channels" and "different terms" used by small and large advertisers were relevant in *PPC Advertising* because the named plaintiffs were trying to assert ***breach of contract claims*** on behalf of class members ***with different contracts***. 282 F.R.D. at 454.[2]

Certification in this common-law fraud case is appropriate so long as the class was exposed to "similar misrepresentations" and omissions. *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975); *see*

---

[1] It is telling that Facebook had to reach back 40 years and quote (at 15) the ***defendant's argument*** in a case that ***certified*** a class to find something to cite for the proposition that heterogeneity alone undermines typicality. *See I.M.A.G.E. v. Bailar*, 78 F.R.D. 549, 555 (N.D. Cal. 1978) ("Defendants argue strenuously that the proposed class is too heterogeneous to meet the test of typicality."). The modifications *Bailar* made to the proposed class addressed differences in the nature of the claims asserted. *See id.* at 556-57.

[2] The named plaintiffs used an online self-serve system to place ads. *PPC Advertising Litig.*, 282 F.R.D. at 450-51. They brought breach of contract and related UCL claims based on agreements they said incorporated statements from an online "Help Center." *Id.* at 449, 455. Although advertisers who used the self-serve system might have seen these statements, larger advertisers "who contract directly with Facebook would have had no reason to consult the Help Center." *Id.* at 458. That made it "highly likely that many members of the proposed class would never have reviewed" the key terms of the alleged "contract." *Id.* The class definition here makes that impossible. *See* Parts II.A.1 & C.1, *infra*.

*Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1135, 1137-38 (9th Cir. 2016) (common policy of nondisclosure predominates over differences in "'individual interactions and circumstances'"). The proposed class guarantees that by including only those advertisers who saw and interacted with the common core of misrepresentations and omissions conveyed through Facebook's self-serve targeting interface. Any other contact with Facebook that class members may have had is immaterial.

Which targeting objectives or categories IMB selected for its ads likewise does not matter. *See Brown v. Hain Celestial Grp., Inc.*, No. 11 Civ. 03082 (LB), 2014 WL 6483216, at *13 (N.D. Cal. Nov. 18, 2014) (class representative need "not buy" the same product as every other class member, so long as "the challenged representations are not 'unique' to any product"); *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (typicality satisfied where claims "arise out of" the same "allegedly false statement," even where "worded in several variations"); Mot. 16.[3]

Finally, Facebook claims in passing (at 17) that IMB is subject to "unique" defenses. But as this Court recently explained, that would matter only if it were "clear at this stage" that those defenses "'threaten to become the focus of the litigation.'" *Huntsman v. Sw. Airlines Co.*, No. 19-CV-00083-PJH, 2021 WL 391300, at *9 (N.D. Cal. Feb. 3, 2021) (granting motion to certify). The only example of a "unique" defense Facebook cites is its meritless challenge to IMB's standing to pursue injunctive relief. The Court will resolve that question on this motion, leaving nothing to distract IMB in subsequent proceedings. Facebook identifies no other defenses unique to IMB, and there are none.[4]

**B.     IMB Will Adequately Represent the Class**

Facebook concedes that IMB and its counsel have no "'conflicts of interest with other class members'" and that they will "'prosecute the action vigorously on behalf of the class,'" *In re Hyundai*

---

[3] Facebook relies on *Moheb v. Nutramax Lab'ys Inc.*, No. CV 12-3633-JFW JCX, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012), for the proposition that the extent of an advertiser's activity on Facebook matters. But the fact that the plaintiff in *Moheb* only "used one bottle of" health supplement mattered because her claim hinged on whether the supplement was effective. *Id.* at *5. By contrast, no amount of advertising could cause Facebook's targeting to become accurate.

[4] If the Court has any concerns about IMB's ability to represent some portion of the class, Facebook's extensive data about its advertisers would make it easy to refine the class, whether as an exercise of the Court's discretion or by granting IMB leave to amend. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 575 (N.D. Cal. 2018); *see* Riedelwald Reply Decl. ¶67.

*& Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019), as they have already done for three years. Instead, Facebook distorts a passage from the deposition of IMB's principal, Ralph Kidd IV, to make it appear as though he somehow conceded that IMB is not adequate.

Mr. Kidd never suggested that his small business could not represent larger advertisers. Rather, he expressed surprise at the idea that IMB would be "similarly situated" to large advertisers on Facebook because he assumed that "SMBs" (small- and medium-sized businesses) like his made up "the bulk of" advertisers that used the Ads Manager platform. Ex. 92 at 181:15-24. As Mr. Kidd explained just minutes later—in a passage Facebook omits from its appendix—what "would cause an advertiser to be similarly situated to" IMB is "[i]f they used targeting and they paid for that targeting" and their "ads were delivered outside the target, and they suffered harm from that." *Id.* at 183:7-13.

The class definition tracks Mr. Kidd's testimony perfectly, capturing only those advertisers who were charged for ads they targeted using Facebook's self-serve targeting interface. Mr. Kidd may have been surprised that large, sophisticated advertisers also used that interface, but there would have been no reason for him to know that without discovery.[5]

## II.     COMMON QUESTIONS PREDOMINATE OVER INDIVIDUAL ISSUES

IMB's opening brief identified several central questions—falsity, materiality, reliance, intent, and harm—that are capable of generating "'common answers'" in this case. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted). Those questions satisfy both commonality and predominance—a requirement the Ninth Circuit has found "'readily met' in cases alleging consumer fraud." *In re Hyundai*, 926 F.3d at 559. Facebook responds by stressing the ways it says the class members are dissimilar. But "'[d]issimilarities within the proposed class'" matter only to the extent they "'have the potential to impede the generation of common answers.'" *Dukes*, 564 U.S. at 350. They cannot do that here because none of the common questions turn on individualized evidence.

---

[5] Facebook notes (at 12) that Mr. Kidd years ago considered an investment strategy to monetize Facebook's fraud. Facebook does not explain how this bears on his ability to represent the class. Mr. Kidd has testified that he is "invested in [his] role" as class representative and "take[s] it seriously." Ex. 92 at 350:7-16. Facebook also quotes an email Mr. Kidd sent in 2015, expressing concern that Facebook might defeat a class action by arguing that IMB's "campaign criteria" were narrower than other advertisers'. App. 472. These offhand musings years before this litigation are irrelevant.

### A.      Common Evidence Will Establish Falsity

Whether the representations in Facebook's targeting interface are actionable depends on whether they were inherently false or rendered misleading by Facebook's failure to disclose some "material fact." *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011); *see id.* at 259 (applying same test to common-law fraud); Cal Civ. Code § 1710. Whether advertisers were "'likely to be deceived'" by the targeting interface for purposes of IMB's UCL claim depends on a "reasonable consumer" test. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Those questions are "'***ideal for class certification***'" because they are objective and will not "'require the court to investigate class members' individual interaction with'" Facebook.  *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (emphasis added) (certifying UCL class); *accord, e.g.*, *Broomfield v. Craft Brew All., Inc.*, No. 17 Civ. 1027-BLF, 2018 WL 4952519, at *11 (N.D. Cal. Sept. 25, 2018) (certifying common-law fraud class).  Facebook's contrary arguments distort IMB's allegations.

#### 1.      *All Class Members Were Exposed to the Same Common Core of Misrepresentations and Omissions*

IMB's tailored class definition follows this Circuit's longstanding practice of favoring "class treatment of fraud claims stemming from a 'common course of conduct.'"  *In re First All. Mortg. Co.*, 471 F.3d 977, 990-92 (9th Cir. 2006).  It ensures that every class member was exposed to the same common core of misrepresentations and omissions, conveyed through:

- An extensive menu of targeting criteria that purported to distinguish among categories of users based on their interests, behaviors, and demographics;
- Pop-up displays (or "hovercards") that described the criteria for inclusion in each category and represented the number of users who met those criteria; and
- A dynamic display of the number of users Facebook represented to comprise the target audience based on the criteria the advertiser chose (the "estimated reach").

Facebook does not dispute that a reasonable advertiser interacting with these features would be misled into thinking that he could, as Mark Zuckerberg put it, "select exactly the audience you want to reach."  Ex. 1 at 4.  Nor does it dispute the evidence showing that Facebook's targeting fell far short of

6

those "accuracy expectations."  Ex. 30(b) at 3; *see* Ex. 52.  Instead, Facebook responds (at 18-19) that advertisers might not have seen all of the same features or had the same expectations.

But the point is not that Facebook made its misrepresentations through Ads Manager or Power Editor, or a particular hovercard or category.  The point is that the same false and misleading representations about Facebook's ability to target specific audiences were made—per the class definition—*across* "Facebook's self-serve targeting interface."

**Which Interface**.  Facebook claims (at 18) that there are differences in the interfaces class members used to define their target audiences.  But its own exhibits establish that the core misrepresentations and omissions were conveyed consistently through the targeting interface associated with Ads Manager and Power Editor.  App. 29-30 (showing just one interface for "Ads Manager").  Facebook argues (at 21 n.10) that IMB's opening brief expanded the proposed class to include advertisers "who accessed other 'self-serve interface[s].' "  It did not.  The proposed "definition **narrows** the class alleged in" the FAC and "is consistent with the complaint's factual allegations," which referred to Ads Manager and Power Editor only.  Mot. 12 n.10 (emphasis added); *see* FAC ¶¶ 36, 132.

**Which Categories**.  Facebook next contends (at 18-19) that a factfinder would need to ask which categories each class member chose and whether they were "granular" or "broad."  That misses the point.  The point is that the sheer number of options—along with the descriptions displayed in the hovercards and Facebook's representation of an ad's "estimated reach"—would give any reasonable advertiser the impression that Facebook actually could distinguish among users based on their behaviors, interests, and demographics.  Yet Facebook failed to disclose that it was "showing ads to someone **other** than the advertisers' intended audience" "**more than half the time**."  Ex. 30(b) at 3 (emphasis added).

**Which Hovercards**.  Facebook claims (at 18) that a factfinder would need to examine the language in the hovercard for each category a class member chose to determine whether it was misleading.  But whatever its exact wording, every hovercard was misleading in the same way:  It represented the number of users who met the criteria for membership in a category without disclosing that "**more than half**" of those users would **not** meet those criteria.  Ex. 30(b) at 3 (emphasis added).[6]

---

[6] Facebook also misconstrues the evidence.  All interest hovercards had **identical** language, *compare* Ex. 44, *with* App. 33, which a Facebook employee internally admitted was "not very accurate," Ex. 91 at 1.

*Which Audience.*  Facebook claims (at 19) that a factfinder would need to consider each ad's "potential reach" to see whether it was misleading.  But, whatever number Facebook gave, its representation of the audience for each ad was misleading in failing to disclose that *60% or more* of the audience would *not* meet the advertiser's targeting criteria.

*Which Contract.*  Although Facebook does not contend that its contracts with advertisers preclude any class member's claim, it implies (at 19) that advertisers who agreed to different contract terms would have different accuracy expectations.  It points out, for example, that its most common contract provides that Facebook "cannot guarantee *in every instance* that your ad will reach its intended target."  App. 894 (emphasis added).  Another ███████████████████████████ App. 1351.  And another specifies that █████████████████████████████████████████████ *Id.* (emphasis added).[7]

These terms may suggest that class members who read them would not expect targeting perfection.  But there is a vast gulf between disclaiming a "guarantee" of success "in every instance," App. 894, and disclosing that—as an internal Facebook document admitted—"*accuracy is abysmal*," Ex. 48 (emphasis added).  That may be why Facebook does not actually argue that its contracts could have rendered its implied accuracy representations non-misleading.  They could not.

*Which Channels.*  Finally, Facebook contends (at 22-23) that a factfinder could not determine whether its interface was misleading without considering what class members might have learned through interactions with Facebook employees.  It is inconceivable that Facebook employees were telling advertisers that Facebook's "best-guess *ceiling*" for interest accuracy was just 60%—let alone that Facebook knew "for a fact" that its behavior targeting was "almost all crap," and that its most popular partner categories were accurate an average of just 10-14% of the time. Ex. 58 at 1; Ex. 48 at 3; Ex. 37 at 2.  The lengths to which Facebook has gone to keep the truth about its accuracy under seal in this litigation belies any suggestion that it was being open with its advertisers.  And without full

---

Although some hovercards for behaviors and partner categories used "caveats" or predictive language, nothing in those words would make a reasonable advertiser less likely to attach importance to the undisclosed fact that Facebook knew its behavior targeting was "crap," Ex. 58 at 1, Ex. 51 at 3, and that its partner categories had ██████████████████ Ex. 59 at 13.

[7] Facebook did not provide copies of the agreements its declarant cites to IMB or the Court.

disclosure of what Facebook called the "difference between advertiser expectations" and "the reality," no amount of communication could have rendered the targeting interface non-misleading. Ex. 52.

        2.    *Falsity Does Not Turn on Class Members' "Sophistication" or "Experience"*

Facebook suggests (at 19-20) it is impossible to apply the UCL's "reasonable consumer" test on a class-wide basis because some class members are "sophisticated." But a plaintiff "has ***no burden*** to establish that there is a uniform understanding among putative class members as to the meaning of" allegedly false or misleading statements, "or that all or nearly all of the class members shared any specific belief." *Hadley*, 324 F. Supp. 3d at 1116 (emphases added; internal quotation marks and brackets omitted); *see Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 254-55 (9th Cir. 2018) (reversing a denial of class certification on this ground). It is enough to make "an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably 'could be misled' by the challenged statements." *Hadley*, 324 F. Supp. 3d at 1116 (internal quotation marks omitted).

There is unquestionably "a probability that a 'significant portion'" of advertisers interacting with Facebook's targeting interface would "attach importance" to the undisclosed fact that Facebook could deliver ads to users who actually met their targeting criteria an average of ***just 36% to 42%*** of the time. *See Collins*, 202 Cal. App. 4th at 256; Ex. 8 at 5; Ex. 42 at 1; Ex. 39. Facebook ***repeatedly acknowledged*** as much in internal documents. *E.g.*, Ex. 3 at 5; Ex. 30(b) at 3; Ex. 32; Ex. 60. If Facebook disavows those statements now, it can tell that to a jury in due course. The evidence before the Court more than satisfies the permissive standard for certification.[8]

**B.**     **Facebook's Fraudulent Intent Can Be Inferred on a Class-Wide Basis**

Facebook concedes that no individualized proof is needed to establish that it knew, at the highest levels of the company, that it was "showing ads to someone other than the advertisers' intended audience" "more than half the time" and falling far short of "advertisers' interest accuracy expectations."

---

[8] Class members' "knowledge" does not alter the analysis. Facebook's own authority explains that special knowledge matters only where products are "targeted to a ***particular group or type of consumers***, either more sophisticated or less sophisticated than the ordinary consumer[.]" *Patricia A. Murray Dental Corp. v. Dentsply Int'l, Inc.*, 19 Cal. App. 5th 258, 273, (2018) (emphasis added). Ads Manager and Power Editor are plainly not so targeted, and Facebook does not argue otherwise. *Cf. id.* at 275 (product "available only" to licensed dentists).

Ex. 30(b) at 3.  Yet Facebook insists (at 26) there is "no common evidence" of its intent to defraud advertisers.  Facebook is again mistaken.

A "fraudulent state of mind"—including the "intent to induce reliance"—can be "inferred" from the defendant's conduct.  *Engalla v. Permanente Med. Grp.*, 938 P.2d 903, 918 (Cal. 1997) (ellipses omitted).  That is why courts have held that intent presents a "common question" suitable for class-wide resolution.  *Meyer v. Bebe Stores, Inc.*, No. 14-CV-267-YGR, 2016 WL 8933624, at *7 (N.D. Cal. Aug. 22, 2016); *cf. Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 987 (9th Cir. 2011) (intent focuses on the defendant's "state of mind" and so requires no "individual determination").  In *Engalla*, for example, California's Supreme Court held that intent could "be reasonably inferred" from misrepresentations made to "induce" consumers to pay for a service.  938 P.2d at 918.  That is this case.

Facebook claims (at 26) that IMB must show that Facebook "knew with substantial certainty" that "every member of the class would rely" on its misrepresentations.  No.  The language Facebook quotes describes the liability of accountants to third parties for negligent misrepresentations in audit reports.  *See Anderson v. Deloitte & Touche LLP*, 56 Cal. App. 4th 1468, 1477 (1997).  It has nothing to do with the intentional consumer fraud Facebook perpetrated on its advertisers.

**C.      Materiality Is a Common Question and Gives Rise to a Presumption of Reliance**

The obvious materiality of the misrepresentations Facebook made to every class member supports a class-wide presumption of reliance.  *See Mirkin v. Wasserman*, 858 P.2d 568, 575 (Cal. 1993); *Engalla*, 938 P.2d at 919.[9]  Facebook runs through a litany of illusory or irrelevant differences in what class members saw.  But Ninth Circuit precedent is clear that, where the "crux" of class claims is the omission of material information, the class-wide practice of concealment can itself be a "common question of fact" that predominates "'over the exact interaction between individual'" class members and the defendant.  *Mercer Canyon*, 835 F.3d at 1137-38.  Facebook's argument that advertisers would be indifferent to the truth about its accuracy is wholly illogical, refuted by its own documents, and contrary to established law.

---

[9]  Contrary to Facebook's suggestion (at 20 n.9), that presumption encompasses the "reasonableness" of class-wide reliance.  *See, e.g.*, *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1072 (C.D. Cal. 2010) (burden to show "that all class members reasonably relied" met by showing of materiality).

1.   *Each Class Member Saw Substantially the Same Misleading Representations*

Facebook objects (at 21) that class members who used ad agencies or consultants "could not have been 'exposed'" to its lies. ███ of advertisers used ad agencies. Dkt. 170-8 at 61. And, in any event, the California Supreme Court has held that a plaintiff who can show that the defendant made material misrepresentations to his agent—even one acting as the "primary decision maker" in the transaction at issue—is entitled to a presumption of reliance in pressing the resulting fraud claim. *Engalla*, 938 P.2d at 919. So the possibility that some class members delegated targeting to ad agencies does not undercut predominance.

Nor is there any concern here that class members might have missed the misleading statements. Unlike the cases Facebook cites involving statements buried on busy webpages, *e.g.*, *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 900-901 (N.D. Cal. 2015) (representation in a "corner" of the webpage with "a good deal of other information"), the *only* elements visible on the Ads Manager interface are the very features IMB alleges are misleading, Ex. 65 at 30 ("Targeting is responsible for four highly-used interface components."); Ex. 18(a)-(u). And there is no way to complete the targeting process without seeing and interacting with those features. *See Brazil v. Dell Inc.*, No. 07 Civ. 1700 (RMW), 2010 WL 5387831, at *5 (N.D. Cal. Dec. 21, 2010) (class-wide presumption appropriate where misrepresentations were made "at the point of sale as part of a standardized online purchasing process"). Although Facebook shows that *even more* misleading information was just a click away, App. 29-38, the baseline of fraudulent misrepresentations was plainly visible to all class members.[10]

Certainly, class members browsed or searched for and selected different categories. But that makes no difference to IMB's theory of fraud, which relies on how those categories were presented across the board. It "makes no difference to the predominance analysis" that some class members may have "encounter[ed]" the same misrepresentations "in different guises." *In re Hyundai*, 926 F.3d at 560.

---

[10] Facebook claims (at 22, 23) that Prof. Hanssens' survey "confirmed" the lack of class-wide exposure. That is simply not true. By definition, every class member *at a minimum* saw and interacted with the same common core of misrepresentations in the targeting interface. Hanssens' survey, to the extent it is credited, shows that ███████████████████████████████████████████████████████████████ ███████████ | Goodstein Reply Decl. ¶ 80. ████████████████████████████████ *Id.*

1   "'It is the underlying scheme'" to misrepresent and conceal Facebook's abysmal targeting accuracy that

2   matters, not the "'exact wording'" of the interface's elements. *First Alliance*, 471 F.3d at 991.

3          Facebook points out (at 23) that a class definition in a fraudulent omission case must exclude

4   individuals who learned of the "allegedly omitted" information before they made their purchase. *Mazza*,

5   666 F.3d at 596.  That's a given.  Facebook has no evidence that ***anyone*** outside the company knew the

6   omitted information before IMB obtained discovery in this litigation.  And, again, its fight to keep that

7   information under seal shows that it continues to keep the falsity of its representations secret.

8                    2.    *Accuracy Is Obviously and Concededly Material*

9          Facebook argues (at 24) that its misrepresentations would not have been material to advertisers

10  who relied on third parties such as ad agencies.  But this is not like the cases Facebook cites, in which a

11  prescribing physician's informed medical advice about the risks of a drug to a specific patient might

12  "override" a patient's reliance on drug labeling.  *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 134

13  (2009); *see Akkerman v. Mecta Corp.*, 152 Cal. App. 4th 1094, 1100-01 (2007).  Ad agencies, unless

14  they were complicit in the fraud, could not have provided comparably informed advice about the true

15  accuracy of Facebook's targeting to their clients.

16         Facebook claims (at 24) that some advertisers used tools to measure the "effectiveness of their

17  campaigns."  But Facebook does not contend that those tools gave advertisers insight into Facebook's

18  true ***targeting accuracy***.   Indeed, ███████████████████████████████████████

19  ██████   Ex. 3 at 6 (emphasis added); *see* Goodstein Decl. ¶¶37-40.  That makes this unlike the cases

20  Facebook cites (at 24), in which the presence of repeat customers could suggest that a product actually

21  works as promised or that customers know and do not care that it does not.  *See Chow v. Neutrogena*

22  *Corp.*, No. 12 Civ. 04624, 2013 WL 5629777, at *2 (C.D. Cal. Jan. 22, 2013) (repeat purchasers of

23  "anti-wrinkle" products); *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 457 (S.D. Cal. 2014) (long-

24  lasting lipstick).  Here, there is no question that Facebook's targeting does ***not*** work as represented to

25  advertisers and—unlike someone who can see their wrinkles persisting or their lipstick fading—there is

26  no question that advertisers could not have uncovered the misrepresentation themselves.

27         Facebook suggests that advertisers focused on getting people to buy their products or download

28  their apps are agnostic about accuracy.  ████████████████████   ████████████████

████████████████████████████████████████████

████████████ Ex. 97 at 3; Ex. 59 at 8; Pinsonneault Decl. ¶69.   That is not surprising. Facebook's marketing expert, Prof. Hanssens, testified that the value of targeting drops if it is poorly executed.  Ex. 94 at 141:5-25.  And that means money "waste[d]," in Dr. Tucker's words.  Ex. 88 at 681; *see Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 821 (9th Cir. 2019) (failure to disclose defect at purchase injures buyer regardless of product performance).  Small wonder that ████ of advertisers in the proposed class quit Facebook after a year or less.  Riedewald Reply Decl. ¶65.[11]

Changing tack, Facebook suggests (at 25) that targeting accuracy might not have been the predominant consideration behind each class member's decision to buy ads.  The presumption of reliance relieves IMB of any obligation to establish the role that Facebook's lies played in any advertiser's purchasing decision.  *See Engalla*, 938 P.2d at 919 (rejecting defendant's reliance arguments for this reason).  But Facebook's whole value proposition lies in the ability to "select exactly the audience you want to reach."  Ex. 1 at 4.  Indeed, Facebook stresses the "value of targeted ads to businesses" in its public messaging to this day.  Ex. 90.  And even Prof. Hanssens' survey showed that *95%* of advertisers considered targeting in their purchasing decision.  Goodstein Decl. ¶¶77-78.

Against all this, Facebook asserts (at 25) there is "no evidence" that reasonable advertisers would find the truth about its targeting accuracy material.  But Facebook's internal documents confirm that "[a]ccuracy is a *foundational expectation* that advertisers have of the audiences" Facebook "build[s] them," Ex. 65 at 21, and one of the "*basic features* customers expect the product to have," *id.* at 4 (emphasis added).  They warn that "advertisers' *confidence is harmed*" on the rare occasions when Facebook's accuracy appeared out of sync with public data.  Ex. 32 at 1 (emphasis original).   And Facebook's *own research* showed that █████████████████████████ ████████████████████████████ Ex. 3 at 5-6 (emphasis added).

Although Facebook's counsel attempts to discredit these findings as "unscientific," they were based on far more robust surveys than the statistically meaningless Hanssens study Facebook touts. *Compare, e.g.*, Ex. 59 (██████████████████████████████) *with* Part II.C.3, *infra*.   And

---

[11] The class excludes advertisers who *paid* only when a Facebook user actually made a purchase or download in response to an ad. *See* p. 2, *supra*.

Facebook evidently took them very seriously.  It devoted substantial corporate resources to improving accuracy, building a targeting team that included as many as 22 engineers ████████████ ████████████████████████████████ Ex. 98.  And ████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████  Ex. 59 at 1; *see* Pinsonneault Decl. ¶¶ 50-56, 67-72.  The fact is—as Facebook internally admitted time and again—that advertisers "expect" that Facebook "*will only show ads to [their] intended audience*."  Ex. 30(b) at 3 (emphasis added).

                3.     *Facebook's Fatally Flawed "Survey" Cannot Undermine the Obvious Materiality of Its Misrepresentations*

In a desperate effort to avoid what common sense, marketing science, and its own data prove beyond reasonable dispute, Facebook points the Court to a survey designed by Prof. Hanssens, which purports to show that advertisers are "satisfied" with Facebook's targeting.  The survey's results are both irrelevant and scientifically unsound.

First, the fact that an advertiser believes she is "satisfied" does not mean she has not been defrauded.  The question is whether she got what she was promised and paid for.  Hanssens' survey cannot answer that because it never asked how advertisers' attitudes might change if they had known the truth Facebook concealed—that ads based on Partner Categories reached the right audience as little as *4% of the time*, Ex. 46 (emphasis added), that Facebook "kn[e]w for a fact" its behavior categories were "*almost all crap*," Ex. 58 at 1 (emphasis added), or that Facebook executives concealed for years that interest accuracy hovered at *40%*, *see* Ex. 42.  Hanssens did not ask those questions because no reasonable person would give the answer Facebook needs to defeat certification.[12]

Moreover, Hanssens' methodology lacks any scientific credibility.  A statistical comparison of the responses to Facebook's own internal data shows less than a *1 in a million chance* that Hanssens actually reached the population of respondents he intended to.  Goodstein Decl. ¶ 61.  That is not surprising given that Hanssens chose a third-party provider to identify respondents, instead of using Facebook data.  *Id.* ¶¶ 44, 47-48.  Nor did Hanssens take appropriate measures to prevent fraud—a well-

---

[12]  The same flaw renders Facebook's conflicted "testimonials," which the parties address in briefing on IMB's Motion to Strike, wholly irrelevant to the objective question of materiality.

documented issue with online surveys, as Facebook's damages expert confirmed. *Id.* ¶¶43-49; Tucker Dep. at 119:4-16. It shows: **60%** of the 330 responses bear obvious indicia of fraud, including nonsensical or implausible responses, many submitted in astonishingly little time. Goodstein Decl. ¶¶51, 54-57, 58. By Prof. Hanssens' own standard, that leaves too few valid responses to yield *any* meaningful result. *Id.* ¶¶66-69; Hanssens Dep. at 100:3-14. This Court should decline to accord the survey any weight.

### D.   All Class Members Suffered Damages Traceable to Facebook's Accuracy Fraud

Facebook objects that IMB's damages models do not capture every nuance of its accuracy problems. But California law does not require that kind of precision. It "'requires only that some reasonable basis of computation of damages be used,'" even where "'the result reached is an approximation.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). Facebook's refund policy and internal methodologies, which never accounted for the variables Facebook now claims are crucial, offer a reasonable basis for just such an approximation. Facebook's contrary arguments would leave millions of defrauded advertisers without effective redress, simply because Facebook didn't keep more detailed records of its deception.

#### 1.   *Every Class Member Suffered Injury*

Facebook starts by claiming (at 27-28) that whether class members were injured at all, and whether Facebook caused that injury, are individualized questions that defeat predominance. That is wrong. The presumption of reliance takes care of causation. *See* Part C, *supra*. "Fraud damages do not normally correlate with the degree of reliance." *In re Hyundai*, 926 F.3d at 561. And Facebook's own refund policy recognized that advertisers are injured ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. There is no legal or practical basis to speculate about the subjective "value" advertisers placed on accuracy, their "expectations," or their "motivations" when ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the case law agrees.

Facebook objects, without elaboration, that its refund policy involved "individualized assessments." But Facebook's own documents show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Pinsonneault Decl. ¶¶142-144. In response, Facebook offers the declaration of an employee with no firsthand knowledge, ▮▮▮▮▮▮▮▮▮▮▮▮

1   ██████████████████████████████████████████████ App.

2   1345.  There is no basis for that in the record.

3        To the contrary, the evidence shows that the primary consideration was "[w]hat ████

4   were served outside target audience?"  Ex. 67 at 1-2; Ex. 68 at 1 ██████████████

5   ██████████████████████████████;  *see also* Pinsonneault Decl. ¶¶142-144 (collecting

6   examples).  That may be why Facebook improperly withheld documents detailing millions of dollars in

7   refunds under baseless claims of privilege.  Church Decl. ¶4; Exs. 100-102.  And even if Facebook

8   could show that it would not have granted a refund in a particular case, "the possibility that an injurious

9   course of conduct" may "fail to cause injury to certain class members" cannot defeat predominance.

10  *Mercer*, 835 F.3d at 1136.

11        2.   *IMB's Damages Models Isolate the Harm from Facebook's Fraud*

12        ***"Mistakes," "Bugs," and "Experimentation."***   Facebook protests (at 28-29) that IMB's

13  damages model does not account for advertisers who inadvertently selected the wrong targeting criteria.

14  But an advertiser whose ads are shown outside its target audience is not getting what it paid for,

15  regardless of its intentions.[13]  Courts do not ask whether, for example, everyone who bought a box of

16  Raisin Bran with a misleading label actually meant to buy Cheerios.  *See Krommenhock v. Post Foods,*

17  *LLC*, 334 F.R.D. 552, 567 (N.D. Cal. 2020) (certifying (b)(3) class of Raisin Bran purchasers, among

18  others).  No consumer class could ever be certified if they did.  Nor does it make any difference if some

19  ads went to the wrong users because of "bugs" or "experiments."  IMB's model awards damages only

20  for the proportion of ads Facebook *itself* estimates were misdelivered due to targeting inaccuracy.

21        ***Average Accuracy.***   Facebook objects (at 29) that average accuracy rates are imprecise.  But,

22  again, California law permits damages based on "'an approximation.'"  *Pulaski*, 802 F.3d at 989.

23  Here, that approximation is ***Facebook's own***.  *See id.*  And because Facebook concedes there are "no

24  alternative means" for class members to establish the number of ads served to the wrong users, it is an

25  appropriate measure.  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016); Decl. of Jian

26

27  ───────────────
    [13]  IMB has never suggested otherwise.  The passage Facebook rearranges from IMB's amended FAC (at
28  28) simply recites the fact that IMB had earlier decided, before it obtained discovery, not to press a claim
    based on its first campaign.  *See* Dkt. 1 ¶55.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO CERTIFY CLASS
CASE NO. 4:18-CV-05286 PJH-JCS

Yuan ¶5 (determining individual accuracy rates would be "impossible and impracticable").  Facebook can explain any limitations in its data to a jury.  *See Bouaphakeo*, 136 S. Ct. at 1049 (weight of representative evidence is "the near-exclusive province of the jury").  For now, Facebook's unsupported criticism of the data it relied on for *all* of its business needs is not a basis to deny certification.

*"Independent Variables."*  Finally, Facebook argues (at 29-30) that advertisers' damages vary based on the value each advertiser placed on targeting relative to other features of Facebook's platform and the advertiser's subjective expectations.  But the Ninth Circuit has rejected Facebook's "willingness to pay" methodology as a means of calculating fraud damages.  *Compare* Tucker Rept. 49-55 *with In re Hyundai*, 926 F.3d at 561.  After all, "[f]raud damages do not normally correlate with the degree of reliance."  *In re Hyundai*, 926 F.3d at 561.  Once a consumer shows a "threshold level of reliance"—presumed here—it is appropriate to hold Facebook "liable for the [advertiser's] entire loss from the [lower]-than-expected" targeting accuracy.  *Id.*  And that is especially so where that amount "can easily be calculated on an individual basis, as it was" under Facebook's own refund policy.  *Id.*  It cannot be "'arbitrary'" to apply the same policy that Facebook itself used to value misdirected ads for years.  *Pulaski*, 802 F.3d at 988.[14]

### 3.  *The Court Can Certify a Class for Punitive Damages*

Finally, Facebook concedes that a showing of actual injury supports an award of punitive damages even if compensatory damages are too difficult to calculate.  Facebook nevertheless protests (at 31) that it would be entitled to litigate individual defenses in separate proceedings.  But that does not defeat predominance.  *See Bouaphakeo*, 136 S. Ct. at 1045 (predominance unaffected by fact that "'other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members'").  And because the amount of any nominal award would be identical for "each class member," there is "no reason to believe that any individualized hearings would be necessary to determine how to divide up any punitive damages."  *Delarosa v. Boiron*, 275 F.R.D. 582,

---

[14]  Mr. Pinsonneault's model is not to the contrary.  The 10% of revenue he attributes to the value of other features is ████████████████████████; not advertisers' subjective views of Facebook's platform.  *See* Pinsonneault Decl. ¶¶ 107-08.

1  593 (C.D. Cal. 2011); *see Arizona v. ASARCO LLC*, 773 F.3d 1050, 1058 (9th Cir. 2014) ("[I]t is not

2  appropriate to examine the ratio of a nominal damages award to a punitive damages award.").[15]

3  **III.   A CLASS ACTION IS SUPERIOR**

4  IMB's opening brief explained (at 27-29) why a class action is the superior method of holding

5  Facebook accountable for its massive fraud.  Facebook concedes that there is no competing litigation

6  and that it makes sense to "concentrat[e]" these claims in this court.  Fed. R. Civ. P. 23(b)(3)(B), (C).

7  But it asserts (at 32) that some data needed to compute damages does not exist and that some class

8  members may wish to proceed individually.  Neither argument undermines certification.

9  Facebook's database expert does not dispute that calculating damages on a class-wide basis

10  would be vastly more efficient than proceeding case-by-case.  *See* Riedewald Decl. ¶91.  Although he

11  could not identify a single part of his report that he had actually written, Ex. 96 at 53:23-54:19,

12  Facebook's Dr. Madnick says the database is missing information relevant to the class claims, Dkt.

13  170-7 ¶¶43-44.  But Facebook's Dr. Tucker *found and used* that information in her report.  Ex. 95 at

14  99:18-101:11, 107:2-9; Riedewald Reply Decl. ¶¶14-30.  Madnick also claims that ▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Dkt. 170-7 ¶¶48-49.  But

16  all that he appears to mean is that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Riedewald Reply Decl. ¶31.  That is

18  irrelevant to the class definition.

19  For her part, Dr. Tucker says there is no way to determine which criteria were used to serve ads

20  that targeted different categories in the alternative.  But that has no bearing on IMB's damages models.

21  IMB's first model uses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

23  Pinsonneault Decl. ¶¶109-110.  The second model relies on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* ¶¶146-149, 157-159;

25  Ex. 93 at 253:25-256:10.

26

27  [15]  Facebook claims (at 31) that its liability for punitive damages is not a "common" question because it is
supposedly not "'central to the validity'" of the class claims.  Nonsense.  Intent is a common question,

28  *see* Part II.B, *supra*, and it is central to the class claim for punitive damages under Cal. Civ. Code §3294.

The possibility that some advertisers might want to proceed individually is no basis to deny certification where ███████████ are advertisers whose recoveries "would be dwarfed by the cost of litigating on an individual basis." *Wolin*, 617 F.3d at 1175; *see* Riedewald Reply Decl. ¶ 64. The cases Facebook quotes do not say that the presence of "at least some" class members with large claims weighs against certification. They say certification may be inappropriate where "'damages suffered by *each* putative class member are large.'" *Nguyen v. BDO Seidman, LLP*, No. 07 Civ. 01352, 2009 WL 7742532, at *8 (C.D. Cal. July 6, 2009) (emphasis added; brackets omitted); *accord Gonzalez-Tzita v. City of Los Angeles*, No. 16 Civ. 0194 FMO, 2019 WL 7790440, at *8 (C.D. Cal. Dec. 9, 2019) (same). And the option to opt out only weighs in favor of certification. *See, e.g., Lehr v. City of Sacramento*, 259 F.R.D. 479, 484 (E.D. Cal. 2009).

## IV.   THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(2)

IMB's opening brief also established (at 17-18) that IMB's claim for injunctive relief under the UCL satisfies Rule 23(b)(2). Facebook's contrary arguments lack merit.

### 1.   *IMB Has Standing To Seek Injunctive Relief on Behalf of the Class*

The Ninth Circuit has held that a plaintiff can establish an "'actual and imminent'" "threat of future harm" for standing purposes through "plausible allegations" that she "will not purchase [a] product" out of a distrust of its labeling "although she would like to." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969-970 (9th Cir. 2018). Just so here. IMB's principal, Ralph Kidd IV, testified at his deposition that he did not intend to advertise on Facebook "at this time" because he believed he had been defrauded. Ex. 92 at 334:15-19 ("I have had [a] bad experience"). In a declaration submitted with IMB's motion, he explained that "IMB would resume advertising on Facebook" if it "could rely on Facebook's representations concerning its targeting accuracy." Dkt. 156-1.

Facebook urges the Court (at 33) to disregard the declaration as a "sham." But this Court has cautioned that the "sham affidavit" rule should not be used absent a "'clear and unambiguous'" "contradiction" in the declarant's testimony. *Purnell v. Rudolph & Sletten Inc.*, No. 18-CV-01402-PJH, 2019 WL 7020217, at *3 n.2 (N.D. Cal. Dec. 20, 2019). There is nothing like that in this case. Mr. Kidd explained that he would not advertise "at *this* time" because Facebook was untrustworthy. Ex. 92 at

334:15-17 (emphasis added).   His subsequent declaration that he **would** advertise when Facebook **stopped** defrauding people tracks that explanation perfectly.

As a fallback, Facebook argues (at 34) that Mr. Kidd lacks sufficiently "concrete plans" to advertise.  But, again, the Ninth Circuit has already held that testimony just like Mr. Kidd's satisfies Article III.  *See Davidson*, 889 F.3d at 969-970; *In re Coca-Cola Prod. Mktg. & Sales Practices Litig.*, No. 14-MD-02555-JSW, 2020 WL 759388, at *7 (N.D. Cal. Feb. 14, 2020) (standing shown where, after testifying he had not purchased a product since learning it was misleadingly labeled, plaintiff submitted a declaration that he "would consider purchasing" it again if the labeling were changed).  Facebook also points out that IMB has not advertised recently.  But Mr. Kidd testified that IMB sees little benefit from general advertising, so it makes sense that it would hold out for accurate targeting.  Ex. 92 at 211:3-8.

### 2.   *Facebook's Remaining Objections Are Meritless*

Facebook complains (at 34-35) that IMB's UCL claim lacks "uniformity."  But the UCL claim challenges Facebook's practice of concealing the truth about its targeting accuracy.  That is all the uniformity Rule 23(b)(2) requires.  *See Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (certification appropriate where defendant's "practices" are "generally applicable to the class as a whole"); Mot. 18.

Facebook claims (at 35) that certification is inappropriate because some class members have not advertised on Facebook in some time.  But the injunction here would benefit anyone in the market for advertising—not just current Facebook advertisers—by allowing them to make informed purchasing decisions.  And there is no basis in the record to conclude that **any** absent class member has abandoned advertising altogether.  Nor is there any reason to assume that class members who formerly used the now-discontinued partner categories could not benefit from non-misleading information about Facebook's other targeting solutions.  That makes this nothing like the cases Facebook cites, where the requested injunction would provide no benefit to identifiable portions of the class.  *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012) (injunction requiring maintenance on a car could not help "former owners"); *Schulken v. Washington Mut. Bank*, No. 09-CV-02708-LHK, 2012 WL 28099, at *7 (N.D. Cal. Jan. 5, 2012) (change to loan terms could not help former borrowers).

### CONCLUSION

IMB respectfully requests that the Court certify the class.

20

Dated:  April 14, 2021

Respectfully submitted,

By: */s/ Steven F. Molo*
Steven F. Molo
Megan Cunniff Church
Caleb Hayes-Deats
Eugene A. Sokoloff
Lauren F. Dayton
Leonid Grinberg
**MOLOLAMKEN LLP**

By: */s/ Jordan L. Lurie*
Jordan L. Lurie
Ari Y. Basser
**POMERANTZ LLP**

By: */s/ Joshua E. Fruchter*
Joshua Elazar Fruchter
**WOHL & FRUCHTER LLP**

*Counsel for Plaintiff and the Proposed Class*

21